**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Patriot National, Inc. Securities Litigation | Master File No. 1:17-cv-01866-ER<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 6

IV. RELEVANT NON-PARTIES .......... 9

V. CLASS ACTION ALLEGATIONS .......... 10

VI. OVERVIEW OF DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 12

A. Background .......... 12

B. 2003—Mariano Acquires GIC Through Patriot National's Predecessor .......... 12

C. January 2015—The Patriot National IPO .......... 16

D. Q1-Q3 2015—Mariano Uses The IPO Proceeds To Enrich Himself And His Associates .......... 17

E. October 2015—Patriot National Announces a Secondary Offering as Pretext for Mariano to Dump his Shares and Raise Money for GIC .......... 20

F. Q4 2015—Mariano Secures A PIPE Transaction To Create Liquidity For GIC .......... 21

G. December 2015—The PIPE Transaction Backfires And Threatens Mariano's Control Of Patriot National .......... 24

H. Q1 2016—Mariano Causes Patriot National To Launch A Repurchase Program To Help Him Maintain Control Of The Company .......... 26

I. April 2016—The PIPE Investors Attempt To Exercise The Warrants And Are Rebuffed .......... 29

J. Q2 2016—Mariano Uses The Strategic Review To Further His Interests .......... 31

K. August 2016—The Ebix Offer .......... 32

L. Q3 2016—Mariano Causes Patriot National To Enter Into A Leveraged Recapitalization For His Own Benefit .......... 36

M. December 2016—A Court Shuts Down The Leveraged Recapitalization ........... 41

N. Q1 2017—Mariano Causes Patriot National To Bail Out GIC ............................ 41

O. Q2 2017—The BDO Investigation Begins ......................................................... 42

P. April 2017—Patriot National Sells Global HR For A Substantial Loss............... 42

Q. April 2017—Cerberus Extends Filing Deadline For Audited Financials ............. 43

R. April 2017—Patriot National Gains New Board Members .................................. 44

S. May 2017—Cerberus Again Extends Filing Deadline For Audited Financials ... 45

T. May 2017—O'Brien Resigns From Board ......................................................... 45

U. May 2017—Patriot National Form A Special Committee To Review Strategic Alternatives ........................................................................................................ 45

V. July 2017—Mariano Resigns................................................................................ 46

W. July 2017—Cerberus Again Extends Filing Deadline For Audited Financials.... 47

X. August 2017—The Findings Of The BDO Investigation Are Revealed ............. 47

Y. August 2017—Shields Resigns From The Board ............................................... 51

Z. August 2017—GIC Falls Under The Administrative Supervision Of The FOIR. 52

AA. September 2017—Patriot National Warns Of NYSE Delisting Risk ................... 53

BB. November 2017—GIC Is Put Into State Receivership ........................................ 53

CC. November 2017—Patriot National Discloses That GIC Is In Receivership And That Bankruptcy Is Imminent ............................................................................ 54

DD. November 2017—Patriot National Announces Its Intent To File For Bankruptcy ........................................................................................................... 55

VII. MISREPRESENTATIONS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ......................................................................................................................... 57

A. The January 15, 2015 Registration Statement Was Materially False and Misleading.......................................................................................................... 57

B. The 2014 10-K Issued March 31, 2015, Contained False And Misleading Statements ........ 67

C. The Company Q1 2015 10-Q Was False And Misleading ........ 78

D. The Q2 2015 10-Q, Issued August 14, 2015, Was False And Misleading ........ 87

E. The Secondary S-1 Filed October 15, 2015 Was False And Misleading ........ 96

F. The Q3 2015 10-Q Issued November 12, 2015, Was False And Misleading ........ 105

G. The Company Misrepresented The PIPE Transaction In An Announcement Dated December 14, 2015 ........ 114

H. The Company Misrepresented The Amended PIPE Transaction In An Announcement Dated December 23, 2015 ........ 116

I. The Company Issued A Press Release On February 29, 2016, Containing A Misleading Strategic Initiatives Update ........ 118

J. The Company Announced The Repurchase Program On March 7, 2016 ........ 119

K. The Company's 2015 Annual Report Filed March 21, 2016, Was False And Misleading ........ 121

L. The Company Issued A Misleading Press Release On April 7, 2016 ........ 134

M. On May 12, 2016, The Company Issued Its Q1 2016 10-Q and A Press Release, Both Of Which Were Misleading ........ 135

N. On August 15, 2016, The Company Issued Its Q2 2016 10-Q and A Press Release, Both Of Which Were Misleading ........ 145

O. On October 21, 2016, Patriot National Filed A Misleading Form 8-K ........ 156

P. Patriot National Issued A Misleading Press Release On November 8, 2016 ........ 157

Q. On November 14, 2016, Patriot National Issued The Q3 2016 10-Q And Press Release, Both Of Which Were Misleading ........ 159

R. On March 3, 2017, The Company Filed A Misleading Form 8-K Regarding The GIC Bailout ........ 175

S. On March 14, 2017, The Company Filed A Misleading Form 8-K Regarding Its 2016 Financial Performance ........ 178

T. The Company Filed A Misleading Form NT 10-K On March 17, 2017 ............ 183

U. On April 4, 2017, The Company Misled The Market Regarding Cerberus' Extension Of The Company's Filing Deadline ............ 185

VIII. LOSS CAUSATION AND DEFENDANTS' CORRECTIVE DISCLOSURES ............ 186

A. October 5, 2015 ............ 186

B. December 14-15, 2015 ............ 187

C. October 24, 2016 ............ 188

D. November 9, 2016 ............ 189

E. December 12, 2016 ............ 189

F. March 6, 2017 ............ 190

G. March 14-15, 2017 ............ 191

H. March 17, 2017 ............ 192

I. November 22, 2017 ............ 193

J. November 29, 2017 ............ 194

IX. UNDISCLOSED ADVERSE FACTS ............ 195

X. SCIENTER ALLEGATIONS ............ 196

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............ 197

XII. COUNTS ............ 199

COUNT I ............ 199

COUNT II ............ 208

XIII. PRAYER FOR RELIEF ............ 209

XIV. JURY TRIAL DEMANDED ............ 210

Co-Lead Plaintiffs ODS Capital LLC, Barry A. Smith, and Sunil Shah, and named Plaintiff Adam Kayce ("Plaintiffs") by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Patriot National, Inc., ("Patriot National" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of public documents, press releases, and media reports issued by and disseminated by Patriot National; (c) review of public information filed in a stockholder derivative class action captioned *Wasik, et al. v. Mariano, et al.*, C.A. 12953-VCL (Del. Ch.) (the "Wasik Derivative Action"); and (d) review of other publicly available information concerning Patriot National. Plaintiffs believe that further substantial evidentiary support exists for the allegations set forth herein, which will be obtained in discovery.[1]

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of all individuals and entities (the "Class") that purchased or acquired Patriot National's securities between January 15, 2015, and

[1] This Consolidated Amended Class Action Complaint is being filed pursuant to (1) the Court's October 12, 2017 Order consolidating *Gingello v. Patriot National, Inc.*, Case No. 1:17-cv-01866 (S.D.N.Y.) and *Kayce v. Patriot National, Inc.*, No. 17-cv-07164 (S.D.N.Y) (Dkt. 31), and (2) the Court's September 18, 2018 Order (a) lifting the stay in *In re Patriot National, Inc. Securities Litigation*, Master File No. 1:17-cv-01866-ER, (b) permitting Co-Lead Plaintiffs to file a consolidated amended complaint, and (c) adjourning defendants' obligation to respond to the amended complaint (Dkt. 72). As the Court is aware, Co-Lead Plaintiffs have moved to intervene in the related *McIntire v. Mariano*, 18-cv-60075-BB (S.D. Fla.) action and have that action transferred to this Court. If the *McIntire* court grants Co-Lead Plaintiffs' motion, Co-Lead Plaintiffs will seek (1) to have *McIntire* consolidated into this action, and (2) this Court's leave to file an additional amended complaint to effectuate that consolidation.

November 28, 2017, inclusive (the "Class Period"), seeking remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendants, led by Steven M. Mariano ("Mariano"), Patriot National's controlling stockholder and former Chairman, President, and Chief Executive Officer ("CEO"), perpetuated a multi-year fraud on the public that ultimately led to the demise of two companies and cost investors millions of dollars. From the moment Patriot National sold shares to the public in its IPO on January 15, 2015, Defendants misrepresented Patriot National and its business to enrich Mariano and other Company insiders at the public's expense.

3. Defendants intentionally withheld information regarding the financial health of Patriot National's most important customer, Guarantee Insurance Company, Inc. ("GIC"), a company controlled by Mariano. Defendants failed to disclose that GIC—which was responsible for 60% to 70% of Patriot National's income and revenue—was on the brink of failure before and throughout the Class Period.

4. GIC was only able to avoid insolvency due to repeated loans and capital contributions from Mariano. Mariano sustained GIC and funded his own lavish lifestyle with money extracted from Patriot National, which Mariano was able to obtain thanks to his position as controlling shareholder, CEO, Chairman, and President of Patriot National.

5. Mariano repeatedly abused his power over Patriot National to benefit himself, GIC, and his friends. Mariano caused Patriot National to, *inter alia*: (1) acquire his and his friends' companies; (2) overpay for contracts with GIC; (3) enter into a number of self-interested and unfair transactions and take other corporate actions primarily for the benefit of him and GIC; (4) fail to accept an eminently reasonable and beneficial offer to buy the Company for $475 million; and (8) bail out GIC with a direct payment of $30 million.

6. Mariano and the Board kept investors in the dark regarding GIC's financial issues and the risk GIC's precarious position posed to Patriot National. For example, throughout the Class Period, Patriot National fully recognized revenue from its contracts with GIC even though it had no reasonable expectation of being paid in full. In fact, Patriot National's receivable from GIC grew from $2,137,140 as of December 13, 2013, to $46,757,000 as of December 31, 2016 (the "GIC Receivable"). Yet at no point during the Class Period did Patriot National make any meaningful allowance for the doubtful recovery of the GIC Receivable.

7. GIC was forced into receivership by the Florida Office of Insurance Regulation ("FOIR") on November 13, 2017 with the GIC Receivable unpaid. It will likely never be repaid because those funds have been siphoned by Mariano and his cohorts and are now gone.

8. Defendants misrepresented other material aspects of Patriot National's business as well, including its adherence to its publicly disclosed Policy Regarding Transactions with Related Persons. During the Class Period, defendants caused Patriot National to enter into numerous transactions with entities controlled by Mariano, his associates, or other members of Patriot National's board of directors (the "Board"). These transactions were on terms favorable to Mariano and/or his associates and harmed Patriot National and its public shareholders.

9. Mariano, Patriot National's management, and the Board pursued numerous transactions designed to help Mariano and other insiders at Patriot National's expense. For instance, Patriot National announced a secondary offering in October 2015 with the hidden purpose of generating funds to transfer to GIC so that it could meet its capital requirements. When that secondary offering failed and the market reacted negatively, in December 2015, Patriot National arranged a private placement to generate $30 million in proceeds for Mariano but nothing for the Company. Mariano used a substantial part of these proceeds to prop up GIC

(and pay the note on his mega-yacht). The failed secondary offering and private placement caused Patriot National's stock price to decline substantially, from $16.11 to $5.34.

10. Similarly, Patriot National later used corporate funds to engage in a share repurchase program and leveraged recapitalization, both of which were designed to meet Mariano's liquidity needs while enabling him to maintain control of Patriot National. The Board was complicit in these acts. Before a Board call on the proposed leveraged recapitalization on October 21, 2016, members of the Board exchanged emails including this observation:

> In my mind (unless there is something that I am totally missing), we are being asked to refi the company's debt at an interest rate that is 220% higher than the current interest rate and pay $11+ million in fees for the opportunity and then pay out $100 million. Net, net we are being asked to approve borrowing money to payout money to shareholders (*i.e.* to solve Steve's personal financial problems). This is lunacy!

After the Board meeting, the exchange continued:

> My only disappointment is that Steve did not 'put his cards on the table' re: his GIC capitalization challenge, which we will need to press him on next time we all talk. I think Jack heard the threat of losing us as board members and Steve has come to grips with the impact of that possibility (at least for now).

11. Mariano also blatantly lied to the public about strategic alternatives the Board was purportedly exploring. For example, after Mariano stated that Patriot National had rejected Ebix, Inc.'s offer to acquire Patriot National for $475 million, Ebix's Chief Executive Officer responded: "[Mariano] is a complete liar - we disengaged not him and our offer was not $475 million - we reduced along the way. It defies any ethics. He did the release to create a negative event into a fake positive event."

12. By 2017, however, the true impact of Mariano's self-interested and fraudulent schemes were coming to light. For example, on March 3, 2017, Patriot National revealed that Mariano, after failing to extract the funds he needed through other means, had extorted Patriot

National into making a $30 million cash payment to GIC. This payment was made only because Patriot National's future depended on GIC using these funds to stay afloat. On this news, Patriot National's stock price dropped from $4.39 to $3.67 per share.

13. But that payment was not enough to save GIC. On November 22, 2017, Patriot National finally announced that GIC had been taken into state receivership and Patriot National may no longer be able to operate as a going concern. On this news, Patriot National's stock price fell $1.06 to $0.36 per share.

14. Immediately after GIC went into receivership Patriot National announced that it intended to file for bankruptcy. On January 30, 2018 (the "Petition Date"), the Company filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Company has also filed a plan of reorganization ("Plan") consistent with the restructuring contemplated by the restructuring support agreement ("RSA") among the Company and its lenders.

15. Patriot National's stock, which was sold to the public at $14.00 per share in its IPO in January 2015, is now worthless, as the RSA and Plan wipe out all existing equity and leave stockholders with nothing.

16. Mariano took Patriot National public to tap into a new source of cash to fund his lavish lifestyle and support his private company. Defendants' misrepresentations induced the public to invest in a company that, by all legitimate metrics, was destined to fail. Defendants' fraud prevented investors from understanding the true risks of the investment, which would have caused a reasonable investor to avoid Patriot National. Patriot National's demise was the inevitable materialization of risks concealed by Defendants, which caused investors to lose millions of dollars.

17. As a result of these wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's shares are actively traded in this Judicial District.

21. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

22. Lead Plaintiff Barry A. Smith, as set forth in his previously-filed certification (Dkt. 16-3), incorporated by reference herein, purchased Patriot National securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23. Lead Plaintiff Sunil Shah, as set forth in his previously-filed certification (Dkt. 16-4), incorporated by reference herein, purchased Patriot National securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24. Lead Plaintiff ODS Capital LLC, as set forth in its previously-filed certification (Dkt. 8-2), incorporated by reference herein, purchased Patriot National securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25. Plaintiff Adam Kayce, as set forth in his previously-filed certification (1:17-cv-07164, Dkt. 1 at 33), incorporated by reference herein, purchased Patriot National securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26. Defendant Patriot National, Inc., is incorporated in Delaware and its headquarters are in Fort Lauderdale, Florida. Before it was delisted on December 13, 2017, Patriot National's common stock traded on the New York Stock Exchange ("NYSE") under the symbol "PN."

27. Defendant Steven M. Mariano founded Patriot National, and served as Patriot National's Chairman, President, and CEO from its reorganization in November 2013 until his resignation on July 12, 2017. Mariano is Patriot National's controlling stockholder, purportedly holding 54.5% of Patriot National's outstanding shares as of November 14, 2016.

28. Defendant Thomas C. Shields ("Shields") served as Patriot National's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer from September 2014 until his resignation in September 2017.

29. Christopher Pesch ("Pesch") served as Patriot National's Executive Vice President, General Counsel and Chief Legal Officer from September 2014 until March 10, 2017, when he was forced to resign.

30. Defendants Mariano, Shields, and Pesch (collectively the "Officer Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Patriot National's reports to the SEC, and oversaw press releases and presentations to securities analysts, money and portfolio managers and institutional investors—*i.e.*, the market. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public market, and that the positive representations being made were materially false and/or misleading. The Officer Defendants are liable for the false statements pleaded herein.

31. Defendant John "Jack" R. Del Pizzo ("Del Pizzo") joined the Board in June 2014, and serves as the "Lead Director." Del Pizzo and Mariano have known each other for over twenty years.

32. Defendant Austin J. Shanfelter ("Shanfelter") joined the Board in June 2014 and served until he resigned on October 17, 2016, allegedly due to health reasons. While serving on the Board, Shanfelter was the Chair of the Board's audit committee (the "Audit Committee") and a member of the nominating and corporate governance committee (the "Nominating and Corporate Governance Committee").

33. Charles H. Walsh ("Walsh") was a member of the Board from January 2015 until he was removed by Mariano on March 30, 2017. While serving on the Board, Walsh was a member of the Board's compensation committee (the "Compensation Committee") and Audit Committee, and the Chairman of the Nominating and Corporate Governance Committee.

34. Quentin P. Smith ("Smith") was a member of the Board from January 2015 until he was removed by Mariano on March 30, 2017. While serving on the Board, Smith was a member of the Audit Committee, the Nominating and Corporate Governance Committee, and the Chairman of the Compensation Committee.

35. Michael J. Corey ("Corey") joined the Board in January 2016. While serving on the Board, Corey was a member of the Nominating and Corporate Governance Committee and the Compensation Committee.

36. Defendants Mariano, Shields, Pesch, Del Pizzo, Shanfelter, Walsh, Smith, and Corey are collectively referred to herein as the "Individual Defendants."

## IV. RELEVANT NON-PARTIES

37. Guarantee Insurance Group ("GIG") is a Delaware corporation with headquarters located at 401 East Las Olas Boulevard, Suite 1540, Fort Lauderdale, Florida. GIG, formerly known as Patriot National Insurance Group, Inc., is the parent company of GIC. Mariano controls GIG and owns 97% of the company. GIG owned 3,950,000 shares of Patriot National stock as of December 21, 2016, which are beneficially owned and reported by Mariano.

38. GIC provided workers' compensation insurance in over 31 states and the District of Columbia, and offered guaranteed cost and alternative market solutions with a specific expertise in segregated portfolio captives and risk-sharing insurance programs. GIC owned 1,936,535 shares of Patriot National stock as of December 21, 2016. On November 17, 2017,

GIC was placed into state receivership for, among other things, failing to maintain sufficient capital and falsifying financial records.

39. Edward Snow is a long-time friend and business associate of Mariano. On February 23, 2016, Snow filed a Form 13-G with the SEC, disclosing that he owned 1,579,166 Patriot National shares, representing 5.6% of Patriot National voting power. Snow has not made any public filings concerning his ownership of Patriot National securities since that filing.

40. Del Pizzo & Associates is a tax and accounting firm owned by Del Pizzo. Allegedly, and in spite of the fact that BDO is Patriot National's public auditor, Del Pizzo & Associates provides tax advisory services to the Company. Patriot National paid Del Pizzo & Associates $109,000 and $185,100 in 2014 and 2015, respectively. In 2016, the Company increased its payments to Del Pizzo & Associates significantly, agreeing to pay a total of $400,000 for what appear to be the same services. Del Pizzo & Associates also received compensation from GIC on an hourly basis.

## V. CLASS ACTION ALLEGATIONS

41. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all individuals and entities that purchased or acquired Patriot National's securities between January 15, 2015, and November 28, 2017, inclusive.

42. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Patriot National's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Patriot National or its transfer agent and

may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon completion of the IPO, Patriot National had approximately 26,390,415 outstanding shares of common stock. As of November 14, 2016, Patriot National had 26,856,799 outstanding shares of common stock. Upon information and belief, these shares are held by thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

43. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

44. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

45. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Patriot National; and

c. to what extent the members of the Class have sustained damages and the proper measure of damages.

46. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. OVERVIEW OF DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. Background

47. Patriot National purportedly provides technology-enabled insurance and employer solutions. According to the Company, it principally offer two types of services: front-end services, such as brokerage, underwriting and policyholder services, and back-end services, such as claims adjudication and administration. The Company claims that its products and services help insurance carriers, employers and other clients mitigate risk, comply with complex regulations, and save time and money.

### B. 2003—Mariano Acquires GIC Through Patriot National's Predecessor

48. As a Florida insurance company, GIC is regulated by the Florida Office of Insurance Regulation ("FOIR") and is subject to annual capital requirements. Each year by March 1, regulated insurance companies must file financial statements with the FOIR, reporting their solvency and risk-based capital at the end of the past calendar year. An insurance company's financial information must satisfy certain criteria, such as risk-based capital ratios. An insurer that does not satisfy the criteria may be put into receivership.

49. Under Mariano's control, GIC continually struggled to meet the requirements of the FOIR and adhere to basic principles of corporate governance.

50. In March of 2008, the FOIR retained an independent accounting firm "to conduct a target financial condition Examination (target examination) of [GIC]" to "review the compliance by [GIC] with the findings in the Report on Examination as of December 31, 2006,

which was dated August 10, 2007, and the directives in Consent Order #93640-07-CO, dated March 11, 2008, (Consent Order)."

51. This examination found numerous deficiencies in GIC's compliance with applicable laws and regulations, primarily with those concerning related party transactions, including:

a. GIC did not have sufficient "procedures to ensure that payments to affiliates are within the terms of the underlying contracts and that advances to affiliates are in accordance with" applicable laws and regulations;

b. Mariano and GIC engaged in numerous improper practices related to GIC's payment of taxes on behalf of several affiliates and Mariano-controlled holding companies, in violation of applicable laws and regulations;

c. The examination was unable to verify at least one general ledger account and offsetting receivable/liability balances due between Mariano-controlled affiliates, in violation of applicable laws and regulations; and

d. GIC was unable to satisfy a request from the FOIR to "provide supporting detail for this account" for "documentation to support [the $2,021,301 liability for Policy Fees Pass-Through Payable it reported in its 2007 Annual Statement], explain [GIC's] method for billing and collecting of these fees, provide documentation granting [GIC] authority to pass these fees on to policyholders and demonstrate how and when these fees will be paid to the taxing authority."

52. The examination concluded: "We are concerned with [GIC's] apparent inability to control and reconcile this account and recommends [GIC] establish or improve accounting controls over the collection of policy fees and the payment of these fees to taxing authorities."

53. In 2011, the FOIR conducted another independent examination of GIC covering the period from January 1, 2007, through December 31, 2010. After its examination, the FOIR found that GIC had again failed to comply with affiliated party transaction requirements. In particular, the FOIR found that GIC's services agreement with "with Patriot Recovery, Inc. was not in compliance with SSAP No. 96 [Settlement Requirements for Intercompany Transactions] in that it did not contain provisions for a timely settlement of accounts involved nor did it contain

a specific due date for those amounts." The FOIR also found that "[GIC] did not maintain written agreements with certain affiliated persons, entities and/or related parties as required by paragraph 15 of Florida Consent Order 88129-06, filed December 29, 2006. The affiliated parties lacking written agreements consisted of: Patriot National Insurance Group, Inc. ("PNIG"), Patriot General Agency, and Del Pizzo & Associates."

54. As of the date of FOIR's 2011 report, Mariano owned PNIG, which in turn owned 100% of Patriot General Agency and GIC. PNIG and Patriot General Agency provided insurance services to GIC, which wrote the underlying insurance policies.

55. In November 2013, Mariano incorporated Old Guard Risk Services, Inc. ("Old Guard") to reorganize certain insurance services entities that he controlled. This reorganization separated the insurance services business (which would become Patriot National) from the insurance risk-taking operations of GIC. After the reorganization, Mariano owned substantially all of the outstanding equity of GIC and a majority of Patriot National's outstanding equity.

56. In every year since 2007, GIC had reported annual operating losses, and by 2013 GIC's business was in trouble. GIC reported $22.3 million and $16.7 million in net underwriting losses, in 2012 and 2013, respectively. In 2014, GIC had $17.43 million in underwriting losses and a total net income loss of $26 million.

57. In order to keep GIC solvent and comply with FOIR's capital requirements, Mariano pumped tens of millions of dollars into GIC each year. Mariano often raised capital for GIC (and to support his lavish lifestyle) by saddling Patriot National (and its predecessor entity and affiliates) with debt and using the proceeds to fund GIC.

58. For example, on November 27, 2013, Mariano caused Old Guard to enter into a $42 million loan agreement with PennantPark Investment Corporation ("PennantPark"). Mariano

pledged his shares in Old Guard to PennantPark as security for the loan. A portion of the proceeds of the loan went to repay an existing $10 million loan; approximately $28.3 million went to GIC to ensure that it met its year-end capital requirement.

59. Mariano used a similar tactic to ensure that GIC met FOIR's year-end capital requirements in 2014. On August 6, 2014, Mariano caused Old Guard to borrow $87.8 million by: (1) causing Old Guard to amend the PennantPark loan to borrow an additional $30.8 million, increasing the loan's principal balance to approximately $68.6 million (the "Amended PennantPark Loan"); and (2) causing Patriot National to enter into another $57 million credit facility with UBS as lead arranger (the "UBS Loan," and together with the Amended PennantPark Loan, the "August 2014 Loans"). The UBS Loan was secured by the common stock of PCM Management, Inc. ("PCM"), a wholly owned subsidiary of Old Guard, and guaranteed by GIG and its wholly owned subsidiaries. The Amended PennantPark Loan continued to be secured by Mariano's Old Guard common stock.

60. Mariano used the proceeds of the August 2014 Loans to provide cash to himself and GIC. On August 6, 2014, Mariano caused Old Guard to enter into two transactions, one with GIG to acquire certain assets and assume certain liabilities of Guarantee Underwriters, Inc. ("GUI") (the "GUI Acquisition") and one with MCMC LLC ("MCMC") to acquire a company that later came to be known as Patriot Care Management, Inc ("PCM") (the "PCM Acquisition").

61. In connection with the GUI Acquisition, Old Guard acquired certain contracts to provide marketing, underwriting, and policyholder services to certain of its insurance carrier clients, as well as related assets and liabilities, from a subsidiary of GIG. Old Guard also acquired a contract to provide a limited subset of its brokerage and policyholder services to GIC. Immediately following the GUI Acquisition, Old Guard entered into a new agreement to provide

all of its brokerage and policyholder services to GIC. In total, Mariano transferred $55.1 million to GIC in connection with the GUI Acquisition.

62. In the PCM Acquisition Mariano simply used Old Guard to enrich himself and his friends. Mariano caused Old Guard to purchase a nurse case management and bill review services business from MCMC in exchange for 3,043,485 shares of Old Guard common stock. All of that stock went to the holders of the MCMC preferred equity: Mariano, Del Pizzo (and his wife), Shanfelter, Pesch, two other Old Guard executives, and other Company insiders. Those 3,043,485 shares of common stock were worth approximately $42.6 million at the time of the IPO.

63. Patriot National recorded approximately $49.432 million in goodwill in connection with the GUI Acquisition and PCM Acquisition.

64. In September 2014, Old Guard changed its name to Patriot National, Inc.

**C. January 2015—The Patriot National IPO**

65. As the end of 2014 neared, Mariano again found he needed to find cash to cover GIC's losses. With Patriot National already saddled with debt, Mariano turned to the public markets.

66. On December 16, 2014, Patriot National filed a registration statement with the SEC for its initial public offering of common stock.

67. On January 6, 2015, Patriot National filed an amended registration statement with the SEC.

68. On January 14, 2015, Patriot National filed the final version of the registration statement with the SEC, which was declared effective on January 15, 2015 (the "Registration Statement"). On January 20, 2015, Patriot National filed with the SEC a prospectus for its IPO (the "Prospectus").

69. In connection with the IPO, Mariano also entered into a customary lock-up agreement, which prohibited him from selling or pledging his Patriot National shares within 180 days of the IPO (*i.e.*, July 17, 2015).

70. On January 15, 2015, Patriot National went public, offering 7,350,000 shares of its common stock at $14 per share, raising $102.9 million.

71. Prior to the IPO, Mariano owned 15,352,170 shares, representing 84.9% of Patriot National's voting power. After the IPO, Mariano continued to own the same amount of shares but controlled only 60% of outstanding shares.

### D. Q1-Q3 2015—Mariano Uses The IPO Proceeds To Enrich Himself And His Associates

72. Immediately following the IPO, Patriot National entered into a new senior secured credit facility with BMO Harris Bank N.A., an affiliate of BMO Capital Markets Corp. (together, "BMO"), as administrative agent, comprised of a $40.0 million revolving credit facility and a $40.0 million term loan facility (the "BMO Credit Agreement"). Over the course of 2015, Patriot National obtained several amendments to the BMO Credit Agreement, increasing the term loan by an additional $50 million in term loans, and obtaining the ability to increase the add-on loan by $50 million.

73. Patriot National used a portion of the proceeds from the BMO Credit Agreement and the IPO to repay the August 2014 Loans. As a result of repaying the PennantPark Loan, Pennant Park released Mariano's pledged Patriot National shares.

74. Mariano used the remaining proceeds from the BMO Credit Agreement and IPO to further enrich himself and his associates by causing Patriot National to purchase his and his associates' businesses even though there was no reasonable business case for doing so.

75. On February 5, 2015, Patriot National purchased 98.8% of the membership interests in DecisionUR, LLC, for $2.2 million in cash from Six Points Investment Partners, LLC, a Mariano-owned company operating out of Patriot National's offices. Mariano received all of the proceeds from the sale.

76. On February 12, 2015, the Board approved Patriot National's acquisition of Vikaran Solutions, LLC ("Vikaran"), a company in which Mariano held a 45% interest, for $8.5 million in cash. Patriot National also agreed to purchase Mehta and Pazol Consulting Services Private Limited for approximately $1.5 million. Mariano received $3.8 million from the acquisition of Vikaran and $749,850 from the acquisition of Mehta and Pazol Consulting Services Private Limited.

77. Patriot National also acquired three companies from Snow, Mariano's longtime friend and business associate.

78. On April 2, 2015, Mariano caused Patriot National to acquire Hospitality Supportive Systems, LLC ("HSS") and Selective Risk Management ("Selective") from Snow for a maximum of $9.65 million and $3.846 million, respectively. The acquisition agreements for HSS and Selective provided for contingent earn-out payments of $4.045 million and $1.923 million as part of the maximum payouts, respectively, based on the companies reaching specified EBITDA thresholds over the 12-month period following the acquisitions. On May 14, 2015, however, Patriot National accelerated the earn-out periods and paid Snow the maximum earn-out possible, a total of $6 million. Accelerating the earn-out payments ensured that those payments could not be clawed back if either company failed to achieve its EBITDA thresholds.

79. Following the acquisition of HSS, Mariano let Snow remain in control of HSS's cash distributions. Snow used this control to withhold payments to Patriot National's customers

and partners, which ultimately resulted in considerable liabilities for Patriot National.

80. On June 15, 2015, Patriot National entered into two transactions with another company owned by Snow, Carman Corporation ("Carman"), for a total of $4 million. In addition, on October 29, 2015, Patriot National, through one of its subsidiaries, entered into an agreement with Carman, pursuant to which Carman would provide Patriot National with certain market-finding and consulting activities in exchange for an upfront payment of $2 million.

81. On July 21, 2015, Patriot National acquired Global HR, a company owned by Shanfelter, a Patriot National director, for $24 million in cash and $18 million in Patriot National stock. Patriot National had no need to purchase Global HR, and, in fact, had to create a new division to account for Global HR.

82. Only one year after it was acquired Mariano began trying to sell Global HR, which he described as a "noncore" and "underperforming" asset. As discussed below, two years after the acquisition, Patriot National sold Global HR for a substantial loss.

83. In addition to this self-interested buying spree, Mariano also awarded gratuitous cash bonuses to himself and his associates. In 2015 alone, Mariano and the Board's Compensation Committee distributed approximately $1.7 million in "M&A Bonuses," with Mariano receiving $700,000, Shields receiving $338,983, and Pesch receiving $92,072.

84. Mariano dictated the terms of his bonus, telling Shanfelter via email on October 26, 2015, that: "I have decided to take a bonus for 2015 . . . I will take it this week[.] No stock is necessary[.]" Shanfelter responded that Mariano's demand was "no problem" and suggested that they "should look at [his] year end bonus as well[, as] [t]his way we could approve this interim bonus tied to a larger year end one." On October 28, 2015, the Compensation Committee approved a $700,000 bonus for Mariano—right after he sent another email stating that he would

"rather just take 700 k bonus and the rest in stock[.]"

85. Mariano did not limit the M&A Bonuses to Company management. Despite not being an officer of Patriot National, Snow also received an M&A Bonus of at least $65,000.

**E. October 2015—Patriot National Announces a Secondary Offering as Pretext for Mariano to Dump his Shares and Raise Money for GIC**

86. As mentioned above, in connection with the IPO Mariano entered into a customary lock-up agreement that prevented him from offering, selling, contracting to sell, pledging or otherwise disposing of, directly or indirectly, Patriot National common stock until July 17, 2015.

87. During the lock-up period, Mariano's cash needs (and desires) grew exponentially. On March 11, 2015, Mariano purchased a $37 million, 187 foot yacht. Lacking the funds to buy the yacht outright, Mariano took out a $32.3 million loan (the "Yacht Loan") from Fifth Third Bank ("Fifth Third") and delivered a $5 million promissory note to the seller, Douglas Von Allmen (the "Von Allmen Note"). Douglas Von Allmen is Mariano's friend and was the second-largest Patriot National stockholder.

88. Pursuant to the Yacht Loan, commencing July 31, 2015, Mariano pledged $50 million in Patriot National common stock to Fifth Third as collateral. The Yacht Loan also required that GIC maintain a risk-based capital ratio of at least 200%.

89. The Yacht Loan was scheduled to mature on March 11, 2020, and the Von Allmen Note was scheduled to mature on September 30, 2015.

90. To help cover his immediate expenses, Mariano took out a $12.5 million revolving note on August 12, 2015. Under the terms of this note, Mariano was required to maintain at least $10 million worth of liquid assets or marketable securities as collateral. Patriot National stock held as collateral, however, was discounted by 35% to 75%.

91. To satisfy his cash needs and ensure that GIC would meet its annual capital requirements, Mariano caused the Board to approve a secondary offering that would allow him to get around the lock-up restrictions and cash out shares of Patriot National. On October 5, 2015, Patriot National filed a Form S-1 registration statement with the SEC for a secondary offering of common stock (the "Secondary Offering") through which Mariano intended to sell an undisclosed number of his shares.

92. The market reacted poorly to news of the Secondary Offering. Patriot National's stock opened at $16.15 per share on October 5, 2015, and closed at $14.72. The following day its stock closed at $13.61. On October 15, 2015 (the date that the number of shares to be sold was announced), Company stock fell to $14.72 per share, an overall drop of 13.8%, on unusually heavy volume.

93. But Mariano's cash needs were paramount. He ignored the market's reaction to the Secondary Offering and pushed forward. On October 15, 2015, Patriot National amended the S-1 to disclose that the Secondary Offering would total $80 million, comprised of a $55 million stock sale by Patriot National and a $20 million stock sale by Mariano. Patriot National's stock price continued to fall on the revised disclosures.

94. On October 20, 2015, Patriot National announced that it was withdrawing the registration statement for the secondary offering citing "market conditions."

**F. Q4 2015—Mariano Secures A PIPE Transaction To Create Liquidity For GIC**

95. After the Secondary Offering failed, Mariano hatched two other plans to satisfy his and GIC's liquidity needs. In the short term, Mariano had a pressing need to secure millions of dollars by December 31, 2015, so that GIC would meet FOIR's capital requirements. To this

end, Mariano retained J.P. Morgan Chase ("JPM") to serve as a placement agent in a private investment in public equity ("PIPE") transaction that would close before the end of 2015.

96. In an effort to satisfy his long term liquidity needs, Mariano instructed Patriot National's management to implement a strategic review process (the "Strategic Review") and hired Evercore as an advisor to run the Strategic Review.

97. Mariano told the directors of Patriot National just enough information to earn their approval for the PIPE Transaction and the Strategic Review at the Board's November 13, 2015, meeting.

98. Mariano disclosed that "management was considering private investment in a public entity . . . transaction facilitated by JP Morgan for $60M." Pesch then made a presentation to encourage Board approval of the PIPE transaction. The Board meeting minutes show that Shanfelter readily supported Mariano's proposal, "not[ing] that he was familiar with these types of PIPE transactions and that he had reviewed the materials provided by JP Morgan and thought the proposed transaction was a good deal." No outside advisors provided any opinions about how a PIPE transaction would affect Patriot National, or whether it was favorable to the Company or necessary to pursue.

99. Mariano also informed the Board that he and certain members of management had already begun the Strategic Review, which they referred to as "Project Vikaran." As part of this project, they had discussions with Evercore "to explore all alternatives available to [Patriot National] to increase/optimize shareholder value." The Board did not discuss the conflicts of interest inherent in Mariano overseeing the Strategic Review.

100. Mariano withheld information regarding the proposed PIPE transaction from certain members of the Board in an effort to push the transaction through without adequate

scrutiny. On December 9, 2015, Pesch notified the Board via email that the following day there would be a telephone conference about approving the PIPE transaction. In response, Smith requested the deal documents for him to review. Pesch did not respond or send the documents until December 10, 2015 at 9:52 am. Smith then privately vented to Shanfelter via email, "This last minute delivery of documents has got to stop."

101. On December 13, 2015, the Board approved a PIPE transaction (the "PIPE Transaction") among Patriot National, Mariano, and three hedge funds, Hudson Bay Master Fund Ltd. ("Hudson Bay"), CVI Investments, Inc. ("CVI"), and Alto Opportunity Master Fund, SPC ("Alto," and collectively with Hudson Bay and CVI, the "PIPE Investors").

102. The PIPE Investors paid Mariano approximately $30 million for 2.5 million shares of Company stock and paid Patriot National approximately $20 million. In return, as provided in a Securities Purchase Agreement, the Company issued: "(i) an aggregate of 666,666 shares of common stock, (ii) the Old Series A Warrants to purchase up to an aggregate of 2,083,333 shares of common stock and (iii) the prepaid Old Series B Warrants for 1,000,000 shares of common stock to CVI Investments, Inc., Hudson Bay Master Fund Ltd., and Alto Opportunity Master Fund, SPC . . . ."

103. To offset the risk that the price of the Company's shares would decline, the warrants entitled the PIPE Investors to additional shares of the Company based upon a formula tied to the Company's stock price, providing them with more shares if the Company's stock price declined.

104. The PIPE Investors purchased common stock priced at $12 per share, a discount to the prevailing market price of approximately $13.

105. Patriot National also entered into a Back-to-Back Agreement with Mariano, pursuant to which, the majority of the shares to be provided to the PIPE Investors upon the exercise of the warrants were to be delivered by Mariano to the Company, which in turn was to deliver newly issued shares to the PIPE Investors. Specifically, the Company would purchase the number of shares of Company stock owned by Mariano equal to 60% of the shares to be issued in connection with the exercise of the warrants by the PIPE Investors.

### G. December 2015—The PIPE Transaction Backfires And Threatens Mariano's Control Of Patriot National

106. News of the PIPE Transaction caused Patriot National's stock to plunge from $13.08 on Friday, December 11, 2015, to $7.79 per share on Monday, December 14, 2015, on unusually heavy volume. Nevertheless, on December 14, 2015, as Patriot National's stock price was crumbling, Mariano sent an email to Smith and Shanfelter touting his successful "stewardship" of Patriot National and a "second capital raise [with]in 11 months" and asking them to "[p]lease think about sending some stock options [and] [r]estricted stock my way . . . Not a bad strike price right now."

107. Mariano eventually tried to repair the damage caused by the PIPE Transaction, but he still needed—and was unwilling to return—the $30 million he had secured for GIC.

108. Mariano renegotiated the Securities Purchase Agreement and entered into a Rescission and Exchange Agreement, pursuant to which the PIPE Investors agreed to return some of the shares they had purchased to Patriot National and in exchange for new warrants and cash.

109. Without holding a Board meeting and without a fairness opinion, the Board approved amendments to the PIPE Transaction via unanimous written consent on December 22, 2015. Under the terms of the revised PIPE Transaction, Mariano kept his $30 million while

Patriot National was forced to give back the $20 million it had received, and Patriot National was still obligated to issue stock pursuant to the warrants.

110. Mariano kept the $30 million because he needed those funds to provide additional capital to GIC. He pumped $17 million of his PIPE Transaction proceeds directly into GIC to ensure that it would meet its capital requirements as of December 31, 2015. Even so, GIC's past due accounts payable to Patriot National, which as of December 31, 2015 totaled $27 million, remained unpaid.

111. Patriot National and Mariano also amended the Back-to-Back Agreement to require Patriot National to purchase from Mariano 100%, rather than 60%, of the shares to be issued in connection with the exercise of the warrants.

112. Following the PIPE Transaction, Mariano took the position that certain of the PIPE Investors were short-selling Patriot National's stock. If true, this created a problem for Mariano, because a lower stock price would increase the number of shares the PIPE Investors would obtain from Mariano when they exercised their warrants. With fewer shares, Mariano would have less control over the Company and less ability to use the Company's funds for his own devices.

113. When Mariano entered into the PIPE Transaction and agreed to the Back-to-Back Agreement, he accounted for Patriot National's stock price at $12 per share. At that price and under the terms of the original Back-to-Back Agreement, if the PIPE Investors exercised their warrants Mariano would have seen his ownership stake decline by approximately 2.5 million shares but still would have maintained control of Patriot National. However, with Patriot National's stock price around $7 per share, the number of shares he would need to surrender

following an exercise of the warrants had increased. Mariano risked losing control of Patriot National.

114. Furthermore, when Mariano entered into the PIPE Transaction, 7,932,080 of his Patriot National shares had been pledged to UBS and Fifth Third in connection with the outstanding UBS Loan and Yacht Loan.

115. The Yacht Loan required Mariano to pledge Patriot National stock worth $50 million to Fifth Third. On July 28, 2015, when Patriot National's stock closed at $17.63, Mariano had covered his obligation by pledging 2.86 million shares to Fifth Third. As Patriot National's stock price began to fall, Mariano had to post additional stock to meet his $50 million obligation.

116. Accordingly, on September 29, 2015, when the stock closed at $15.52, Mariano pledged an additional 361,700 shares.

117. One month later, on October 29, 2015, at a price of $13.01 per share, Fifth Third required Mariano to pledge an additional 1.255 million shares.

118. And later, on December 8, 2015, when Patriot National's stock closed at $13.73, Fifth Third required Mariano to pledge an additional 2.125 million shares.

### H. Q1 2016—Mariano Causes Patriot National To Launch A Repurchase Program To Help Him Maintain Control Of The Company

119. Under the pressure resulting from Patriot National's declining stock price, Mariano began a campaign to increase the Company's stock price in an effort to limit his exposure under the terms of the PIPE Transaction and the loans in which he had pledged Company stock as collateral.

120. To that end, Mariano caused Patriot National to launch a share repurchase program. A Company-funded stock repurchase program would increase Mariano's control of Patriot National at no cost to him.

121. In early 2016, Mariano told Shanfelter he wished to implement a stock repurchase plan and began discussing it with Patriot National's outside counsel.

122. In addition to the repurchase program, Mariano sought to publicly announce the Strategic Review implemented at the end of 2015. Mariano hoped news of the repurchase program and the Strategic Review would drive up the Company's share price, and he had Evercore review precedent announcements of strategic reviews, which found that "[a] company's stock went up, on average, 4.6% the day after the announcement[.]"

123. On February 24, 2016, Patriot National's stock closed at $6.11 per share. After the close of trading, Patriot National released its 2015 year-end earnings Form 8-K. The following day, Patriot National's stock closed at $4.54 per share. Patriot National's stock continued to drop each day thereafter, from $4.37 per share, to $4.22 per share, to $3.92 per share, and, on March 2, 2016, to $3.65 per share.

124. Shanfelter helped Mariano put the repurchase program into effect by bringing the idea to the Board. On the morning of March 1, 2016, Shanfelter emailed the Board to propose the repurchase program and request approval.

125. Mariano justified the program to the Board by explaining, "[g]iven the impending offers we expect for the company[,] we also think this is a very short term event[.]" Explaining further, Mariano stated that his proposed buyback "[p]lan is confined to a direct stock repurchase only up to $6 a share[.]"

126. On March 3, 2016, without the benefit of any outside opinion as to the impact of the stock repurchase plan, much less a discussion about whether Mariano had any conflict of interest, the Board authorized a stock repurchase program of $15 million (the "Repurchase

Program”). The consent also required that any repurchase of stock must “represent a sound use of [Patriot National]’s funds,” and could “not impair the capital of [Patriot National].”

127. The Board initially appointed Pesch and Shields as administrators of the Repurchase Program. The Board further decided that shares should not be repurchased if the stock price exceeded $6 per share.

128. Notwithstanding the appointment of Pesch and Shields as administrators, Mariano actually controlled the Repurchase Program from the beginning. He determined the number of shares to repurchase and had his personal wealth management team at UBS execute the stock repurchases on behalf of Patriot National.

129. Patriot National announced the Repurchase Program after the market closed on March 3, 2016, with Mariano stating in the associated press release that the Repurchase Program was instated because “[w]e believe [Patriot National]’s common stock is significantly undervalued and does not reflect the value or the earnings power of our operating platform . . . ” That press release further disclosed that the Repurchase Program was “effective immediately,” and that it “gives management discretion in determining the market and business conditions under which shares may be purchased from time to time, in open market transactions or in negotiated off-market transactions.”

130. The press release concealed Mariano’s true purposes for the Repurchase Program, which were unlawful and completely self-interested. By the time of the March 3, 2016, press release, Mariano’s primary goals for the Repurchase Program were to limit his exposure under the PIPE Transaction, the UBS Loan, and Yacht Loan, and increase his ownership percentage of Patriot National at no cost to him.

131. On March 9, 2016, again without any deliberation or outside opinion, the Board modified its prior approval and expressly gave Mariano control of the Repurchase Program. The Board charged Mariano with the power to "make all necessary, appropriate or advisable day to day determinations regarding the purchase of shares of Common Stock in the Repurchase Program."

132. After officially being put in charge, Mariano continued aggressively buying back Patriot National stock.

133. Between March 3, 2014, and March 14, 2016, the last day before the commencement of the blackout period before the Company's next earnings report, Patriot National purchased 992,182 shares for $5.7 million.

134. Even during the blackout period Mariano continued repurchasing Company stock. In total, between March 3, 2016, and April 15, 2016, when the Repurchase Program was paused, Patriot National repurchased 1,360,457 shares for $8,672,616.48. Through these efforts, Mariano succeeded in increasing his ownership stake in Patriot National by approximately 2.5%.

### I. April 2016—The PIPE Investors Attempt To Exercise The Warrants And Are Rebuffed

135. On April 5, 2016, Hudson Bay and CVI each submitted notice to Patriot National that they were exercising their warrants for 1 million and 250,000 shares, respectively. On April 8, 2016, Hudson Bay notified Patriot National that they were exercising additional warrants for 356,004 shares.

136. Due to the Back-to-Back Agreement's provision requiring the Company to purchase 100% of shares purchased pursuant to the exercise of the warrants, the successful exercise of the warrants per the notices submitted by Hudson and CVI would have reduced Mariano's ownership stake to 48.4%.

137. Even worse for Mariano was the prospect that Hudson and CVI would exercise all of their warrants. Approximately 3,667,499 shares were issuable to each of CVI and Hudson Bay upon the exercise of all of their respective warrants. The exercise of all of their warrants would force Mariano to transfer over 7 million shares of Patriot National stock. Based on Patriot National's outstanding shares and Mariano's holdings as of March 14, 2016, this would have caused Mariano's control to fall from 53.8% to 26.8%.

138. Even if Mariano was not concerned with his loss of control, he could not have complied with Hudson's and CVI's attempt to exercise their warrants because all of Mariano's shares (and some he did not have) were pledged to UBS and Fifth Third as collateral for the UBS Loan and the Yacht Loan. By April 2016, when the PIPE Investors sought to exercise their warrants, Mariano had pledged 12,107,158 of his 14,629,138 Patriot National shares for various loans, including: 10,525,100 shares to Fifth Third; 1,330,380 shares to UBS; and 251,678 shares to Walsh (as security for a loan he obtained from Walsh in 2016). As such, Mariano had no unencumbered shares to transfer.

139. In light of his lack of unencumbered shares and to avoid the loss of majority control, Mariano simply chose not to comply with the notices from Hudson and CVI. Mariano immediately had Pesch draft letters to Hudson and CVI denying their exercise notices, which the Board quickly approved.

140. On April 13, 2016, after receiving the letters denying its right to the Company shares, Hudson Bay sued Patriot National and Mariano (as well as a nominal defendant transfer agent) in the United States District Court for the Southern District of New York for breach of contract. This action was captioned: *Hudson Bay Master Fund LTD. v. Patriot National Inc., et al.*, Case No. 1:16-cv-02767 (S.D.N.Y. filed Apr. 13, 2016).

### J. Q2 2016—Mariano Uses The Strategic Review To Further His Interests

141. Throughout 2016, the Strategic Review continued. Mariano began seriously pursuing taking Patriot National private again—barely a year after going public.

142. Mariano ran the Strategic Review from the start and excluded, as much as possible, the special committee of directors that purportedly was in charge of the process (the "Special Committee").

143. Mariano met with potential buyers and controlled the financial figures they received. Mariano manipulated and controlled Patriot National's financials so that he could use them to justify the specious financial projections used to shop Patriot National to buyers. This did not slip by Evercore, who on January 14, 2016, pushed back on Mariano and Wilson's margin projections from 2016-2019.

144. By mid-April 2016, many of the potential transactions and other opportunities that Evercore had presented in connection with the Strategic Review were stale. At the end of April, Mariano doubted whether Evercore's process would result in the funds he need to satisfy his and GIC's requirements.

145. On April 27, 2016, Mariano began to secretly explore other options. He had Wilson schedule a call with Houlihan Lokey Capital, Inc. ("Houlihan") for May 3, 2016, to discuss alternative options.

146. After the May 3, 2016, call between Houlihan and Mariano and Wilson, Houlihan emailed Wilson stating, "As a follow up to our discussion last week, attached please find the qualifications for our Capital Markets Group as well as a preliminary look at financing . . . . We believe this deal will be attractive to debt investors and that it presents an attractive alternative." On May 12, 2016, Wilson had another call with Houlihan.

147. Mariano and Wilson hid their partnership with Houlihan from everyone outside their circle of cohorts, including some of the Board members. For example, on May 20, 2016, Wilson emailed Mariano from his personal account to Mariano's private business email address with the subject line, "Calculation," to discuss their schemes.

### K. August 2016—The Ebix Offer

148. Mariano's scheme to have Patriot National enter into a transaction for his personal benefit was disrupted when Ebix sent the Board an unsolicited offer to acquire Patriot National for $9.50 per share, representing an approximately 30% premium to Patriot National's stock price at the time. On June 15, 2016, Ebix went public with its offer of $9.50 per share, which represented a 37% premium to the closing price of Patriot National's stock the previous day.

149. On August 1, 2016, Patriot National issued a press release, "Patriot National Receives Enhanced Offer from Ebix, Inc.; Commences Strategic Discussions." The press release stated:

> FORT LAUDERDALE, Fla., Aug. 1, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National) . . . today announced that the Special Committee of its Board of Directors (the "Special Committee") has agreed to consider an enhanced offer for a potential acquisition by Ebix, Inc. (NASDAQ: EBIX), a leading international supplier of On-Demand software and E-commerce services to the insurance, financial, e-governance and healthcare industries.
>
> As previously reported by Ebix on June 15, 2016, the Special Committee received an unsolicited offer from Ebix to acquire 100% of the outstanding stock of Patriot National for $9.50 per share. The Special Committee has now received a revised and enhanced offer from Ebix to acquire Patriot National for a total enterprise value of $475 million, which the Special Committee expects will yield a price per share that materially exceeds Ebix's initial offer, after payment of Patriot's related transaction expenses, all outstanding debt obligations, and certain accounts payable.
>
> Ebix has also signed a confidentiality agreement with Patriot National and has begun comprehensive due diligence with [Patriot

> National]. Patriot National does not expect to make any further announcements regarding this offer until the Special Committee has concluded its ongoing consideration of all value-enhancing strategic opportunities.

150. Initially, Mariano was not opposed to a transaction with Ebix as long as the terms satisfied his personal interests. He took steps to ensure that any deal with Ebix would be on his terms, even if it harmed the minority stockholders' interests.

151. By the end of the summer of 2016, however, Mariano had soured on any transaction with Ebix. Rather than break off negotiations with Ebix and inform the public of this fact, Mariano strung Ebix (and the market) along by presenting the illusion that he and Patriot National were negotiating in good-faith.

152. On August 15, 2016, Patriot National issued a press release over Globe Newswire, attached to the Form 8-K filed with the SEC on August 15, 2016, as Exhibit 99.1, that states in relevant part:[2]

> FORT LAUDERDALE, FL., August 15, 2016 – Patriot National, Inc. (NYSE: Patriot National), … a leading provider of technology and outsourcing solutions, today announced its financial results for the quarter ended June 30, 2016, and confirmed that the special committee of its Board of Directors (the "Special Committee") is in the final stages of its consideration of possible strategic opportunities.
>
> **Strategic Opportunities Consideration**
>
> ***The Special Committee, which is comprised of independent directors, is working collaboratively with Ebix, Inc. to explore the possible combination of the two businesses, while continuing to explore other available strategic opportunities for Patriot National to maximize value for shareholders***. Ebix is expected to complete its due diligence by August 31, 2016, as the Special Committee nears the conclusion of its evaluation of the prospects it has received and expects to make a recommendation to the Board

[2] All emphasis in this complaint is added unless otherwise noted.

> of Directors soon on whether [Patriot National] should enter into any transaction or pursue another alternative. As announced August 1, 2016, Ebix made an improved offer to acquire 100% of the outstanding stock of [Patriot National].

153. As detailed below, this statement was misleading because the independent directors were in fact beholden to Mariano, who was unwilling to allow Patriot National and/or the Board to approve a transaction with Ebix because it would require him to cede control of Patriot National and threatened to expose the fraud and other improprieties he was engaged in at Patriot National and its subsidiaries. Mariano had no intention of allowing the Ebix transaction; instead, as detailed below, he engaged in a secret process to obtain funds for GIC without accepting the Ebix offer.

154. On November 8, 2016, Patriot National issued a press release over Globe Newswire entitled "Patriot National Rejects $475 Million Offer from Ebix, Inc.[:] Special Committee Continues to Explore and Evaluate More Attractive Offers and all Opportunities for Value Creation." The press release stated:

> **Company Release - 11/8/2016 1:46 PM ET**
>
> FORT LAUDERDALE, Fla., Nov. 8, 2016 /PRNewswire/ -- Patriot National, Inc. (NYSE: Patriot National) . . . ***today announced that the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal. The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation.***
>
> * * *
>
> Neither the Special Committee nor the Board of Directors has made a decision to enter into any transaction or other opportunity at this time, and there are no assurances that the consideration of strategic opportunities will result in [Patriot National] entering into

> a transaction or other opportunity. The exploration of strategic opportunities may be terminated at any time and without notice.
>
> Patriot National will provide a more complete update on its strategic value creation initiatives on the third quarter earnings conference call on Monday, November 14, 2016.

155. The Company's Form 10-Q for the third quarter of 2016, issued on November 14, 2016, stated:

> On November 8, 2016 we announced that the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal. The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation.

156. During a November 14, 2016, conference call with analysts, Mariano discussed the reasons for killing the Ebix offer. He stated that the offer was rejected because there was a better offer on the table:

> . . . ***Well, the Ebix transaction was rejected because it wasn't the best offer on the table***. And so, with that, I really can't say anything further, other than there is still a process going. And the special committee is continuing to look at offers. ***The rejection of the Ebix deal was plain and simple because we had a better offer from someone else.*** . . .

157. The Special Committee never voted or recommended against the Ebix transaction. As explained below, the purportedly independent directors on the Special Committee were actually beholden to Mariano, who would not allow the Special Committee to approve the Ebix transaction. Mariano did not want to lose control of the Company.

158. As described below, the "better offer" referenced by Mariano was a fake, likely created by Mariano, solely for the purpose of strong arming the Board to approve his preferred

transaction: a leveraged recapitalization that would provide him the liquidity he needed while strengthening his control over Patriot National.

159. Moreover, it was Ebix that "rejected" the offer, and not Patriot National. In fact, as detailed above, when Ebix's CEO learned of Patriot National's press release asserting this much, he emailed a colleague, "[Mariano] is a complete liar - we disengaged not him and our offer was not $475 million - we reduced along the way. It defies any ethics. He did the release to create a negative event into a fake positive event." In fact, the only reason why Ebix's CEO never publically responded to Patriot National's press release because it was "limited by a tight NDA (that [Mariano] forced [Ebix] to sign as a precondition to talking to [it] many months back)." Indeed, Corey, a member of the Special Committee was also shocked to learn of the false and/or misleading statement that the Special Committee rejected Ebix's offer, texting Smith on that same day: "[the press release] shows we (SC) voted on rejecting the Ebix offer, which is not true . . . . Is that a problem[?]."

### L. Q3 2016—Mariano Causes Patriot National To Enter Into A Leveraged Recapitalization For His Own Benefit

160. When it became clear to Mariano that no satisfactory transaction would occur prior to the end of the year, he started hunting for a new source of funds to solve his short-term liquidity problems

161. To that end, concurrently with the Ebix offer process, Mariano began exploring the possibility of doing a leveraged recapitalization in which Patriot National would take out a much larger loan to issue a massive dividend of $2.50 to all stockholders for an aggregate total of $67 million (the "Dividend"). Mariano intended to pump his cut of the Dividend proceeds—which, as the largest holder of Company shares, was substantial—into GIC to ensure that it stayed solvent and complied with its annual capital requirement.

162. Mariano engaged Houlihan to find potential lenders willing to fund the Dividend. Because Mariano knew that this plan would be perceived as self-interested and harmful to Patriot National, he kept it secret and waited to push for the Board's quick approval at the last moment. For example, on September 8, 2016, Mariano emailed Wilson stating, "we need to make sure we can handle debt at both high and low. If so. I will sign Houlihan this week." Wilson replied, "Absolutely…we should also talk about what, if anything, to say about it internally. I don't trust certain people's ability to keep their mouth closed." Mariano then responded, "Pesch. Definitely. Question is can Tom [Shields] and Dave [Quigley, Patriot National accounting executive,] keep quiet. They need to be in on it."

163. In addition to pursuing a leveraged recapitalization, Mariano also engaged Aon Securities Inc. ("Aon") to help find other potential investors in Patriot National. While Aon's engagement letter contemplated it working as a financial advisor to find potential acquirers for Patriot National, in reality, Aon's work was to help Mariano arrange a going-private transaction, which was what Mariano wanted most as it would benefit him the most. While Aon worked to find potential acquirers for Patriot National it was also working with Mariano to help him find investors for another of his companies, Ashmere.

164. Ashmere is a workers' compensation insurance company that Mariano attempted to launch in 2016. Mariano planned for Ashmere to quickly ramp up its business by taking $100 million of GIC's book of business within the first year of operations.

165. Mariano simply moved GIC's management and directors to Ashmere. All of Ashmere's executives were previously members of GIC's executive team until they left GIC in October 2016. Similarly, with one exception, each of Ashmere's directors, is currently or previously served as a director, executive, or employee of GIC or the Company.

166. As of October 6, 2016, Mariano indirectly owned and controlled Ashmere. In the fall of 2016, Mariano retained Aon to help him find investors for Ashmere. On November 28, 2017, Mariano sold Ashmere and its parent holding company.

167. The Board did not authorize the engagement of either Houlihan or Aon.

168. By September 25, 2016, Aon had arranged for Mariano and Wilson to meet with three potential investors in New York City.

169. On September 27, 2016, Mariano emailed Wilson stating, “Most likely We will have to do the [H]oulihan deal[.] It’s the quickest deal to get cash[.] Solves our vendor issue and allows for deleverage of clients[.] So many different things going on I am getting dizzy. Lol.”

170. On September 29, 2016, Aon emailed Mariano to recommend that Patriot National move forward with another potential acquirer. In the email, Aon stated that during the sales process, they had “weeded-out three potential buyers as they did not have the ability to proceed on … our required time frame.” Aon echoed this same sentiment in a September 30, 2016, email to Mariano, stating that “I have softly let-down [two potential acquirers], convincing them that the time frame is too fast for them.” There was no business reason for Patriot National to sell itself on an expedited basis. Aon’s timeline was dictated solely by Mariano’s need for liquidity.

171. Mariano needed to start building Board support for the Dividend, so he began by telling Del Pizzo, his most trusted director on the Board, more details about his plan. On the evening of October 4, 2016, Mariano emailed Del Pizzo, stating “Heading home from a week in Nyc[.] Can we talk on dividend tomorrow with Todd [Wilson?]”

172. On October 11, 2016, Cerberus Business Finance, LLC (“Cerberus”) sent Houlihan and Mariano a revised, non-binding outline of proposed terms for a $280 million

financing package "for the purposes of repaying existing indebtedness, funding a common stock buyback, paying a dividend to shareholders…" The package consisted of a $250 million term loan and $30 million revolving credit line. While Houlihan had received other term sheets for loans in connection with leveraged recapitalization, it highlighted to Mariano that Cerberus was offering the highest amount of financing and could close within Mariano's preferred time frame.

173. On October 18, 2016, a potential acquirer ("Party A") sent Mariano an unsigned letter of intent. Its term sheet was similar to that of Ebix's offer with a total enterprise value of $475 million. Party A's offer differed, however, in how it treated Mariano.

174. On October 19, 2016, Mariano forwarded Party A's unsigned letter of intent via email to Smith, Del Pizzo, Walsh, and Corey. In the accompanying email, Mariano emphasized that Party A "ha[s n]o issue with us doing a dividend or buyback of stock ahead of deal given timing of potential closing." In the same email, Mariano finally provided more details to the Board about his scheme to implement a leveraged recapitalization, telling the directors that "Cerberus is [the] best proposal and that the Cerberus loan's "[c]losing [was] set for November 10" pending Board approval. Mariano further told the Board that an acquisition and a leveraged recapitalization were "not mutually exclusive," *i.e.*, Patriot National could "do the refi and dividend in November and close the [Party A] deal late q1."

175. Mariano also organized a Board call for October 21, 2016. Prior to the meeting, Smith emailed Walsh and Corey, stating that "In my mind (unless there is something that I am totally missing), we are being asked to refi the company's debt at an interest rate that is 220% higher than the current interest rate and pay $11+ million in fees for the opportunity and then pay out $100 million. Net, net we are being asked to approve borrowing money to payout money to

shareholders (*i.e.* to solve Steve's personal financial problems). This is lunacy!" At the meeting, Mariano and the Board discussed Party A's offer and the Leveraged Recap.

176. After the Board meeting, at 4:38pm, Corey emailed Smith and Walsh, stating, "For the first time I think we are finally getting valuable information. I really want to drill down on the use of capital for operating the company. I think it is BS to say that we want to make sure our shareholders love us and want to stay with us. Nobody takes on this kind of debt for that purpose." Smith quickly replied, "I agree..." Smith then commented, "Frankly, I am pleasantly surprised with this call. That said, the proof will be in the pudding on this shareholder distribution notion. My only disappointment is that Steve did not 'put his cards on the table' re: his GIC capitalization challenge, which we will need to press him on next time we all talk. I think Jack heard the threat of losing us as board members and Steve has come to grips with the impact of that possibility (at least for now). Talk to you guys on Monday . . . ."

177. The same day, Patriot National announced that Shanfelter had left the Board, allegedly due to health reasons.

178. In late October and early November 2016, Mariano convinced the Board to approve a leveraged recapitalization using the Cerberus loan. Mariano told the Board that he had reached a tentative agreement with a third-party to acquire Patriot National and take Patriot National private, but that the deal could not close before the end of the 2016. As such, a leveraged recapitalization was necessary to provide GIC with enough funding to meet its year-end capital requirements. As evidenced by the email exchange above among Smith, Walsh, and Corey, the Board knew that the purpose of the leveraged recapitalization was to fund GIC.

179. Nevertheless, on November 9, 2016, the Board approved entering into the $280 million credit facility with Cerberus (the "Cerberus Credit Agreement"), which permitted the

Dividend and the expansion of Patriot National's stock repurchase program by approximately $33.7 million (collectively, the "Leveraged Recap").

### M. December 2016—A Court Shuts Down The Leveraged Recapitalization

180. On November 30, 2016, the Wasik Derivative Action was filed in Delaware court challenging the Leveraged Recap. On December 1, 2016, the plaintiff in that case moved for a temporary restraining order in connection with the Repurchase Program and the Dividend.

181. On December 7, 2016, the Court granted the motion, enjoining the Dividend and the Repurchase Program.

182. On December 19, 2016, the Court modified its prior order, enjoining the Dividend and the expansion of the Repurchase Program approved by the Board on November 9, 2016.

### N. Q1 2017—Mariano Causes Patriot National To Bail Out GIC

183. With the injunction preventing the Dividend, Mariano continued to scheme to extract funds out of Patriot National to fund GIC and keep it from state receivership—material information that was concealed from Patriot National stockholders.

184. On March 3, 2017, Patriot National filed a Form 8-K with the SEC disclosing that on February 27, 2017, Patriot National, GIG, and Mariano, in his personal capacity, executed a binding term sheet calling for the Company to pay GIG $30 million, which GIG "immediately contributed into GIC as surplus and thereby included in GIC's calculation of total adjusted capital and its risk-based capital levels as of the end of the calendar year just ended in compliance with Florida Statute Section 624.4085" (the "GIC Bailout"). This was the $30 million that Mariano first sought to secure for GIC through the Dividend. In exchange for the $30 million, GIG agreed, *inter alia*, that Patriot National would be GIC's exclusive service provider for 10 years and it would allow Patriot National access to GIC's books and records, as well as its board meetings.

185. After receiving the cash, Mariano and GIG violated the terms of the GIC Bailout by preventing Patriot National from accessing GIC's books and records or attending a GIC board meeting.

**O. Q2 2017—The BDO Investigation Begins**

186. The Wasik Derivative Action forced BDO and the Audit Committee to begin investigating Patriot National's finances (the "BDO Investigation"). Specifically, the investigation focused on certain expenses that Mariano charged to Patriot National and accounting matters related to Patriot National's acquisition of the three companies from Snow in 2015 (*i.e.*, HSS for $9.65 million on April 1, 2015, Selective for $3.846 million on April 1, 2015, and Carman for $2 million on June 15, 2015).

187. On April 3, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders that it was forced to delay the filing of its annual 10-K for 2016. In the accompanying press release issued over Globe Newswire, the Company claimed that "it is still finalizing the 10-K and continues to prepare analyses and provide documentation requested by its auditor. In addition, on March 29, 2017, the Audit Committee of [Patriot National]'s Board of Directors, with the assistance of independent counsel and advisors, commenced an internal review regarding certain accounting matters related to transactions between [Patriot National] and Hospitality Supportive Systems, LLC, Selective Risk Management and Carman Corporation, and their affiliates which, as previously reported, [Patriot National] entered into during calendar year 2015."

188. Patriot National never filed its 10-K for 2016.

**P. April 2017—Patriot National Sells Global HR For A Substantial Loss**

189. On April 4, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders of the sale of Global HR for $20 million with additional earn-out and contingent

payments of up to $10 million. This sale occurred not even two years after Patriot National bought the company from Shanfelter for $24 million in cash and $18 million in Patriot National stock.

190. On April 4, 2017, the Company issued over Globe Newswire a press release announcing that it had sold, "on April 3, 2017, substantially all of the assets of Global HR Research ("Global HR"), a pre-hire intelligence solutions provider, to a subsidiary of Renovo Capital, LLC for total consideration of up to $30 million." The release noted that "$20 million was paid to Global HR in cash at closing and $5 million will be deposited into escrow for possible purchase price and working capital adjustments, satisfaction of certain post-closing conditions and any indemnification claims. In addition, Global HR may receive an earnout payment of up to an additional $5 million."

191. In connection with the sale, Patriot National wrote down $17.7 million related to Global HR's goodwill.

**Q. April 2017—Cerberus Extends Filing Deadline For Audited Financials**

192. On April 4, 2017, Patriot National filed a Form 8-K with the SEC. Attached as exhibits were Patriot National's April 3, 2017, and April 4, 2017, press releases, detailed above. The 8-K stated, in relevant part:

> On March 31, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent, and the other lenders party thereto (the "Credit Agreement"), consented to extending the time by which [Patriot National] must deliver its audited financial statements to the lenders from March 31, 2017 to May 1, 2017.
>
> ***
>
> During the first quarter of 2017, [Patriot National] paid down approximately $36.0 million principal of the Term Loan under its

> Credit Agreement, $20.0 million of which was attributable to the sale of Global HR.

193. Additionally, the filing informed stockholders that Mariano had removed Smith and Walsh from the Board:

> On March 30, 2017, [Patriot National] received a written consent signed by Steven M. Mariano, Steven Mariano Trust, [GIC] Company, Blue Ridge Insurance Company, LLC and [GIG], which collectively hold of record at least a majority in voting power of all outstanding shares of [Patriot National], removing Quentin P. Smith and Charles H. Walsh from the Board of Directors of [Patriot National], effective immediately.

### R. April 2017—Patriot National Gains New Board Members

194. On April 27, 2017, Patriot National filed a Form 8-K with the SEC, notifying stockholders of changes to the composition of the Board:

> On April 23, 2017, Patriot National . . . received written consents signed by Steven M. Mariano, Steven Mariano Trust, [GIC], Blue Ridge Insurance Company, LLC and [GIG], which collectively hold of record at least a majority in voting power of all outstanding shares of [Patriot National], removing Michael Purcell from the Board of Directors of [Patriot National] (the "Board") and appointing Terry Coleman and Glenn Hibler to the Board, effective immediately. . . .
>
> On April 26, 2017, the Board appointed Ernest Csiszar to the Board, effective immediately, to fill the vacancy. Mr. Csiszar will serve as a Class III director.
>
> On April 26, 2017, Jeff Rohr resigned from the Board, effective immediately.
>
> ***On April 27, 2017, the Board appointed Messrs. Hibler and Csiszar to the Audit Committee; Messrs. Coleman and Hibler to the Compensation Committee; and Mr.Coleman to the Nominating and Corporate Governance Committee. Mr. Csiszar was appointed as the chairman of the Audit Committee; Mr. Hibler was appointed as the chairman of the Compensation Committee; and Mr. Coleman was appointed as the chairman of the Nominating and Corporate Governance Committee.***

> ***The Board has determined that Messrs. Coleman, Csiszar, and Hibler each meet all applicable independence requirements to serve on such committees*** . . . .

**S. May 2017—Cerberus Again Extends Filing Deadline For Audited Financials**

195. On May 5, 2017, Patriot National filed a Form 8-K with the SEC disclosing that:

> On May 1, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent, and the other lenders party thereto, executed a waiver consenting to extend the time by which [Patriot National] must deliver its audited financial statements to the lenders from May 1, 2017 to May 26, 2017.

**T. May 2017—O'Brien Resigns From Board**

196. On May 9, 2017, Patriot National filed a Form 8-K with the SEC disclosing that:

> On May 3, 2017, James O'Brien resigned from the Board of Directors of [Patriot National], effective immediately. As previously disclosed, on February 27, 2017 Patriot National, Inc. (the "Company"), [GIG], Inc. ("GIG"), and Steven Mariano, the Chairman, Chief Executive Officer and majority owner of [Patriot National] and GIG, entered into an agreement (the "Agreement"). Mr. O'Brien stated that his resignation was due to disagreements regarding non- compliance with the terms of the Agreement.

**U. May 2017—Patriot National Form A Special Committee To Review Strategic Alternatives**

197. On May 30, 2017, Patriot National filed a Form 8-K with the SEC announcing that the Board had formed a new special committee of independent directors "to explore and review a range of strategic alternatives for [Patriot National]." Attached as Exhibit 99.1 to the Form 8-K and is incorporated by reference was Patriot National's May 30, 2017 press release, which stated:

> FORT LAUDERDALE, Fla., May 30, 2017 (GLOBE NEWSWIRE) — Patriot National, Inc. . . . announced today that its Board of Directors has formed a new special committee of independent directors (the "Special Committee") to explore and review a range of strategic alternatives for [Patriot National].

> There is no assurance that this review will result in any strategic alternatives being announced or consummated. Patriot National does not intend to discuss or disclose further developments during this process unless and until the Board of Directors of [Patriot National] has approved a specific action or otherwise determined that further disclosure is appropriate.

## V. July 2017—Mariano Resigns

198. On Thursday, July 13, 2017, after the market closed, Patriot National announced that Mariano had resigned from his officer and director positions. The press release did not mention any severance payment to Mariano. In a Form 8-K filed the following day, Patriot National revealed that the Board approved a $10 million "Severance Payment" (the term used in the 8-K) to Mariano (the "July 14 8-K"). That Severance Payment consisted of $6 million paid immediately and four annual payments of $1 million apiece starting August 2018 ("Mariano's Severance").

199. That Form 8-K stated:

> On July 10, 2017, Steven M. Mariano tendered his resignation as President, Chief Executive Officer, director and Chairman of the Board of Directors (the "Board") of Patriot National . . . . On July 12, 2017, the Board accepted his resignation, effective immediately.
>
> In connection with his separation from [Patriot National], [Patriot National] and Mr. Mariano entered into a Confidential Separation and Severance Agreement and General Release (the "Separation Agreement") on July 12, 2017, effective immediately, that specifies the terms of, and the benefits he is eligible to receive in connection with, his departure from [Patriot National]. Subject to his compliance with the terms and conditions of the Separation Agreement, Mr.Mariano (i) received a payment of $6.0 million and will receive $4.0 million to be paid over four annual payments beginning August 1, 2018, which payments shall accelerate upon a change of control (the $6.0 million payment and $4.0 million payment are collectively referred to as the "Severance Payment") and (ii) will receive a continuation of group health plan coverage until the earlier of July 13, 2019 or the time he obtains group health plan coverage with a new employer. The Severance Payment is subject to clawback by [Patriot National].

> At the option of [Patriot National], Mr. Mariano will serve in a consulting role where he will assist [Patriot National] as reasonably requested by the Board or Chief Executive Officer, and be available upon request to the Special Committee of independent directors to explore and review a range of strategic alternatives for [Patriot National].
>
> Under the Separation Agreement, Mr. Mariano provided a general waiver and release of claims against [Patriot National] and is subject to certain cooperation and restrictive covenants, including confidentiality, non-disparagement, non-solicitation, and non-competition.

**W. July 2017—Cerberus Again Extends Filing Deadline For Audited Financials**

200. On July 20, 2017, Patriot National filed a Form 8-K with the SEC disclosing that:

> On July 14, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National . . . , Cerberus Business Finance, LLC, as collateral agent and as administrative agent ("Cerberus"), and the other lenders party thereto, executed a waiver consenting to extend the time by which [Patriot National] must deliver its audited financial statements to the lenders, provided that (i) [Patriot National] deliver such financial statements to the lenders on or prior to August 11, 2017, (ii) the $30.0 million total revolving credit commitment is terminated in full on the waiver effective date, and (iii) from and after the waiver effective date, [Patriot National] does not pay any dividends or make other cash distributions in respect of or repurchase any of its equity interests. The effectiveness of the waiver is subject to the fulfillment of certain conditions precedent, including [Patriot National]'s payment of a non-refundable waiver fee equal to $400,000 to Cerberus, in its capacity as administrative agent, for the account of the lenders. The waiver effective date was July 14, 2017.

**X. August 2017—The Findings Of The BDO Investigation Are Revealed**

201. On August 8, 2017, GIC filed its 2016 audited financial statement with the FOIR. The filing included BDO's Independent Auditor's Report, which was, for the first time, critical of GIC and Mariano. Notably, BDO refused to "express an opinion on the 2016 statutory basis financial statements" because it did not have sufficient and appropriate audit evidence to provide

an audit opinion. It also concluded that GIC appeared to lack sufficient capital as of December 31, 2016, which invited action by Florida insurance regulators.

202. With respect to the GIC Bailout, BDO noted that, as of August 4, 2017, GIG had already breached its terms, including:

a. "The required provisions include Section II of the [GIC Bailout], which requires that GIC extend the renewal expiration date of all service agreements with Patriot National Inc. by ten years from the expiration date."; and

b. "Additionally, GIC distributed $8.5 million to GIG in spite of the covenants in Section III of the [GIC Bailout], which prohibited the issuance of dividends or distributions, or any further advances to any shareholder or GIG."

203. BDO also stated that, as of December 31, 2016, GIC had an admitted income tax recoverable balance of $16,948,000 due from GIG, and that BDO had "evaluated this matter and concluded that this recoverable should be non-admitted as of December 31, 2016." However, BDO noted that GIC "has not recorded this adjustment in the accompanying December 31, 2016 statutory financial statements[, and] [a]s a result, we believe that admitted assets and capital and surplus are each overstated by $16,948,000 as of December 31, 2016."

204. Additionally, BDO stated that GIC held approximately 1,936,000 shares of Patriot National stock as of December 31, 2016, with a fair value of approximately $9 million. Unrealized losses on this investment in Patriot National stock amounted to approximately $10.9 million as of December 31, 2016. GIC did not classify the loss as other-than-temporary impairment, but "was not able to provide sufficient audit evidence to support the conclusion that an other-than-temporary impairment of these securities has not occurred as of December 31, 2016." If an other-than-temporary adjustment were recorded by GIC, the loss would have been recorded as a realized loss.

205. BDO also discussed related-party transactions, stating that, as of December 31, 2016, GIC and GUI, another subsidiary of GIG, exchanged certain liabilities, whereby GIC exchanged $8,022,643 in amounts payable to a related party, Patriot Underwriters, Inc., a wholly owned subsidiary of Patriot National, in exchange for $8,022,643 in "Funds Held on behalf of reinsurers by GUI." This assignment of GIC's liability to Patriot National was done unilaterally and without the requisite consent of Patriot National.

206. BDO further explained that it was not until July 27, 2017, that "an agreement was executed between GIC and [Patriot National], in which [Patriot National] agreed to the assignment of the receivable balance due from GIC to GUI as of December 31, 2016." Under the terms of the assignment, GIC agreed to guarantee GUI's payment of the $8,022,643 to Patriot National. While the agreement was executed in July 2017, GIC paid Patriot National on behalf of GUI in April 2017, which resulted in a non-admitted receivable of $8,022,643 from GUI to GIC.

207. Notably, GIC did not record any liability associated with its guaranty of the GUI obligation as of December 31, 2016, despite being required to do so. Moreover, "[t]he guarantee and payment of the GUI obligation, resulting in a non-admitted asset is a form of advancing funds to a related party[,] requires advanced approval from the [FOIR]." GIC did not get advance approval. Based on this, BDO concluded that, "we believe that capital and surplus are each overstated by $8,011,643 as of December 31, 2016."

208. Based on BDO's conclusions, it is clear that Mariano and GIC simply transferred GIC's debt to GUI to get the debt off of GIC's books to satisfy the December 31, 2016, capital requirement, and did not document or get approval of the transfer or have GIC guarantee the debt because doing so would have required that the debt to be kept on GIC's books. It was only after

the commencement of the BDO Investigation into Patriot National and GIC that Mariano and GIC attempted to paper the transfer and retroactively have GIC guarantee the debt.

209. BDO also discussed certain transactions with Snow and Snow related entities, including that:

a. Carman Corporation and Steel Corporation, both of which are owned by Snow, owe GIC a total of approximately $8.4 million as of December 31, 2016 ($5.4 million for Carman and $3 million for Steel);

b. Snow also has a management position and an ownership interest in Progress Physical Therapy, which executed a consulting agreement for monthly fees of $225,000 per month with GIC in October 2016, incurring total fees of $675,000 in 2016;

c. BDO was "unable to determine whether the transaction with [Snow] or companies owned or controlled by [Snow] have been appropriately accounted for and disclosed in [GIC's 2016 financial statement]"; and

d. GIC had two notes receivable from Carman Corporation totaling a combined $5.5 million but did "not provide [BDO] with sufficient audit evidence to support the collectability of these notes or authoritative statutory support for the admissibility of these notes as of December 31, 2016, [under Florida law]."

210. BDO further stated that, on December 30, 2016, Quadra Capital Corporation LCC ("Quadra"), a company that is owned by current and former GIC officers, executed a promissory note to repay $1.2 million to GIC that GIC advanced to them in 2016. GIC included this note as an admitted asset for 2016, but BDO stated that it had evaluated the matter and "concluded that the note should be non-admitted as of December 31, 2016" under Florida law.

211. Finally, BDO addressed whether GIC could continue as a going concern, concluding that GIC had "suffered losses from operations and reflects a capital surplus level of $28.8 million as of December 31, 2016 that raise substantial doubt about its ability to continue as a going concern." However, BDO noted that GIC had not recorded adjustments to income tax recoverable of $16,948,000, $1,200,000 related to Quadra's promissory note, and $8,022,643

due to Patriot National as of December 31, 2016. Taken together, these amounts total approximately $26.2 million, which, when subtracted from GIC's claimed surplus of $28.8 million results in an actual surplus of $2.6 million, which is well below the company's required minimum capital requirement as of December 31, 2016, of $19.3 million. BDO warned that "[t]his capital deficien[cy] could result in action by the [GIC's] regulators."

### Y. August 2017—Shields Resigns From The Board

212. On August 17, 2017, Patriot National filed a Form 8-K with the SEC stating:

> On August 11, 2017, Thomas Shields, the Executive Vice President and Chief Financial Officer of Patriot National . . . agreed to resign from [Patriot National] effective September 15, 2017 (the "Effective Date") to pursue other opportunities. On August 11, 2017, Thomas Shields and [Patriot National] entered into a Confidential Separation Agreement and General Release (the "Separation Agreement"), effective on the Effective Date, that specifies the terms of, and the benefits he is eligible to receive in connection with, Mr. Shields' departure from [Patriot National]. Subject to his compliance with the terms and conditions of the Separation Agreement, Mr. Shields will receive (i) a total of $920,000, of which $370,000 shall be paid on the Effective Date with the remaining to be paid over six monthly installments beginning October 15, 2017, which payments shall accelerate upon a change of control, (ii) 23,529 restricted shares of [Patriot National]'s common stock pursuant to the vesting schedule established in his employment agreement as if his employment had not been terminated or, alternatively, the cash equivalent of such shares on September 15, 2017, and (iii) continuation of group health plan coverage until the earlier of September 15, 2019 or the time he obtains group health plan coverage with a new employer.
>
> In order to provide a smooth transition of leadership, Mr. Shields shall serve as a consultant to his successor as [Patriot National]'s Chief Financial Officer until March 15, 2018, and shall receive a lump sum of $35,000 for any month in which he provides consulting work.

### Z. August 2017—GIC Falls Under The Administrative Supervision Of The FOIR.

213. On August 18, 2017, the FOIR filed the Consent Order for Administrative Supervision, *In the Matter of: Guarantee Insurance Company*, Case No. 208236-17-Co (Aug. 18, 2017) (the "Administrative Supervision Order").

214. The Administrative Supervision Order provided that "[a]fter a complete review" of GIC's records, "[t]he [FOIR] has determined that grounds exist for [GIC] to be placed in administrative supervision for the purpose of protecting the assets of [GIC] and protecting the interests of its insureds during the implementation of a proposed corrective action plan[,]" which "could result in both significant restructuring of [GIC's] business as well as the infusion of capital."

215. The Administrative Supervision Order provided GIC until September 1, 2017, to submit a plan detailing, *inter alia:* how it will meet its capital requirements; how it will provide sufficient reserves to pay all policyholder claims and other liabilities as they come due; and how it will strengthen its corporate governance and internal control weaknesses. Additionally, the FOIR required GIC to re-audit its financial statements for 2016.

216. The Administrative Supervision Order provided that "[GIC] shall cease writing any new business, and shall provide notice to its appointed agents that no new business may be written."

217. The Administrative Supervision Order also sought to further prevent Mariano from expropriating funds from the company by prohibiting GIC from "wast[ing] assets or expend[ing] funds in excess of $10,000, other than in the ordinary course of business, without the proper written consent of the [FOIR]."

### AA. September 2017—Patriot National Warns Of NYSE Delisting Risk

218. On September 29, 2017, Patriot National filed a Form 8-K with the SEC disclosing that:

> on September 25, 2017 [Patriot National] received a notification (the "Notice") from the New York Stock Exchange (the "NYSE") that it was not in compliance with the NYSE's continued listing standards set forth under Rule 802.01B of the NYSE Listed Company Manual because the average global market capitalization of [Patriot National]'s common stock was less than $50 million over a consecutive 30 trading-day period while its last reported stockholders' equity was less than $50 million. As a result of the Notice, [Patriot National] became subject to the suspension and delisting procedures set forth in Sections 801 and 802 of the NYSE Listed Company Manual.

### BB. November 2017—GIC Is Put Into State Receivership

219. On November 13, 2017, the FOIR put GIC into state receivership ("GIC's Receivership"). On that day, the FOIR sent a letter (the "Receivership Letter") to Florida's Department of Financial Services (the "DFS") "petitioning for an order appointing the [DFS] as receiver and directing it to rehabilitate or liquidate the business of [GIC]."

220. In the Receivership Letter, the FOIR states that "GIC has insufficient assets to pay all outstanding obligations and is insolvent" and that "GIC's insolvency renders its further transaction of insurance hazardous to its policyholders, subscribers, claimants, creditors, and the citizens of the state of Florida."

221. The FOIR also found that "GIC knowingly filed a false financial statement with the [FOIR]" by "report[ing] collateral for Unauthorized Reinsurance as a liability for Funds Held by GIC[.]" Specifically, the FOIR found that "GIC booked and availed itself of reinsurance credit at a time that it knew that it did not have sufficient cash and invested assets to cover this liability."

222. Most importantly, the FOIR found that "GIC has systematically transferred funds, totaling $15,743,000 to Mr. Steve Mariano, the ultimate owner of GIC during the calendar year 2016 and through June 2017. These transfers were made with no documented business purpose and no discernable benefit to GIC[.]" The FOIR further concluded that "[w]hile Mr. Mariano benefitted individually from these transaction by receiving cash from GIC, this indebtedness diverted funds that otherwise could be used to increase the surplus of GIC and otherwise be available for the payment of policyholders." Additionally, "the [FOIR] has identified other transactions involving parties with known association to Mr. Mariano that have been harmful to GIC."

**CC. November 2017—Patriot National Discloses That GIC Is In Receivership And That Bankruptcy Is Imminent**

223. In a Form 8-K filed with the SEC on November 22, 2017, Patriot National finally disclosed the severity of the regulatory issues at GIC and revealed the extent to which Patriot National relied upon GIC's business:

> [Patriot National's] largest customer, [GIC] Company ("GIC"), which has historically accounted for approximately 60-70 percent of [Patriot National]'s business, consented to be placed into receivership on November 13, 2017. [Patriot National] has met with the Florida Office of Insurance Regulation (the "OIR") on various occasions, including most recently on November 20, 2017, seeking to obtain both payment for past services rendered to GIC and an agreement that would allow [Patriot National] to provide and receive payment for future services while GIC is in receivership. However, based on the most recent meeting with the OIR and other authorities now engaged in respect of GIC, [Patriot National] does not believe these efforts will be successful. Accordingly, a major portion of [Patriot National]'s revenue and cash flow going forward will cease.
>
> Based on [Patriot National]'s deteriorating financial condition, and in compliance with the Worker Adjustment and Retraining Notification Act, [Patriot National] has notified approximately 250 employees, representing approximately one-third of its workforce, of the immediate termination of their employment. [Patriot

> National] is currently unable in good faith to make a determination of an estimate of the costs associated with the termination. [Patriot National] will file an amended Current Report upon determination of the estimate or range of estimate of costs.

224. This Form 8-K also disclosed that Patriot National entered into a Forbearance Agreement (the "Forbearance Agreement") with Cerberus related to the Cerberus Credit Agreement. The Forbearance Agreement was necessary because Patriot National was and continues to be in default of the Cerberus Credit Agreement due to its failure to deliver timely financial statements, its non-payment of interest due November 1, 2017, and its failure to comply with financial covenants.

225. Additionally, the Form 8-K informed stockholders that Patriot National could be put into bankruptcy as soon as December 3, 2017.

### DD. November 2017—Patriot National Announces Its Intent To File For Bankruptcy

226. On November 28, 2017, Patriot National filed a Form 8-K with the SEC announcing that it had reached an agreement in principle with its secured lenders to recapitalize Patriot National in the form of a restructuring support agreement (the "RSA"). Under the terms of the RSA, Patriot National and its direct and indirect U.S.-based subsidiaries will file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

227. The 8-K states, in relevant part:

> Patriot National, Inc. (the "Company") announced today that it has reached an agreement in principle with its secured lenders to recapitalize [Patriot National]. Under the terms of the agreement, [Patriot National] anticipates that it will reduce its debt, significantly improve its liquidity and financial condition, and improve its ability to service its customers.
>
> On November 28, 2017, [Patriot National] entered into a restructuring support agreement (the "RSA") with the lenders under its Financing Agreement, dated as of November 9, 2016, with and among Cerberus Business Finance, LLC, as the collateral

agent and administrative agent, and certain funds and accounts managed by each of Cerberus Business Finance, LLC and its affiliates and TCW Asset Management Company LLC, as the lenders party thereto (the "Lenders") (the "Credit Agreement," and the claims and other obligations arising thereunder, the "Lender Claims."). The RSA contemplates that [Patriot National] and its direct and indirect U.S.-based subsidiaries will file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement the recapitalization in accordance with the RSA and the term sheet for a plan of reorganization attached thereto as Exhibit A (the "Term Sheet").

Pursuant to the terms of the RSA and definitive documentation to be negotiated, the Lenders will provide [Patriot National] with debtor-in-possession ("DIP") financing and use of cash collateral to permit [Patriot National] to continue its operations during the Chapter 11 cases and pending completion of a comprehensive reorganization to be implemented pursuant to a Chapter 11 plan of reorganization (the "Plan") for [Patriot National] and each of its direct and indirect subsidiaries that are debtors in the Chapter 11 cases (the "Subsidiary Debtors").

[Patriot National] expects that it will continue to operate its business in the ordinary course and the Chapter 11 filing is not expected to have a meaningful impact on [Patriot National]'s day-to-day operations. Specifically, [Patriot National] intends to continue to provide the same level of service to all of its carrier customers in accordance with the terms of the current agreements. Furthermore, it is anticipated that all commissions due to brokers who commit to continue their business relationships with [Patriot National] will be paid in the ordinary course of business or in full under the Plan. [Patriot National] expects the reorganization, which is subject to the completion of definitive documentation and regulatory approval, to be completed early in the second quarter of 2018.

The RSA, together with the Term Sheet and the other documents described therein, sets forth the material terms of the Plan. Pursuant to the Plan, all of the issued and outstanding equity interests in [Patriot National] and each of the Subsidiary Debtors will be extinguished, and the Lenders (or their designees) will receive 100% of the newly issued equity interests in Reorganized Patriot National, Inc. ("Reorganized Patriot National, Inc.") and each of the Reorganized Subsidiary Debtors (the "Reorganized Subsidiary Debtors") on account of a portion of the Lender Claims.

> After giving effect to the transactions contemplated by the Plan, [Patriot National] and its direct and indirect subsidiaries will be owned and controlled by funds and accounts managed by Cerberus Business Finance, LLC and its affiliates and TCW Asset Management Company LLC.

228. The filing explains that Patriot National stockholders "will not receive or retain any property on account of such equity interests, and such holders will be deemed to have rejected the Plan."

229. On January 30, 2018, Patriot National filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Company has also filed a Plan consistent with the RSA among the Company and its lenders. The RSA and Plan wipe out all existing equity and leaves stockholders with nothing. Patriot National's stock, which was sold to Plaintiffs and other members of the public at $14.00 per share in its IPO in January 2015, is now worthless.

## VII. MISREPRESENTATIONS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

### A. The January 15, 2015 Registration Statement Was Materially False and Misleading

230. The Class Period begins on January 15, 2015. On that day, the Company launched its IPO, offering 7,350,000 shares of common stock at $14 per share pursuant to the Registration Statement. The IPO raised a total of approximately $102.9 million.

231. The Registration Statement stated that "[t]he accompanying combined financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP)." The Registration Statement further stated that Patriot National was "not currently subject to any material interest rate risk or credit risk."

232. The Registration Statement also discussed Patriot National's "goodwill" assets, representing that, as of September 30, 2014, Patriot National had approximately $59.385 million

of goodwill assets in its balance sheet. Approximately $49.432 million was attributable to Patriot National's 2014 PCM Acquisition and GUI Acquisition.

233. The Registration Statement claimed that "[i]n accordance with United States Financial Accounting Standards Board ('FASB') Accounting Standards Codification ("ASC") *350, Intangibles - Goodwill and Other*, goodwill is not amortized but instead is tested for impairment at least annually (more frequently if certain indicators are present) . . . . There was no impairment as of December 31, 2013 or 2012 or for the years then ended." The Registration Statement stated that Patriot National "assess[es] potential impairment on [its] goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired."

234. The Registration Statement also stated that the Company had $2,137,140 million in accounts receivable owed by GIC as of December 31, 2013, and that "Management believes that the receivable balances from these largest customers [*i.e.*, GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience." The Registration Statement explained that "Management assesses the collectability of [Fee Income Receivable from Related Parties, *i.e.*, GIC,] balances and adjusts the receivable to the amount expected to be collected through an allowance for doubtful accounts. As of December 31, 2013, [Patriot National] maintained an allowance for doubtful accounts of approximately $2.5 million in connection with fee income receivables from an unaffiliated insurance company customer" (*i.e.*, not GIC).

235. The Registration Statement contained audited financial statements as of December 31, 2013, as well as unaudited financial statements as of September 30, 2014. The December 31, 2013, financial statements contained showed revenue from operations of $55.9

million, of which $9.4 million was attributable to GIC. The September 30, 2014, financial statements reflect revenue from operations of $62.5 million, of which $24.6 million is attributable to GIC.

236. With respect to GIC and other related parties, the Registration Statement identified the following "Risk Factors":

> **Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**
>
> ***
>
> . . . . . . ***[W]e will continue to be significantly impacted by the overall business levels of these carrier partners. While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control. . . . . In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive***. A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.
>
> ***Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.***
>
> Immediately upon consummation of this offering, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, will beneficially own 59.5% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIG], the parent company of [GIC]. As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not impact otherwise impact our actions in a manner that is adverse to us or our stockholders. Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc.

> in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC]. . . .
>
> Although Mr. Mariano is no longer a board member or officer of [GIG] or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIG], Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders.
>
> **CERTAIN RISK AND CHALLENGES**
>
> ***
>
> **We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.**
>
> ***
>
> Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government sponsored programs such as Medicare and Medicaid. ***They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.*** Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients. We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention. ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us***.

237. As required by Regulation S-K, the Registration Statement contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying

> transactions with related persons and to assist us in the preparation of related disclosures required by the SEC.
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee.***
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

238. The Registration Statement stated that the purpose for the IPO was to raise funds to pay off existing debt and that the "use of proceeds" from the IPO would be as follows:

> We intend to use the net proceeds from this offering, together with borrowings under the senior secured credit facility or cash on hand, as follows: (1) $66.8 million to repay all outstanding amounts under the amended and restated first lien term loan agreement, dated as of August 6, 2014 (the "PennantPark Loan Agreement"), between, among others, us and certain of our subsidiaries, as borrowers, certain of our other subsidiaries and certain affiliated entities, as guarantors, and PennantPark Investment Corporation and certain of its affiliates, as lenders, comprising (i) an initial tranche (the "Initial Tranche") and (ii) an additional tranche (the "Additional Tranche"), and (2) $56.6 million to repay all outstanding amounts under the credit agreement, dated as of August 6, 2014 (the "UBS Credit Agreement"), between, among others, us and certain of our subsidiaries, the lenders party thereto and UBS Securities LLC, as lead arranger, bookmanager, documentation agent and syndication agent, in each case including accrued interest and applicable prepayment premiums

> ***
>
> We plan to use the remaining net proceeds remaining after repayment of these borrowings for general corporate purposes, which, consistent with our growth strategy described elsewhere in this prospectus, may include possible acquisitions of, or investments in, businesses or other assets. While we routinely engage in discussions with third parties regarding potential acquisitions in the ordinary course of our business, we have no present understandings, commitments or agreements to enter into any acquisitions or investments. Our management will have broad discretion in the application of remaining net proceeds, and investors will be relying on the judgment of our management regarding the treatment of these proceeds.

239. Regarding Mariano's compensation, the Registration Statement stated:

> The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by the Company, in each case, as determined by our compensation committee.

240. Pesch, Mariano, Shields, Del Pizzo, and Shanfelter signed or authorized the signing of the Registration Statement.

241. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented the following material information: (1) the primary purposes for the IPO; (2) GIC's ability to operate as a going concern and meet its regulatory capital requirements; (3) GIC's ability to pay and close out the accounts payable to Patriot National; (4) Patriot National's adherence to GAAP in its financial statements, including improperly accounting for doubtful accounts and goodwill; (5) the risks to Patriot National caused by GIC's precarious financial position; (6) the credit risk that GIC posed to Patriot National at the time of the IPO; (7) Mariano's compensation; and (8) Patriot National's adherence to its Policy

Regarding Transactions with Related Persons and other rules and policies ensuring proper corporate governance.

242. Defendants failed to disclose the primary purposes for Patriot National going public—rather than to repay the August 2014 Loans, the main purpose was to allow Mariano to tap public funds to cover GIC's annual losses and allow it to meet its FOIR capital requirements, to obtain additional funds to fund his personal companies, and to support his extravagant lifestyle.

243. Between 2007 and 2013, GIC sustained over $43 million in total losses. Mariano needed to inject a total of $36 million into GIC for it be able to remain in business and meet its annual capital requirements. By the time Patriot National went public, Mariano was longer able to pump his own money into GIC. If Mariano not taken Patriot National public and then transferred a portion of the IPO proceeds to GIC, GIC would have collapsed. Indeed, GIC did collapse soon after Mariano lost the ability to illegally take funds from Patriot National to give GIC.

244. The financial statements contained in the Registration Statement were materially false and misleading because they failed to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable. Given GIC's precarious condition at the time of the IPO, it was not possible for GIC to make good on its debts to Patriot National unless Mariano siphoned funds from Patriot National and transferred them to GIC. As of December 31, 2013, GIC's accounts payable to Patriot National was $2,137,140, and on December 31, 2014, that number had grown to $11,979,800. GIC needed Patriot National's funds to remain in business, and its debts to the Company were growing. Given this situation, the collectability of the

Company's accounts receivable from GIC was not reasonably probable or assured and should have been reserved against.

245. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Accordingly, Patriot National's revenue as of December 31, 2013 was overstated by at least $2,137,140, and revenue for the nine months ended September 30, 2014 was overstated by at least $11,979,800. Accordingly, Patriot National's financial statements were materially false and misleading as well as not properly stated in accordance with GAAP.

246. The Registration Statement also falsely and misleadingly stated that Patriot National did not face any credit risk. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was present at the time of the IPO—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

247. GIC presented yet another undisclosed credit risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

248. The Registration Statement was also false and misleading because Patriot National's financial statements misrepresented the value of Patriot National's "goodwill" assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired. In the Registration Statement, Patriot National stated that it would test its goodwill valuations annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

249. The Registration Statement represented that, as of September 30, 2014, Patriot National had approximately $59.385 million of goodwill assets in its balance sheet, of which approximately $49.432 million was attributable to Patriot National's 2014 PCM Acquisition and GUI Acquisition.

250. The goodwill attributed to GUI and PCM represented approximately 36% of Patriot National's total assets. However, both GUI and PCM derived a substantial portion of their revenue from GIC. Before Patriot National acquired GUI from GIC, GUI generated revenue for GIC by servicing and underwriting insurance policies for GIC, as well as performing brokerage and policyholder services to GIC pursuant to a producer agreement with GIC. PCM also derived a large portion of its revenues from business with GIC.[3] Accordingly, the majority of the goodwill attributed to the acquisition of GUI and PCM represented goodwill derived from GIC's imperiled revenue stream.

---

[3] For example, from August 6, 2014 to December 31, 2014, PCM earned $6.1 million in claims administration services fee income from GIC.

251. At time of the IPO, circumstances existed that required Patriot National to test the GUI and PCM goodwill for impairment based on the fact that GIC's business had been deteriorating for years. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

252. In addition, the "Risk Factors" identified in the Registration Statement (*see* ¶ 208) were false and misleading because the Registration Statement failed to disclose that, at the time of the IPO: (1) GIC's business had been in decline for at least 7 years; (2) GIC could not repay its debts to Patriot National and could not satisfy its annual capital requirements without an influx of Mariano's cash every year (3) GIC's decline in business was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (4) Mariano had taken millions out of GIC for his person benefit; (5) GIC had been under regulatory scrutiny for years due to its failure to fulfill legal obligations, including maintaining sufficient capital ratios and impermissible related party transactions; and (6) the aforementioned regulatory issues at GIC were or should have been known to Defendants.

253. In addition, the Registration Statement contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons. Although the Registration Statement set forth Patriot National's policy, it did not disclose that Patriot National had historically failed to comply with that policy. The statement that the Company would adhere to the policy after the IPO was false. Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano

and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without performing the necessary due diligence; (5) the Board's decisions to accelerate the earn-out payments to Mariano and Snow barely a month after entering into the acquisition agreements; and (6) Mariano's secret December 31, 2016, transfer of Patriot National's accounts receivable from GIC to GUI. Thus, Patriot National had no means or intention to apply the policy as disclosed in the Registration Statement after the IPO.

### B. The 2014 10-K Issued March 31, 2015, Contained False And Misleading Statements

254. On March 31, 2015, Patriot National filed its annual report for the fiscal year ended December 31, 2014, on 10-K with the SEC (the "2014 10-K"). The 2014 10-K stated that "[t]he accompanying combined financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America," and further provided:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the year ended December 31, 2014 was $102.7 million compared to $55.9 million for the year ended December 31, 2013, an increase of $46.9 million or approximately 84%. The increase was primarily due to an increase in fee income from related party.
>
> ***For the year ended December 31, 2014, approximately 71% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party,*** and approximately 18% of our total fee income and fee income from related party was attributable to contracts with our second largest client.
>
> For the year ended December 31, 2013, approximately 44% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 38% and 12% of our total fee income and fee income from related party were

> attributable to our contracts with our second and third largest clients, respectively.
>
> ***
>
> **Concentration**
>
> ***
>
> As of December 31, 2014, approximately 86% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2013, approximately 62% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 23% and 11% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2012, approximately 28% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 51% and 19% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. ***Management believes that the receivable balances from these largest customers do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience.***

255. Patriot National also reported in the 2014 10-K that as of December 31, 2014, it had $11.988 million in fee income receivable from a related party, a significant increase from the $2.79 million in fee income receivable from a related party as of December 31, 2013.

256. The 2014 10-K further stated that, as of December 31, 2014, Patriot National was "not subject to any material interest rate risk or credit risk." The 2014 10-K also stated that Patriot National had $11,979,800 in accounts receivable owed by GIC as of December 31, 2014, and that "Management believes that the receivable balances from these largest customers [*i.e.*, GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience." The 2014 10-K further stated that management "assess[es] the

collectability of [Fee Income Receivable from Related Parties] balances and adjust[s] the receivable to the amount expected to be collected through an allowance for doubtful accounts. As of December 31, 2014, we maintained an allowance for doubtful accounts of approximately $0.1 million." Additionally, the filing stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

257. The 2014 10-K also contained the following false and misleading statements and/or omissions in the "Risk Factors" detailed in the prospectus.

> **Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**
>
> ***
>
> . . . . . . ***[W]e will continue to be significantly impacted by the overall business levels of these carrier partners. While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control. . . . . In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive***. A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.
>
> **Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.**
>
> Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owns 59.5% of the outstanding shares of our common stock and substantially all of the outstanding

> equity of [GIG], the parent company of [GIC]. As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders. Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC]. . . .
>
> Although Mr. Mariano is no longer a board member or officer of [GIG] or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIG], Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders.
>
> **We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.**
>
> Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government sponsored programs such as Medicare and Medicaid. ***They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.*** Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients. We are liable for payments or reimbursements in connection with any fines or penalties imposed on our clients arising out of services we perform for them under the agreements, and we would be required participate fully with our clients in any action plan or other corrective measures required by any regulatory agency or body, which could be costly and divert management's attention. ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us***.

258. The 2014 10-K stated that "[a]s of December 31, 2014, we had approximately $61.5 million of goodwill and approximately $33.0 million of net intangible assets (the latter, net of $1.8 million of accumulated amortization and generating a deferred tax liability of

approximately $13.2 million) recorded, which represents, in the aggregate, 66% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI Acquisition and PCM Acquisition].” Patriot National further stated that it “assess[es] potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired.” Additionally, the 2014 10-K, disclosed that Patriot National reported $7.756 million in intangible assets related to “Customer & Carrier Relationships”

259. The 2014 10-K contained the following “Statement of Policy Regarding Transactions with Related Persons”:

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC. . . .
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.
>
> In reviewing transactions with related persons, the Audit Committee or disinterested members of the board of directors will consider all relevant facts and circumstances, including, without limitation:
>
> - the nature of the related person’s interest in the transaction;
> - the material terms of the transaction;
> - the importance of the transaction both to [Patriot National] and to the related person;
> - whether the transaction would likely impair the judgment of a director or executive officer to act in the best interest of [Patriot National];

> - whether the value and the terms of the transaction are substantially similar as compared to those of similar transactions previously entered into by [Patriot National] with non-related persons, if any; and
>
> - any other matters that management or the Audit Committee or disinterested directors, as applicable, deem appropriate.
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.
>
> Generally, the Related Person Transaction Policy applies to any current or proposed transaction in which:
>
> - [Patriot National] was or is to be a participant;
>
> - the amount involved exceeds $120,000; and
>
> - any related person (*i.e.*, a director, director nominee, executive officer, greater than 5% beneficial owner and any immediate family member of such person) had or will have a direct or indirect material interest.

260. The 2014 10-K states that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the amount of approximately $109 thousand in the year ended December 31, 2014 for tax advisory services it performed in fiscal years 2014 and 2013 in respect of entities that are now our subsidiaries."

261. The 2014 10-K further states that Mariano received no compensation for 2014 and $255,235 in total compensation for 2013. As disclosed in the 2014 10-K:

> The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for

> successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

262. Additionally, the 2014 10-K also disclosed that "[o]n February 5, 2015, [Patriot National] purchased 98.8% of the membership interests of DecisionUR, LLC, a California limited liability company which provides web-based Utilization Review Software for the worker's compensation industry for $2.2 million in cash. The membership interests, previously held by Six Points Investment Partners, LLC [a Mariano-owned company operating out of Patriot National's offices], were transferred to [Patriot National] pursuant to an Assignment and Assumption Agreement. The transaction closed on February 5, 2015."

263. Mariano, Shields, Del Pizzo, Shanfelter, Smith, and Walsh signed or authorized the signing of Patriot National's 2014 10-K. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

264. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

cash flows of the registrant as of, and for, the periods presented in this report," among other things.

265. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented the following material information: (1) GIC's ability to operate as a going concern and meet its regulatory capital requirements; (2) GIC's ability to pay and close out the accounts payable to Patriot National; (3) Patriot National's adherence to GAAP in its financial statements, including improperly accounting for doubtful accounts, goodwill, and "Customer & Carrier Relationships"; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and other rules and policies ensuring proper corporate governance; and (7) Mariano's compensation.

266. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013. To cover these losses and ensure that GIC could meet its year-end FOIR capital requirements, Mariano was forced to pump a total of $36 million into GIC. Thus, Patriot National and the Individual Defendants knew or were reckless in not knowing as of March 31, 2015, that GIC was unable to repay the $11,979,800 recorded as an account receivable as of December 31, 2014. Indeed, the account receivable from GIC had continued to grow since the end of 2014 and totaled $14.5 million on March 31, 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary

Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

267. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of March 31, 2015—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

268. The 2014 10-K failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

269. The 2014 10-K was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the 2014 10-K materially false and misleading.

270. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis

rather than accrue it as it is purportedly "earned." Patriot National's revenue as of December 31, 2014, was overstated by at least $11,979,800, the amount of the receivable recorded as owing from GIC. Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

271. In addition, the 2014 10-K contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons. Although the Registration Statement set forth Patriot National's policy, it did not disclose that Patriot National did not follow and had historically failed to comply with this policy. The statement that the Company would adhere to the policy after the IPO was false. Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without performing the necessary due diligence; and (5) the Board's decisions to accelerate the earn-out payments to Mariano barely a month after entering into the acquisition agreements with no reason for doing so. Thus, Patriot National had no intention to apply the policy as stated in the 2014 10-K.

272. The financial statements contained in the 2014 10-K also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be

tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

273. Approximately 84% of Patriot National's $61.5 million goodwill asset shown in the 2014 10-K resulted from its acquisitions of GUI and PCM, and that figure represented 36% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. By March 31, 2015, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

274. For the same reasons, Patriot National's accounting of approximately $7.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, misleading, and omitted information necessary to make such misstatements not misleading.

275. Additionally, the above detailed "Risk Factors" were false and misleading because the 2014 10-K failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary cause of GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and

GIC; (5) Patriot National's related party transaction policy was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and entering into impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to the Individual Defendants.

276. The 2014 10-K was also false and misleading because it did not disclose that: (1) Patriot National purchased DecisionUR directly from Mariano; and (2) Del Pizzo did not perform $109,000 worth of tax advisory services.

### C. The Company Q1 2015 10-Q Was False And Misleading

277. Defendant Pesch signed or authorized the signing of Patriot National's Form 8-K filed with the SEC on May 6, 2015.

278. On May 14, 2015, Patriot National filed its quarterly report for the period ended March 31, 2015 (the "Q1 2015 10-Q"). The Q1 2015 10-Q stated that "[t]he accompanying unaudited combined financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

279. The Q1 2015 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated:

> For the three months ended March 31, 2015, approximately 83% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 10% of our total fee income and fee income from related party was attributable to contracts with our second largest client.
>
> For the three months ended March 31, 2014, approximately 56% of our total fee income and fee income from related party was

> attributable to our contracts with [GIC], and approximately 31% of our total fee income and fee income from related party were attributable to our contracts with our second largest client.
>
> ***
>
> *Fee Income from Related Party*. Fee income from related party for the three months ended March 31, 2015 was $24.6 million compared to $2.5 million for the three months ended March 31, 2014, an increase of $22.1 million.
>
> ***
>
> **Concentration**
>
> For the three months ended March 31, 2015, approximately 83% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 10% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended March 31, 2014, approximately 56% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 31% and 7% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.
>
> As of March 31, 2015, approximately 84% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 5% and 3% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

280. Patriot National also reported in the Q1 2015 10-Q that as of March 31, 2015, it had $13.740 million in fee income receivable from related parties, an increase of $1.752 million from December 31, 2014. The Q1 2015 10-Q further provided that Patriot National had $14.5

million in accounts receivable owed by GIC as of March 31, 2015, and "[a]s of March 31, 2015, we were not subject to any material interest rate risk or credit risk[.]" Additionally, the filing stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

281. Additionally, the Q1 2015 10-Q reported an increase of approximately $6 million in goodwill, for a total of over $67 million as of March 31, 2015. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was worth over $7.7 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . . ***The intangible asset is tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the combined company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.***

282. The Q1 2015 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which stated:

> For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2014. ***Other than as described below, there have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2014.***

*283.* The only additional risk factor listed in the Q1 2015 10-Q was the following:

> **We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.**
>
> We have recently acquired a number of insurance services firms in a short period of time. We believe that similar acquisition activity will be important to maintaining comparable growth in the future. Failure to successfully identify and complete acquisitions likely would likely result in slower growth. . . .

> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as ***violations of sanctions laws or anti-corruption laws, risks relating to ensuring compliance with licensing and regulatory requirements***, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

284. The Q1 2015 10-Q further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

285. The Q1 2015 10-Q also disclosed Patriot National's acquisitions in that quarter. Specifically, it stated:

> On April 8, 2015, TriGen Insurance Solutions, Inc. ("TriGen"), our wholly owned subsidiary, entered into an asset purchase agreement with Hospitality Supportive Systems, LLC, a Pennsylvania limited liability company ("HSS"), and the sole shareholder of HSS effective April 1, 2015, pursuant to which we acquired substantially all of the assets of HSS for an estimated maximum of $9,650,000. Pursuant to the HSS purchase agreement, [Patriot National] paid HSS $5,605,000 in cash at closing. HSS will also be entitled to an earn-out payment of up to $4,045,000 twelve months after closing, subject to reduction on a pro-rata basis if EBITDA within the first year does not meet certain targets. On May 14, 2015, ***due to strong post-acquisition performance, the parties amended the HSS purchase agreement to cap the incentive earn-out at $5,000,000 and to accelerate the base earn-out to be paid as of the date of the amendment.***

> On April 8, 2015, TriGen also entered into an asset purchase agreement with Selective Risk Management LLC, a Pennsylvania limited liability company ("SRM"), and the shareholders of SRM effective April 1, 2015, pursuant to which we acquired substantially all of the assets of SRM for a maximum of $3,845,000. Pursuant to the SRM purchase agreement, we paid SRM $1,922,500 in cash at closing. SRM will also be entitled to an earn-out payment of up to $1,922,500 twelve months after closing, subject to reduction on a pro-rata basis if EBITDA within the first year does not meet certain targets. On May 14, 2015, ***due to strong post-acquisition performance, the parties amended the SRM purchase agreement to accelerate the earn-out to be paid as of the date of the amendment.***
>
> On April 17, 2015, Vikaran Technology Solutions, Inc. ("VTS"), our wholly owned subsidiary, entered into an agreement and plan of merger with Vikaran Solutions, LLC, an Illinois limited liability company ("Vikaran"), and certain members of Vikaran, pursuant to which Vikaran was merged with and into VTS. The merger closed on April 17, 2015 for a purchase price of $8,500,000 paid in cash at closing.

286. Defendant Shields signed or authorized the signing of the Q1 2015 10-Q filed with the SEC on May 14, 2015. Mariano and Shields each certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

287. 283. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and

cash flows of the registrant as of, and for, the periods presented in this report," among other things.

288. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for income, goodwill, account receivable, and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National as of May 14, 2015; and/or (6) the propriety and performance of the Company's recent acquisitions.

289. As detailed above, between 2007 and 2013, GIC sustained over $43 million in total losses. Mariano needed to inject a total of $36 million into GIC for it be able to remain in business and meet its annual capital requirements. Thus, Patriot National and the Individual Defendants knew or were reckless in not knowing on May 14, 2015, that GIC would be unable to repay the $14.5 million account receivable. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future. (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

290. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's

bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of May 14, 2015—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

291. The Q1 2015 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

292. The Q1 2015 10-Q was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Q1 2015 10-Q materially false and misleading.

293. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue as of March 31, 2015 was overstated by at least $2.5 million, the quarterly increase in the amount of the

receivable recorded as owing from GIC. Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

294. The financial statements contained in the Q1 2015 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

295. Approximately 76.8% of Patriot National's $67.1 million "goodwill" asset listed in the Q1 2015 10-Q resulted from its acquisitions of GUI and PCM, and that figure represented 30% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. As of May 14, 2015, Patriot National and the Individual Defendants knew, or were recklessly uninformed, of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

296. For the same reasons, Patriot National's accounting of approximately $7.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded,

and thus, false and omitted information necessary to make such misstatements not misleading.

297. Additionally, the above detailed "Risk Factors" were false and misleading because the Q1 2015 10-Q and the 2014 10-K failed to disclose that, as of May 14, 2015: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary cause of GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's related party transaction policy was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and entering into impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to the Individual Defendants.

298. The "Subsequent Events" statements detailing the numerous acquisitions by Patriot National in the first quarter of 2015 were also false and materially misleading because they misrepresented or omitted that: (1) Snow (the former owner of acquired companies HSS, Selective, and Carman) was a long-time friend of Mariano; (2) the "strong post-acquisition performance" which the Company used to justify the accelerated earn-out payments was based upon fraud; (3) as a result of the fraudulent conduct engaged in at the newly acquired subsidiaries, Patriot National was facing significant risks; and (4) Snow was receiving "consulting" fees from Patriot National and GIC. All of the above would slowly be revealed to the public and regulators, which resulted in Patriot National's inability to file its annual statement for 2016, GIC's Receivership, and ultimately, Patriot National's bankruptcy.

**D. The Q2 2015 10-Q, Issued August 14, 2015, Was False And Misleading**

299. On August 14, 2015, Patriot National filed its quarterly report for the period ended June 31, 2015 (the "Q2 2015 10-Q"). The Q2 2015 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

300. The Q2 2015 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended June 30, 2015 was $47.4 million compared to $15.5 million for the three months ended June 30, 2014, an increase of $31.9 million or approximately 206%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first two quarters of 2015.
>
> Total fee income and fee income from related party for the six months ended June 30, 2015 was $90.4 million compared with $31.1 million for the same period in 2014, an increase of $59.3 million or 191%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first two quarters of 2015.
>
> For the three and six months ended June 30, 2015, approximately 70% and 76%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 9% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and six months ended June 30, 2015.
>
> For the three and six months ended June 30, 2014, approximately 58% and 57%, respectively, of our total fee income and fee income

from related party was attributable to our contracts with [GIC], and approximately 36% and 34%, respectively, of our total fee income and fee income from related party were attributable to our contracts with our second largest client.

***

*Fee Income from Related Party*. Fee income from related party for the three months ended June 30, 2015 was $20.5 million compared to $6.3 million for the three months ended June 30, 2014, an increase of $14.2 million. For the six months ended June 30, 2015, fee income from related party was $45.1 million compared to $8.8 million for the six months ended June 30, 2014, an increase of $36.3 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the six-month period ended June 30, 2015 relative to the six-month period ended June 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, *Related Party Transactions*. Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC]. Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], as described in Note 13, *Concentration*, [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

***

> **Concentration**
>
> For the three months ended June 30, 2015, approximately 70% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 9% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended June 30, 2014, approximately 58% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 36% and 6% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.
>
> For the six months ended June 30, 2015, approximately 76% of total combined fee income and fee income from related party was attributable to contracts with [GIC] and approximately 9% was attributable to contracts with [Patriot National]'s second largest customer. For the six months ended June 30, 2014, approximately 57% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 34% and 6% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.
>
> As of June 30, 2015, approximately 67% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% and 1% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.
>
> Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

301. Patriot National also reported in the Q2 2015 10-Q that as of June 30, 2015, it had $16.6 million in fee income receivable from related parties, an increase of $2.1 million from the

previous quarter and $4.6 million (38.6%) since December 31, 2014. The Q2 2015 10-Q further stated that despite the $16.6 million in accounts receivable attributable to GIC and, "[a]s of June 30, 2015, we were not subject to any material interest rate risk or credit risk[.]" Additionally, the filing stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

302. Additionally, the Q2 2015 10-Q reported an increase of approximately $24.3 million in goodwill, for a total of over $85.7 million as of June 30, 2015. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $22 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, [Patriot National] will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.

303. The Q2 2015 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which provided: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2014. Other than as described below, there have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2014." The only additional risk factor listed in the Q2 2015 10-Q was the following:

> **We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.**

> We have recently acquired a number of insurance services firms in a short period of time. We believe that similar acquisition activity will be important to maintaining comparable growth in the future. Failure to successfully identify and complete acquisitions likely would likely result in slower growth. . . .
>
> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as violations of sanctions laws or anti-corruption laws, ***risks relating to ensuring compliance with licensing and regulatory requirements***, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

304. The Q2 2015 10-Q further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

305. The Q2 2015 10-Q also disclosed Patriot National's acquisitions in that quarter. Specifically, the Q2 2015 10-Q stated:

> On July 20, 2015 [Patriot National] entered into a membership interest purchase agreement with Global HR Research LLC, a Florida limited liability company ("Global HR"), In Touch Holdings LLC, a Florida limited liability company ("ITH"), the members of Global HR, and Brandon G. Phillips as the sellers' representative, pursuant to which, subject to the satisfaction or waiver of certain conditions, [Patriot National] will acquire all of the outstanding membership interests of Global HR. The Global HR transaction is expected to close on the later of (i) three business days following the satisfaction of certain customary closing conditions and (ii) August 25, 2015. ***One of [Patriot National]'s***

> ***independent directors, Austin J. Shanfelter, indirectly controls Global HR*. . . .**

306. Defendant Shields signed or authorized the signing of the Q2 2015 10-Q filed with the SEC on August 14, 2015. Mariano and Shields also certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

307. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," among other things.

308. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for income, goodwill, account receivable, and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National as of August 14, 2015; and/or (6) the propriety of Patriot National's recent acquisitions.

309. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013. To cover these losses and ensure that GIC could meet its year-end FOIR capital requirements, Mariano was forced to pump a total of $36 million into GIC. Thus, Patriot National and Mariano knew or were reckless in not knowing as of August 14, 2015, that GIC would be unable to repay the $14.5 million recorded as an account receivable as of June 30, 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds in the future. (And indeed this was repeatedly proven to be true, in the failed Secondary Offering, the PIPE, the sham Strategic Review, the Leveraged Recap, the GIC Bailout, Mariano's Severance, and ultimately, GIC's Receivership.)

310. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of August 14, 2015—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

311. The Q2 2015 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to

enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

312. The Q2 2015 10-Q was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Q2 2015 10-Q materially false and misleading.

313. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue for the three months ended June 30, 2015 was overstated by at least $2.1 million, the quarterly increase in the amount of the receivable recorded as owing from GIC. Consequently, Patriot National's financial statements set forth in the Q2 2015 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

314. The financial statements contained in the Q2 2015 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

315. Approximately 60% of Patriot National's $85.8 million goodwill asset listed in the Q2 2015 10-Q resulted from its acquisitions of GUI and PCM, and that figure represented 23% of all Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on revenue from GIC. By August 14, 2015, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

316. For the same reasons, Patriot National's accounting of approximately $22 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, misleading, and omitted information necessary to make such misstatements not misleading.

317. Additionally, the above detailed risk factors were false and misleading because the Q2 2015 10-Q failed to disclose that, as of August 14, 2015: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary cause of GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's related party transaction policy was ineffective, feckless, and/or Patriot

National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and entering into impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to the Individual Defendants.

318. Additionally, as explained above, Global HR was a disaster for Patriot National because the Company grossly overpaid in the acquisition. In fact, once Shanfelter left Patriot National and competent individuals were placed in charge of the Audit Committee, they immediately wrote down the goodwill attributable to Global HR by $17.7 million, or more than 42% of its purchase price. Further, Patriot National sold Global HR for a loss of approximately $20 million, barely a year and a half after acquiring it. Accordingly, Patriot National's statements in support of the purported valuation of Global HR were clearly false and misleading.

**E. The Secondary S-1 Filed October 15, 2015 Was False And Misleading**

319. On October 15, 2015, Patriot National filed a Secondary S-1 with the SEC. The Company sought to sell $55 million in common stock and Mariano sought to sell approximately $326.2 million worth of his holdings in the Company. The Secondary S-1 stated that Patriot National "intend[e]d to use a portion of the net proceeds from this offering to finance our growth strategy, which may include possible acquisitions of, or investments in, businesses or other assets, and to repay all outstanding amounts under the revolving credit facility of our senior secured credit facility, including accrued interest. We will use any remaining net proceeds of this offering for working capital and for general corporate purposes."

320. The Secondary S-1 stated, among other things, that Patriot National is "not currently subject to any material interest rate risk or credit risk." The Secondary S-1 further explained that Management "assess[es] the collectability of [Fee Income Receivable from Related Parties] balances and adjust[s] the receivable to the amount expected to be collected

through an allowance for doubtful accounts. As of December 31, 2014, we maintained an allowance for doubtful accounts of approximately $0.1 million." Additionally, the Secondary S-1 stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

321. Additionally, the Secondary S-1 stated that "[a]s of June 30, 2015, we had approximately $85.8 million of goodwill and approximately $67.1 million of net intangible assets (the latter, net of $5.0 million of accumulated amortization and generating a deferred tax liability of approximately $12.3 million) recorded, which represents, in the aggregate, 68% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI Acquisition and PCM Acquisition]." The prospectus further stated "[w]e assess potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired." Moreover, it stated that Patriot National "determined that there was no [goodwill] impairment as of December 31, 2014 or June 30, 2015."

322. The Secondary S-1 also contained the following "Risk Factors":

> **Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**
>
> ***
>
> . . . ***[W]e will continue to be significantly impacted by the overall business levels of these carrier partners. While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control. . . . . In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive***. A reduction in the business levels of our

carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues.

***

**Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.**

As of September 25, 2015, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owned 62.2% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIG], the parent company of [GIC]. As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders. Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC]. . . .

***

**We have acquired 16 insurance and other services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.**

***

***Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, assumption of unexpected or unknown contingencies or liabilities, risks relating to ensuring compliance with licensing and regulatory requirements, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth.*** Post-acquisition deterioration of targets could also result in lower or

> negative earnings contribution and/or goodwill impairment charges.
>
> ***
>
> **We are subject to extensive regulation and supervision and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business.**
>
> Our carrier partners, as insurance companies, are also heavily regulated by the states in which they operate, as well as by the federal government for participation in government-sponsored programs such as Medicare and Medicaid**. *They are subject to regulations regarding, among other things, solvency, capital levels, loss reserves, investments, pricing, and affiliate transactions.*** Although we are not subject to regulation as an insurance company, pursuant to our agreements with our insurance carrier clients, we assume liability for compliance with all applicable laws, regulations and regulatory bulletins regarding the reporting of policy data for our clients. . . . ***In addition, we could also be indirectly impacted by regulatory changes that affect our carrier partners if they cause them to terminate or alter their relationships with us.***

323. The Secondary S-1 contained the following "Statement of Policy Regarding Transactions with Related Persons":

> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may

> also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

324. The Secondary S-1 stated that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the amounts of approximately $336,000 in the year ended December 31, 2013 and approximately $109,000 in the in the year ended December 31, 2014 for tax advisory services it performed in fiscal years 2011, 2012 and 2013 in respect of entities that are now our subsidiaries."

325. The Secondary S-1 further states that Mariano received no compensation for 2014 and $255,235 in total compensation for 2013. The annual report states:

> The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

326. Mariano, Shields, Del Pizzo, Shanfelter, Smith, and Walsh signed or authorized the signing of Patriot National's Secondary S-1 filed with the SEC on October 15, 2015.

327. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts, goodwill, and "Customer & Carrier Relationships"; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that that GIC posed to Patriot National as of October 15, 2015; and (6) Patriot National's adherence to its Policy

Regarding Transactions with Related Persons and other rules and policies ensuring proper corporate governance.

328. The Secondary S-1 was false and misleading because it misrepresented and/or omitted the true reasons for the Secondary Offering. Mariano caused Patriot National to announce the Secondary Offering so that he could obtain the liquidity he needed to provide GIC capital to meet its 2015 FOIR capital requirements and pay off his debt to Von Allmen incurred in the purchase of his mega-yacht. Patriot National's stated reason for the Secondary Offering (primarily, to "finance [its] growth strategy") was mere pretext for Mariano to obtain the cash he needed, while raising money to cover the hole in the Company budget when GIC inevitably could not repay its accounts payable to Patriot National.

329. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013. To cover these losses and ensure that GIC could meet its year-end FOIR capital requirements, Mariano was forced to pump a total of $36 million into GIC. Thus, Patriot National and the Individual Defendants knew or were reckless in not knowing as of October 15, 2015, that GIC would be unable to repay the $16.5 million recorded as an account receivable as of June 30, 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

330. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of October 15, 2015—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

331. The Secondary S-1 failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

332. The Secondary S-1 was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Secondary S-1 materially false and misleading.

333. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue as of December 31,

2014 was overstated by at least $11,979,800, the amount of the receivable recorded as owing from GIC and its revenue for the six months ended June 30, 2015 was overstated by at least $4.6 million, the additional account receivable from GIC recorded by Patriot National during that period. Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

334. In addition, the Secondary S-1 contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons. Although the Secondary S-1 set forth Patriot National's purported policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it currently applied the policy was false. Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent, but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without performing the necessary due diligence; (5) the Board's decisions to accelerate the earn-out payments to Mariano and Snow barely a month after entering into the acquisition agreements; and (6) the Board's approval of the Secondary Offering for Mariano's personal benefit and no legitimate business reason. Thus, Patriot National's statement in the Secondary S-1 that it applied the disclosed Policy Regarding Transactions with Related Person was false.

335. The financial statements in the Secondary S-1 also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any

excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

336. Approximately 60% of Patriot National's $85.8 million "goodwill" asset listed in the Secondary S-1 was tied to its acquisitions of GUI and PCM, and that figure represented 23% of all Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. By October 15, 2015, Patriot National and the Individual Defendants knew, or were recklessly uninformed, of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring that Patriot National test for impairment of goodwill in its financial statements to reflect the true worth of GUI's contracts and assets and liabilities, as well as PCM's business as they relate to GIC. Had Patriot National done so, it would not have reported such businesses to have approximately $50 million in combined goodwill. However, Patriot National did not conduct an impairment test for its goodwill, and thus, the statement that Patriot National adhered to GAAP's goodwill impairment requirements was false and/or misleading.

337. For the same reasons, Patriot National's accounting of approximately $22 million in intangible assets related to customer and carrier relationships (namely, GIC) was unfounded and thus false, and omitted information necessary to make such misstatements not misleading.

338. Additionally, the above detailed risk factors were false and misleading because the Secondary S-1 failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline was not "impacted by many factors outside

of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary cause of GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (5) Patriot National's related party transaction policy was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and entering into impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to the Individual Defendants .

339. The Secondary S-1 was also false and misleading for stating in the "Statement of Policy Regarding Transactions with Related Persons" that, among other things, the Audit Committee and/or disinterested directors oversee and approve interested transactions. This was false and misleading because Patriot National did not follow this policy. Each of the purportedly independent directors that oversaw the "Policy Regarding Transactions with Related Persons" was operating for the benefit of Mariano and/or themselves, as revealed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services which were never provided; (2) GIC's business dealings with Patriot National; and (3) the Board's decisions to acquire numerous companies from Mariano and his close friends and associates without due care.

340. The Secondary S-1 was also false and misleading because it did not disclose that Del Pizzo did not perform $336,000 and $109,000 worth of tax advisory services in 2013 and 2014, respectively.

**F. The Q3 2015 10-Q Issued November 12, 2015, Was False And Misleading**

341. On November 12, 2015, Patriot National filed its quarterly report for the period ended September 30, 2015 (the "Q3 2015 10-Q"). The Q3 2015 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity

with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

342. The Q3 2015 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended September 30, 2015 was $58.5 million compared to $31.4 million for the three months ended September 30, 2014, an increase of $27.1 million or approximately 86%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first three quarters of 2015.
>
> Total fee income and fee income from related party for the nine months ended September 30, 2015 was $148.9 million compared with $62.5 million for the same period in 2014, an increase of $86.4 million or approximately 138%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed in the first three quarters of 2015.
>
> For the three and nine months ended September 30, 2015, approximately 66% and 72%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% and 8% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and nine months ended September 30, 2015.
>
> For the three and nine months ended September 30, 2014, approximately 76% and 66%, respectively, of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 10% and 22%, respectively, of our total fee income and fee income from related party were attributable to our contracts with our second largest client.
>
> ***

*Fee Income from Related Party*. Fee income from related party for the three months ended September 30, 2015 was $23.8 million compared to $15.8 million for the three months ended September 30, 2014, an increase of $8.0 million. For the nine months ended September 30, 2015, fee income from related party was $68.9 million compared to $24.6 million for the nine months ended September 30, 2014, an increase of $44.3 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the nine-month period ended September 30, 2015 relative to the nine-month period ended September 30, 2014, and, accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, Related Party Transactions. Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC]. Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

***

**Concentration**

For the three months ended September 30, 2015, approximately 66% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended September 30, 2014, approximately 76% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 10% and 7% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

> For the nine months ended September 30, 2015, approximately 72% of total combined fee income and fee income from related party was attributable to contracts with [GIC] and approximately 8% was attributable to contracts with [Patriot National]'s second largest customer. For the nine months ended September 30, 2014, approximately 66% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 22% was attributable to contracts with [Patriot National]'s second largest customer.
>
> As of September 30, 2015, approximately 62% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% and 1% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2014, approximately 86% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 8% and 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

343. Patriot National also reported in the Q3 2015 10-Q that as of September 30, 2015, it had $22.1 million in fee income receivable from related parties, an increase of $6.6 million since the previous quarter and an increase of $10.2 million, or 85%, since December 31, 2014. The Q3 2015 10-Q further stated that Patriot National had $22 million in accounts receivable owed by GIC as of September 30, 2015, and "[a]s of September 30, 2015, we were not subject to any material interest rate risk or credit risk[.]"

344. Additionally, the Q3 2015 10-Q reported a total of over $119.4 million as of September 30, 2015. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $29 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the company will incur an accounting charge for

> the amount of impairment during the fiscal quarter in which the determination is made.

345. The Q3 2015 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2014. Other than as described below, there have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2014." The only additional "Risk Factor" listed in the Q3 2015 10-Q was the following:

> **We have acquired a number of insurance services firms in a short period of time, and there are risks associated with such acquisitions, which could adversely affect our growth and results of operations.**
>
> Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, contingencies or liabilities, such as violations of sanctions laws or anti-corruption laws, ***risks relating to ensuring compliance with licensing and regulatory requirements***, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.

346. The Q3 2015 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties;" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

347. Defendant Shields signed or authorized the signing of the Q3 2015 10-Q filed with the SEC on November 12, 2015. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

348. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," among other things.

349. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National as of November 12, 2015; and (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance.

350. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013. To cover these losses and ensure that GIC could meet its year-end FOIR capital requirements, Mariano was forced to pump a total of $36 million into GIC. Thus, Patriot National and the Individual Defendants knew or were reckless in not knowing as of November 12, 2015 that GIC would be unable to repay the $22.1 million recorded as an account receivable as of September 30, 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

351. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of March 31, 2015—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

352. The Q3 2015 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock

price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

353. The Q3 2015 10-Q was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Q3 2015 10-Q materially false and misleading.

354. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue as purportedly "earned." Patriot National's revenue for the three months ended September 30, 2015 was overstated by at least $6.6 million, the quarterly increase in the amount of the receivable recorded as owing from GIC. Consequently, Patriot National's financial statements as set forth in the Q3 2015 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

355. The financial statements contained in the Q3 2015 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

356. Approximately 43% of Patriot National's $119.4 million "goodwill" asset listed in the Q3 2015 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 18% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. As of November 12, 2015, Patriot National and the Individual Defendants knew, or were recklessly uninformed, of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

357. For the same reasons, Patriot National's accounting of approximately $29.8 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

358. Additionally, the above detailed "Risk Factors" were false and misleading because the Q3 2015 10-Q and the 2014 10-K failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) GIC's decline was not "impacted by many factors outside of [Patriot National's] control," as Patriot National executives controlled GIC; (3) the primary cause of GIC's decline was Mariano's looting; (4) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue

benefits for himself and GIC; (5) Patriot National's related party transaction policy was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (6) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios and entering into impermissible related party transactions; and/or (7) the aforementioned regulatory issues at GIC were known to the Individual Defendants .

### G. The Company Misrepresented The PIPE Transaction In An Announcement Dated December 14, 2015

359. On December 14, 2015, Patriot National filed a Form 8-K with the SEC stating:

> On December 13, 2015 (the "Signing Date"), Patriot National . . . and Steven M. Mariano, the President and Chief Executive Officer of [Patriot National], as the selling stockholder (the "Selling Stockholder"), entered into a Securities Purchase Agreement (the "Purchase Agreement") [*sic*] certain purchasers named therein (the "Purchasers"), pursuant to which, subject to the satisfaction or waiver of certain conditions, (i) [Patriot National] will issue and sell, and the Purchasers will purchase, an aggregate of 1,666,666 shares (the "Company Shares") of common stock of [Patriot National], par value $0.001 per share (the "Common Stock"), (in the form of 666,666 shares of common stock and a prepaid warrant for 1,000,000 shares of common stock) and warrants to purchase up to an aggregate of 2,083,333 shares of Common Stock (the "Warrant Shares"), subject to adjustments pursuant to which additional shares may be issued, to be issued by [Patriot National] (the "Warrants"), for an aggregate purchase price of approximately $20 million, and (ii) the Selling Stockholder will sell, and the Purchasers will purchase, an aggregate of 2,500,000 shares (together with [Patriot National] Shares, the "Firm Shares") of Common Stock, for an aggregate purchase price of approximately $30 million, in a private placement transaction (the "Transaction"). The Purchase Agreement contains certain customary representations and warranties accompanied by certain indemnification rights and certain customary and other closing conditions. The transaction is expected to close on December 16, 2015 (the date of such closing, the "Closing Date").
>
> ***

> On the Signing Date, [Patriot National] and the Selling Stockholder entered into an agreement (the "Stock Back-to-Back Agreement"), pursuant to which [Patriot National] will repurchase a number of shares of Common Stock owned by the Selling Stockholder equal to 60% of the Warrant Shares to be issued in connection with the exercise by Purchasers of the Warrants.
>
> The issuance and sale, as applicable, of the Firm Shares and the Warrants are intended to be exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"). [Patriot National] expects to rely upon Section 4(a)(2) of the Securities Act, as the issuance and sale of the Firm Shares and Warrants pursuant to the Purchase Agreement do not involve a public offering and further upon reliance on the representation by each Purchaser that it is acquiring the securities for its own account, for investment only, and not with a view to any resale or public distribution thereof.

360. Patriot National's press release over Globe Newswire, attached to the Form 8-K as Exhibit 99.1, explained that "[Patriot National] expects to use the proceeds from this transaction for general corporate purposes."

361. Defendant Pesch signed or authorized the signature of the Form 8-K.

362. In another Patriot National press release, dated December 14, 2015, announcing the PIPE Transaction, Patriot National stated:

> Steven M. Mariano, President and CEO of Patriot National said, "We appreciate the support of the investors who participated in our offering and their confidence in our plans for continued strong growth. ***We plan to maintain a strong balance sheet and to use the proceeds of this offering to finance future growth, including strategic acquisitions***. Since we completed our IPO, we have completed 16 acquisitions that have significantly expanded our carrier relationships, increased our distribution reach and diversified our business beyond workers' compensation. We have a robust pipeline of acquisition opportunities and with the proceeds of this offering, we are confident that we can continue to make strategic acquisitions that will enhance shareholder value. ***Furthermore, increasing our float through this transaction will create more liquidity, to the benefit of current and potential shareholders***.

363. Similarly, on December 16, 2015, Patriot National issued a press release announcing the close of the PIPE Transaction. Among other things, the press release quoted Mariano as saying:

> "We are pleased to have completed this capital raise so that we can continue to execute our balanced growth strategy, which includes a combination of organic growth and strategic acquisitions. With a strong balance sheet, we are well positioned to continue to invest in organic growth initiatives to expand our carrier and employer relationships by cross selling our broad suite of insurance services and to make selective, accretive acquisitions in our core insurance services business operations."
>
> Mr. Mariano continued, "[Patriot National] has no plans to raise additional equity and I have no plans to sell any shares in 2016. After this one time sale I remain the majority stockholder of Patriot National, and as such my interests continue to be fully aligned with stockholders to grow our business and create stockholder value. We remain highly confident in the 2016 financial guidance reiterated in our most recent earnings release."

364. The above statements were false and misleading because they omitted and/or misrepresented the purpose for PIPE Transaction—*i.e.*, to provide Mariano with $30 million to fund GIC's capital requirements and cover his yacht payments. These statements were also false and misleading because they omitted and/or misrepresented why Patriot National needed to raise additional capital less than one year after the IPO. Finally, the statements misrepresented the strength of Patriot National's balance sheet and its business growth.

### H. The Company Misrepresented The Amended PIPE Transaction In An Announcement Dated December 23, 2015

365. On December 23, 2015, Patriot National filed a Form 8-K with the SEC, stating:

> On December 23, 2015 (the "Signing Date"), Patriot National . . . entered into several agreements (collectively, the "Rescission and Exchange Agreement") with Steven M. Mariano, the President and Chief Executive Officer of [Patriot National] (the "Stockholder"), and certain investors named therein (the "Investors"), pursuant to which [Patriot National] has rescinded the purchase and sale of an aggregate of 1,666,666 shares (the "Shares") of common stock of

> [Patriot National], par value $0.001 per share (the "Common Stock") (in the form of 666,666 shares of common stock and a prepaid warrant for 1,000,000 shares of common stock) issued on December 16, 2015, for an aggregate purchase price of approximately $20 million, and [Patriot National] has exchanged the warrants previously issued by [Patriot National] to each of the Investors for new warrants (the "New Warrants") to purchase up to an aggregate of 3,250,000 shares of Common Stock (the "New Warrant Shares") (the "Transaction"). The Rescission and Exchange Agreement contains certain customary representations and warranties accompanied by certain indemnification rights and certain customary and other closing conditions.
>
> ***On the Signing Date, [Patriot National] and the Stockholder amended and restated a stock back-to-back agreement (the "Amended and Restated Stock Back-to-Back Agreement"), pursuant to which [Patriot National] will repurchase a number of shares of Common Stock owned by the Stockholder equal to 100% of the New Warrant Shares to be issued in connection with the exercise by Investors of the New Warrants, resulting in no dilution for existing shareholders.***

366. Patriot National's press release over Globe Newswire, attached to the Form 8-K as Exhibit 99.1, further states:

> Steven M. Mariano, Patriot National Chairman and Chief Executive Officer noted, "The decline in our stock price since the closing of the original transaction has had a meaningful impact to our stockholders. Following many productive conversations with our investors, [Patriot National] worked diligently with the private placement investors and mutually agreed to rescind [Patriot National] portion of the transaction. Patriot National has no plans to raise equity capital in 2016, and, as previously announced, I have no plans to sell any additional shares in the coming year."
>
> Mariano added, "Our continued organic growth and strong free cash flow – as evidenced by our reiteration of 2016 guidance during the 3rd quarter earnings report – in combination with our present credit facility, will allow us to continue to execute our balanced growth strategy, which consists of investments in organic growth initiatives as well as selective strategic acquisitions in our core business lines."

367. The above statements were false and misleading because they omitted and/or misrepresented the true purpose for PIPE Transaction, *i.e.*, to provide Mariano with $30 million

to fund GIC's capital requirements and cover his yacht payments. They also misrepresented the strength of Patriot National's business—the Company's "organic growth and strong free cash flow" was illusory.

368. The above statements were also false and misleading because they omitted and/or misrepresented Mariano's impetus to amend the PIPE Transaction, which was to prevent the dilution of his control over Patriot National. Because Mariano's core motivation was to maintain control of the Company, he never intended to honor the Back-to-Back Agreement and tender his shares to Patriot National. In fact, Mariano intended to use his control of Patriot National to prevent the exercise of the warrants.

### I. The Company Issued A Press Release On February 29, 2016, Containing A Misleading Strategic Initiatives Update

369. On February 29, 2016, Patriot National issued a press release, "Patriot National Updates 2016 Strategic Initiatives for Value Creation." The press release stated:

> Steven M. Mariano, Chairman and Chief Executive Officer of Patriot National, stated, ". . . . Our 2015 achievements reflect our efforts to build a world-class platform that gives us a significant competitive advantage. ***More importantly, it positions Patriot National to increase revenue and profitability and deliver improved shareholder returns.***
>
> "As we move forward into 2016, our near-term objectives include increasing organic growth through cross-selling and offering more choices to agencies and carriers, as well as enhancing our platform and technology capabilities with a few surgical acquisitions. ***Furthermore, with the integration of our 2015 acquisitions behind us***, we expect margins to expand as our Adjusted EBITDA grows faster than revenue. We can achieve our 2016 plan without raising additional capital."
>
> ***"Patriot National is fortunate to have a Board of Directors committed to lending their experience and skills to help facilitate, as well as oversee, these strategic value creation initiatives. Three of our outside directors have agreed to serve on a new committee expressly dedicated to this mission. Our management team looks***

> ***forward to working with the Board committee in our collective efforts to enhance shareholder value."***
>
> Management and the Board committee will assess the potential merits of initiatives for alignment with [Patriot National]'s value creation strategy, will evaluate any unsolicited proposals, and may engage third party advisors, as appropriate. [Patriot National] previously engaged a financial advisor to assist in exploring opportunities that may accelerate value creation, and that engagement will continue, if it proves to be useful, under the guidance of the Board committee.

370. The above statements were false and materially misleading because they omitted and/or misrepresented, *inter alia*, (1) that the Special Committee was independent when it was in fact beholden to Mariano; (2) that the Special Committee was functioning as it was supposed to (when in fact the Strategic Review was dominated by Mariano); (3) Mariano dictated the timeframe for a transaction based on his year-end liquidity needs; (4) that Mariano had alternative motives for the Strategic Review, namely, to fight with the PIPE Investors, bail out GIC, and fund Ashmere and his own personal obligations; (5) that there were improper and/or fraudulent activities occurring at Patriot National's subsidiaries; and (6) that Patriot National's 2015 acquisitions were successfully integrated.

**J. The Company Announced The Repurchase Program On March 7, 2016**

371. On March 7, 2016, Patriot National filed a Form 8-K with the SEC stating:

> On March 3, 2016, the Board of Directors of Patriot National . . . approved a $15 million stock repurchase program (the "Repurchase Program"). Under the new Repurchase Program, [Patriot National] may repurchase up to $15 million of its common stock. The Repurchase Program may continue for up to eighteen (18) months. [Patriot National] may repurchase its common stock from time to time, in amounts and at prices [Patriot National] deems appropriate, subject to market conditions and other considerations. [Patriot National's] repurchases may be executed using open market purchases or negotiated off-market transactions.

372. Patriot National's press release, attached to the Form 8-K as Exhibit 99.1, further states:

> ***"We believe [Patriot National]'s common stock is significantly undervalued and does not reflect the value or the earnings power of our operating platform, which is unparalleled in the marketplace and positions Patriot National for long-term sustainable growth and profitability***," said Steven M. Mariano, Chief Executive Officer of Patriot National. ***"Our management team and Board are focused on evaluating all opportunities to create value for our shareholders and we are pleased to announce this share repurchase program."***

373. The above statements were false and misleading because they omitted and/or misrepresented the purpose for the Repurchase Program. As demonstrated above, Mariano's impetus for the Repurchase Program was to decrease his risk under the New Series B Warrants and further entrench himself as majority shareholder.

374. Additionally, the above statements were false and misleading because they omitted and/or misrepresented Patriot National's ability to afford the Repurchase Program. The statements fail to disclose that Mariano and the Board made matters worse at Patriot National by forcing it to amend the BMO Credit Facility so that Mariano could obtain funds and ability to repurchase Patriot National stock. Lastly, the above statements were false and misleading because they omitted and/or misrepresented UBS's, Snow's, and Allied Standard Asset Management, LLC's ("Allied Standard") roles in the Repurchase Program. Allied Standard is a secretive investment company owned by Mariano that was run out of Patriot National's headquarters. Allied Standard made stock purchases on behalf of GIC and worked with Mariano to manipulate Patriot National's stock price.

### K. The Company's 2015 Annual Report Filed March 21, 2016, Was False And Misleading

375. On March 21, 2016, Patriot National filed its annual report for the fiscal year ended December 31, 2015 on 10-K with the SEC (the "2015 10-K").

376. The 2015 10-K stated that "[t]he accompanying consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

377. The 2015 10-K stated "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the year ended December 31, 2015 was $209.8 million compared to $102.7 million for the year ended December 31, 2014, an increase of $107.1 million or approximately 104%. The increase was primarily due to increased overall revenue in organic growth, acquisition revenue and fee income from related party.
>
> For the year ended December 31, 2015, approximately 69% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 7% of our total fee income and fee income from related party was attributable to contracts with our second largest client.
>
> ***
>
> *Fee Income from Related Party*. Fee income from related party for the year ended December 31, 2015 was $86.9 million compared to $46.9 million for the year ended December 31, 2014, an increase of $40.0 million or approximately 85%.
>
> ***The increase was principally attributable to an increase of $41.3 million of brokerage and policyholders services fee income from [GIC]***. On August 6, 2014 we entered into a new agreement with [GIC] to provide all of our brokerage and policyholder services to [GIC], with no such contract existing previously during 2014. The

increase was partially offset by a decrease of $3.1 million of claims administration services fee income earned from [GIC] for the year ended December 31, 2015.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the year ended December 31, 2015 relative to the year ended December 31, 2014 and, accordingly, the net increase in fee income from related party was solely related to changes in the volume of business we managed.

***

**Concentration**

For the year ended December 31, 2015, approximately 69% of total fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 7% was attributable to contracts with [Patriot National]'s second largest customer. For the year ended December 31, 2014, approximately 71% of total fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 18% was attributable to contracts with [Patriot National]'s second largest customer. For the year ended December 31, 2013, approximately 44% of total fee income and fee income from related revenues was attributable to contracts with [GIC] and approximately 38% and 12% were attributable to contracts with [Patriot National]'s second and third largest customers, respectively.

As of December 31, 2015, approximately 77% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 3% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer. As of December 31, 2014, approximately 86% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 8% and 2% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. As of December 31, 2013, approximately 62% of fee income receivable and fee income receivable from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related

> party, and approximately 23% and 11% of fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second and third largest customers, respectively. Management believes that the receivable balances from these largest customers do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience.
>
> Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

378. Patriot National also reported in the 2015 10-K that as of December 31, 2015, it had $27.1 million in fee income receivable from related party, a dramatic increase of $15.2 million (or 127%) in fee income receivable from related party since December 31, 2014.

379. The 2015 10-K further stated that, as of December 31, 2015, Patriot National is "***not currently subject to any material interest rate risk or credit risk***." The 2015 10-K also stated that the Company had $27.1 million in accounts receivable owed by GIC and that "Management believes that the receivable balances from these largest customers [*i.e.*, GIC] do not represent significant credit risk based on cash flow forecasts, balance sheet analysis and past collection experience." The 2015 10-K further explained that Management "assess[es] the collectability of [Fee Income Receivable from Related Parties] balances and adjusts the receivable to the amount expected to be collected through an allowance for doubtful accounts. As of December 31, 2015, we maintained an allowance for doubtful accounts of approximately $0.3 million." Patriot National also stated that "***We expect a significant increase in brokerage and policyholder services fee income from [GIC] going forward***."

380. Additionally, Patriot National states in the 2015 10-K that "[a]s of December 31, 2015, we had approximately $118.1 million of goodwill and approximately $75.7 million of net intangible assets (the latter, net of $11.5 million of accumulated amortization and generating a

deferred tax liability of approximately $9.1 million) recorded, which represents, in the aggregate, 63% of our total assets. This goodwill and intangible assets are primarily associated with the [GUI Acquisition and PCM Acquisition]. We assess potential impairment on our goodwill and intangible asset balances, including client lists, on an annual basis, or more frequently if there is any indication that the asset may be impaired." Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $31 million, as of December 31, 2015. Patriot National then stated that it had "determined that there was no impairment as of December 31, 2015 and 2014."

381. The 2015 10-K also contained the following false and misleading statements and/or omissions in the "Risk Factors":

> **Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients.**
>
> . . . ***[W]e expect we will continue to be significantly impacted by the overall business levels of [GIC], Zurich, AIG and Scottsdale. While we have a limited ability to affect their business levels through the services we provide, their business levels are largely impacted by many factors outside of our control*. . . . . *In addition, their business levels will depend on their ability to attract and retain policyholders, which can be impacted by their competitiveness in terms of financial strength, ratings, reputation, pricing, product offerings (including alternative market offerings) and other factors that independent retail agencies and policyholders consider attractive.*** A reduction in the business levels of our carrier partners would result in a reduction of the services we provide to them and the amount of revenues we generate from such services, which, assuming we have not expanded our relationships with additional carrier partners or other clients, could represent a significant portion of our revenues. . . .
>
> ***
>
> **Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties.**

As of March 14, 2016, Mr. Mariano, our founder, Chairman, President and Chief Executive Officer, beneficially owned 53.8% of the outstanding shares of our common stock and substantially all of the outstanding equity of [GIC] Group, the parent company of [GIC]. As such, we cannot assure you all of our transactions with [GIC] will be on the same terms as those available with unaffiliated third parties or that the affiliation will not otherwise impact our actions in a manner that is adverse to us or our stockholders. Although most of our operations were separated from [GIC] and consolidated under Patriot National, Inc. in the Reorganization in November 2013, a substantial portion of our revenues is generated through our relationship with [GIC]. Our total fee income and fee income from related party pursuant to contracts with [GIC] and our fee income from related party constituted 69% and 41%, respectively, of our total fee income and fee income from related party for the year ended December 31, 2015. Furthermore, through the 2014 Acquisitions, we acquired contracts to provide marketing, underwriting and policyholder services and our Patriot Care Management Business from entities controlled by Mr. Mariano. Concurrently, we also entered into a new agreement with [GIC] to provide all such services that GUI had provided to [GIC], its parent, prior to the GUI Acquisition.

Although Mr. Mariano is no longer a board member or officer of [GIC] Group or [GIC], and we have implemented a related party transaction policy in connection with this offering, because of his ownership position in [GIC] Group, Mr. Mariano's interests in our dealings with [GIC] may not align with our other stockholders. See "Certain Relationships and Related Party Transactions and Director Independence."

**We have acquired 17 insurance and other services firms in a short period of time and we have limited experience integrating the operations of companies or businesses that we have acquired and may incur substantial costs in connection therewith which could adversely affect our growth and results of operations.**

We have acquired 17 insurance and other services firms in a short period of time. We believe that similar acquisition activity will be important to maintaining comparable growth in the future. Failure to successfully identify and complete acquisitions would likely result in slower growth. Even if we are able to identify appropriate acquisition targets, we may not be able to execute transactions on favorable terms or integrate targets in a manner that allows us to fully realize the anticipated benefits from these acquisitions. Our ability to finance and integrate acquisitions may also suffer if we

expand the number or size of our acquisitions. Furthermore, in order to achieve the growth we seek, we may acquire numerous smaller market participants, which could require significant attention from management and increase risks, costs and uncertainties associated with integration.

***

***Post-acquisition risks include those relating to retention of personnel, retention of clients, entry into unfamiliar markets or lines of business, assumption of unexpected or unknown contingencies or liabilities, risks relating to ensuring compliance with licensing and regulatory requirements, tax and accounting issues, distractions to management and personnel from our existing business and integration difficulties relating to accounting, information technology, human resources, or organizational culture and fit, some or all of which could have an adverse effect on our results of operations and growth. Post-acquisition deterioration of targets could also result in lower or negative earnings contribution and/or goodwill impairment charges.***

***

382. Similarly, Patriot National states the following in the 2015 10-K:

*1. Regulation of Our Carrier Partners*

Our insurance carrier partners are subject to extensive regulation by the insurance regulators of the states in which they operate, as well as by the federal government for participation in government-sponsored programs such as Medicare and Medicaid. While we are not subject to these regulations, they could indirectly impact us if our carrier partners were forced to alter their businesses or the nature of their relationship with us as a result of regulation. The nature and extent of such regulation varies by jurisdiction but typically includes the following: standards of solvency, including risk-based capital requirements; mandates that may affect wage replacement and medical care benefits paid; restrictions on the way rates are developed and premiums are determined; limitations on the manner in which general agents may be appointed; required methods of accounting; establishment of reserves for unearned premiums, losses and other purposes; and limitations on their ability to transact business with affiliates; potential assessments for the satisfaction of claims under insurance policies issued by impaired, insolvent or failed insurance companies.

> Under the regulations applicable to [GIC], because of our affiliation through the common control of Mr. Mariano, all material transactions among us and [GIC] generally must be fair and reasonable and, if material or of a specified category, require prior notice and approval by the Florida Office of Insurance Regulation.

383. The 2015 10-K contained the following "Statement of Policy Regarding Transactions with Related Persons":

> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee.***
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.
>
> ***

384. The 2015 10-K stated that "Del Pizzo & Associates P.C., a tax advisory firm wholly owned by Mr. Del Pizzo, one of our directors, has received payments from us in the amount of approximately $185,100 in the year ended December 31, 2015 for tax advisory services it performed in fiscal year 2015 in respect of entities that are now our subsidiaries. Del Pizzo & Associates P.C. will continue providing similar services for fiscal year 2016."

385. The 2015 10-K further states that Mariano received $700,001 in compensation for 2015 and no compensation for 2014. The annual report states:

> The term of Mr. Mariano's employment agreement continues through December 31, 2017, with automatic renewals for successive 12 month periods. Mr. Mariano receives an annual base salary of $1.00 subject to review by our compensation committee on an annual basis. Mr. Mariano is eligible to earn an annual bonus as determined by our compensation committee and is entitled to participate in, and receive awards under, any long-term incentive plan maintained by [Patriot National], in each case, as determined by our compensation committee.

386. Patriot National stated the following in the 2015 10-K in connection with the amended PIPE Transaction and the Back-to-Back Agreement:

> **Loan Arrangements and Receivable from Affiliates**
>
> Concurrent with the issuance of the New Warrants, the company entered into an amended Stock Back-To-Back Agreement with Steven M. Mariano. Under the terms of the amended Stock Back-To-Back Agreement, Mr. Mariano will transfer Common Stock to [Patriot National] equal to 100% of the New Warrant Shares to be issued upon any exercise of the New Warrants by the PIPE Investors. Mr. Mariano also agrees to hold [Patriot National] harmless from and indemnify [Patriot National] for any expenses, obligations and liabilities that [Patriot National] incurs in connection with the issuance or performance of the New Warrants, including with respect to issuing additional shares of Common Stock.

387. Further, Patriot National stated the following in the 2015 10-K in connection with the "Forward Purchase Asset" (essentially, the value of the shares held by Mariano to be purchased by the Company pursuant to the Back-to-Back Agreement in the event the warrants are exercised):

> The forward purchase asset is maintained at equal value to the Series A and B Warrants, as created by the Back-to-Back Agreement with the selling stockholder. There were no equity and fixed income security investments or forward purchase assets as of December 31, 2014.

The following is a reconciliation of the fair value of [Patriot National]'s financial assets that were measured using significant unobservable (Level 3) inputs:

| Year Ended December 31, 2015 (in thousands) | | Forward Purchase Asset |
|---|---|---|
| Fair value, January 1, 2015 | $ | — |
| Record fair value of forward purchase asset | | 27,300 |
| Record increase in fair value of forward purchase asset | | 820 |
| Fair Value, December 31, 2015 | $ | 28,120 |

388. Each of the Individual Defendants signed or authorized the signing of Patriot National's 2015 10-K filed with the SEC. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

389. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," among other things.

390. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including

meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for intangible assets and doubtful accounts; (4) the risks to Patriot National posed by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and other rules and policies ensuring proper corporate governance; (7) Mariano's intention and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; and (8) the value of the Forward Purchase Asset.

391. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, and an additional net income loss of $16.9 million in the following two years. To make up these annual operating losses, Mariano pumped at least $17 million (proceeds from the PIPE Transaction) into GIC so that it could meet its year-end FOIR capital requirements in 2015. Thus, Patriot National and the Individual Defendants knew or were reckless in not knowing as of March 21, 2016 that GIC would be unable to repay the $27.1 million recorded as an account receivable as of December 31, 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

392. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of March 21, 2016—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

393. The 2015 10-K failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

394. The 2015 10-K was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the 2015 10-K materially false and misleading.

395. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue as of December 31, 2015, was overstated by at least $15.2 million, the twelve month increase in the amount of the

receivable recorded as owing from GIC. Accordingly, Patriot National's financial statements were materially false and misleading and not properly stated in accordance with GAAP.

396. In addition, the 2015 10-K contained false and misleading statements concerning Patriot National's purported adherence to its Policy Regarding Transactions with Related Persons. Although the 2015 10-K set forth Patriot National's purported policy, it did not disclose that Patriot National had historically failed to comply with that policy and its statement that it currently applied the policy was false. Each of the purported independent directors tasked with overseeing the "Policy Regarding Transactions with Related Persons" was not actually independent but was operating for the benefit of Mariano and/or themselves, as confirmed by, among other things: (1) Del Pizzo's lucrative contract for purported tax services; (2) GIC's business dealings with Patriot National; (3) Mariano's unreported compensation and charging of significant personal expenses to Patriot National; (4 ) the Board's acquire numerous companies from Mariano and his close friends and associates without performing the necessary due diligence; (5) the Board's approval of the Secondary Offering for Mariano's personal benefit; and (6) the Board's actions in connection with approving and amending the PIPE Transaction. Thus, Patriot National's statement in the 2015 10-K that it applied the disclosed Policy Regarding Transactions with Related Person was false.

397. The financial statements contained in the 2015 10-K also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

398. Approximately 43.6% of Patriot National's $118.1 million "goodwill" asset listed in the 2015 10-K was tied to its acquisitions of GUI and PCM, and that figure represented 16.7% of total Patriot National assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. By March 21, 2016, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

399. For the same reasons, Patriot National's accounting of approximately $29 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

400. Additionally, the above detailed risk factors were false and misleading because the 2015 10-K failed to disclose that, at the time of the filing: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure

to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National and Mariano.

401. The 2015 10-K was false and misleading because it did not disclose that Del Pizzo did not perform $185,000 worth of tax advisory services.

402. Additionally, the Forward Purchase Asset was required to be accounted for at its "fair value measurement," which demands that Patriot National account for, among other things, the risk of non-performance (*i.e.*, the risk that a liability will not be paid). As detailed above, Patriot National did not account for Mariano's inability and/or unwillingness to indemnify Patriot National at the full Warrant Redemption Liability. Accordingly, Patriot National's accounting for the Forward Purchase Asset at a value equal to the Warrant Redemption Liability was false and/or misleading.

### L. The Company Issued A Misleading Press Release On April 7, 2016

403. On April 7, 2016, Patriot National issued a press release, "Patriot National Updates Strategic Value Creating Initiatives." The press release stated:

> FORT LAUDERDALE, Fla., April 7, 2016 /PRNewswire/ --As previously reported, the Board of Directors of Patriot National, Inc. (NYSE: Patriot National) ("Patriot National" or the "Company") formed a committee of independent directors ("Committee") to oversee strategic value creating initiatives. ***The Committee continues to explore strategic alternatives for [Patriot National] to maximize value for shareholders, including a possible sale of [Patriot National]. Neither the Committee nor the Board has made a decision to enter into any transaction or other alternative at this time***, and there are no assurances that the consideration of strategic alternatives will result in [Patriot National] entering into a transaction or other alternative. The Committee has not has not set a timetable for completion of the evaluation process. The exploration of strategic alternatives may be terminated at any time and without notice. [Patriot National] does not expect to make any further public announcements regarding these matters unless and

> until the Committee makes a decision with respect to a specific action or otherwise concludes its review.

404. The above statements, however, were false and materially misleading because they omitted and/or misrepresented, *inter alia*, (1) that the Special Committee was independent; (2) that the Special Committee was functioning as it was supposed to (when in fact the Strategic Review was dominated by Mariano); (3) Mariano dictated the timeframe for a transaction based on his year-end liquidity needs; and (4) that Mariano had alternative motives for the Strategic Review, namely, to fight with the PIPE Investors, bail out GIC, and fund Ashmere and his own personal obligations.

405. As detailed above, from the outset, Mariano dominated and controlled the Special Committee to ensure that he would receive disproportionate, unique benefits for himself and GIC no matter what occurred.

### M. On May 12, 2016, The Company Issued Its Q1 2016 10-Q and A Press Release, Both Of Which Were Misleading

406. On May 12, 2016, Patriot National released a press release, attached to the Form 8-K filed with the SEC, as Exhibit 99.1, that states:

> **Management Commentary**
>
> "***I am pleased to report that our first quarter 2016 fee income increased 51% to $64.9 million, up from $43.0 million in the first quarter of 2015***," said Steven M**.** Mariano, Chief Executive Officer of Patriot National. "Our first quarter results were ahead of our internal operating plan and we are reaffirming our full year 2016 outlook of total fee income of $270-$280 million and Adjusted EBITDA of $73-$78 million. Our guidance excludes contribution from any future acquisitions made in 2016.
>
> "***We have built a comprehensive platform that we believe is a significant competitive advantage that positions us to increase revenue, margins, profitability and ultimately shareholder returns***. Today, we work with 139 insurance carriers and 4,100 insurance agencies and we offer a broad menu of products and services beyond workers' compensation.

> "***Since our IPO, we have successfully integrated 18 acquisitions, and we have focused our efforts on driving operating efficiencies.*** During the first quarter, our planned operating efficiency initiatives resulted in $7.3 million in total annualized expense savings, $400,000 of which we recognized in the first quarter. For the remainder of 2016, we will continue to seek additional expense savings through more efficient operations.

407. Defendant Pesch signed or authorized the signature of the Form 8-K.

408. On May 13, 2016, Patriot National filed its quarterly report for the period ended March 31, 2016 (the "Q1 2016 10-Q"). The Q1 2016 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

409. The Q1 2016 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended March 31, 2016 was $64.9 million compared to $43.0 million for the three months ended March 31, 2015, an increase of $21.9 million or approximately 51%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed as a result of transactions that occurred in August of 2014 and from acquisitions completed since January 2015.
>
> For the three months ended March 31, 2016, approximately 62% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 5% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three months ended March 31, 2016.
>
> For the three months ended March 31, 2015 approximately 83% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 10% of

> our total fee income and fee income from related party were attributable to our contracts with our second largest client.
>
> ***
>
> *Fee Income from Related Party*. Fee income from related party for the three months ended March 31, 2016 was $24.5 million compared to $24.6 million for the three months ended March 31, 2015, a decrease of $0.1 million.
>
> Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three-month period ended March 31, 2016 relative to the three-month period ended March 31, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.
>
> ***
>
> **Concentration**
>
> For the three months ended March 31, 2016, approximately 62% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 5% was attributable to contracts with [Patriot National]'s second largest customer. For the three months ended March 31, 2015, approximately 83% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 10% were attributable to contracts with [Patriot National]'s second largest customer.
>
> As of March 31, 2016, approximately 68% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer. As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

410. Patriot National also reported in the Q1 2016 10-Q that as of March 31, 2016, it had $20.6 million in fee income receivable from GIC and "[a]s of March 31, 2016, we were not

subject to any material interest rate risk or credit risk[.]" Further, the Q1 2016 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

411. Additionally, the Q1 2016 10-Q reported an increase of approximately $4.9 million in goodwill, for a total of over $122 million as of March 31, 2016. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $37 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, [Patriot National] will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.

Patriot National also stated that it had "determined that there was no impairment as of March 31, 2016."

412. The Q1 2016 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2015. There have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2015."

413. The Q1 2016 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties;" and (2) "We are subject to extensive regulation and supervision, and our failure to

comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

414. The Q1 2016 10-Q also stated the following "Subsequent Events":

> On March 3, 2016, the Board of Directors approved a $15 million stock repurchase program. Under the new Repurchase Program, [Patriot National] may repurchase up to a maximum of $15 million of its common stock. Pursuant to the Fourth Amendment to the BMO Credit Facility, [Patriot National] may purchase no more than 1,000,000 shares in any calendar month. For the three months ended March 31, 2016, [Patriot National] purchased 992,182 shares for a purchase price of $5.7 million in the open market. Total purchases under the plan as of May 11, 2016 were 1,360,457 shares for a purchase price of $8.7 million in the open market.
>
> As of May 11, 2016, 1,360,457 of the repurchased shares have been retired and none remain as treasury shares.
>
> On April 13, 2016, Hudson Bay Master Fund Ltd. ("Hudson Bay") filed suit in the US District Court for the Southern District of New York against [Patriot National], Steven M. Mariano, our Chairman and Chief Executive Officer, and American Stock Transfer Company, LLC as a nominal Defendant. Hudson Bay alleges that [Patriot National] and Mr. Mariano are in breach of various contracts regarding delivery of price adjustment warrants, and that Mr. Mariano interfered with those same contracts between [Patriot National] and Hudson Bay. Hudson Bay seeks specific performance of the contracts, monetary damages, and attorney's fees. On April 14, 2016, CVI Investments Inc. ("CVI"), also filed suit against [Patriot National] in the same court. The CVI suit makes similar allegations of breach of contract regarding the price adjustment warrants. The CVI suit similarly seeks specific performance of the contracts, monetary damages, and attorney's fees, as well as injunctive relief.
>
> [Patriot National] has filed answers in both actions denying the allegations and asserting defenses. [Patriot National] has been indemnified for any losses related to the warrant agreements by Mr. Mariano.

415. The Registration Statement contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC. . . .
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.
>
> ***

416. Patriot National stated the following in the Q1 2016 10-Q in connection with the PIPE Transaction and the Back-to-Back Agreement:

> **Loan Arrangements and Receivable from Affiliates**
>
> In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

417. In connection with Patriot National's purchase of Company shares from Mariano pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $48.8 million as of March 31, 2016. The Q1 2016 10-Q states:

> *Decrease (Increase) in Fair Value of Warrant Redemption Liability*. There was a $20.7 million increase in the fair value of warrant redemption liability for the three months ending March 31, 2016, which was fully offset by a corresponding $20.7 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. These instruments are fully described in Note 12 Related Party and Note 15 Warrant Redemption Liability. For the three months ended March 31, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015. There was no remaining warrant redemption liability as of March 31, 2015 and no future fair value adjustments are required.

418. On May 13, 2016, Patriot National held a conference call for its Q1 2016 results, in which Mariano explained the purpose of the Repurchase Program, stating in relevant part:

> In February, our Board formed a special committee of independent directors to evaluate strategic value creation initiatives and in March, our Board approved a $15 million share buyback program. To-date, we have repurchased 1.4 million shares under the program. The special committee has not set a timetable for the completion of their evaluation of strategic alternative and do not plan to make any public announcements unless they decide to pursue a certain specific action will conclude their review.

419. Defendant Shields signed or authorized the signing of the Q1 2016 10-Q. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

420. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," among other things.

421. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National as of May 13, 2016; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (7) that Patriot National's acquisitions posed a significant threat to Patriot National's financial health at the time of filing; (8) the purpose and execution of the Repurchase Program; (9) Mariano's willingness and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; and (10) the value of the Forward Purchase Asset.

422. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, and an additional net income loss of $16.9 million in the following two years. Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE Transaction) into GIC so that it could meet its 2015 year-end FOIR capital requirements. Thus, Patriot National and Mariano knew or were reckless in not knowing as of May 13, 2016 that GIC would be unable to repay the $20.6 million recorded as an account

receivable as of March 31, 2016. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

423. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of May 13, 2016—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

424. The Q3 2015 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

425. The financial statements contained in the Q1 2016 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires

that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

426. Approximately 42% of Patriot National's $122.5 million "goodwill" asset listed in the Q1 2015 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 15.3% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. By May 13, 2016, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

427. For the same reasons, Patriot National's accounting of approximately $37.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

428. Additionally, the above detailed "Risk Factors" were false and misleading because the Q1 2016 10-Q and the 2015 10-K failed to disclose that, as of May 13, 2016: (1)

GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National and the Individual Defendants.

### N. On August 15, 2016, The Company Issued Its Q2 2016 10-Q and A Press Release, Both Of Which Were Misleading

429. On August 15, 2016, Patriot National released a press release over Globe Newswire, attached to the Form 8-K filed with the SEC on August 15, 2016, as Exhibit 99.1, that states:

> Patriot National, Inc. . . . today announced its financial results for the quarter ended June 30, 2016, and ***confirmed that the special committee of its Board of Directors (the "Special Committee") is in the final stages of its consideration of possible strategic opportunities***.
>
> **Strategic Opportunities Consideration**
>
> The Special Committee, which is comprised of independent directors, is working collaboratively with Ebix, Inc. to explore the possible combination of the two businesses, while continuing to explore other available strategic opportunities for Patriot National to maximize value for shareholders. Ebix is expected to complete its due diligence by August 31, 2016, as the Special Committee nears the conclusion of its evaluation of the prospects it has received and expects to make a recommendation to the Board of Directors soon on whether [Patriot National] should enter into any transaction or pursue another alternative. As announced August 1, 2016, Ebix made an improved offer to acquire 100% of the outstanding stock of [Patriot National].
>
> ***

**Management Commentary**

> "During the second quarter, we continued to execute on our strategy of becoming the leading end-to-end technology-enabled services provider to the insurance industry. While the second quarter is always a seasonably low quarter for our company, ***we continue to be extremely optimistic about our ability to drive significant organic revenue and EBITDA growth through the second half of 2016, as well as full year 2017***," said Steven M. Mariano, Chief Executive Officer of Patriot National. "***Our sales pipeline remains strong*** and we are focused on driving top-line growth and profitability by expediting new carrier agreements and technology wins as well as significantly reducing our cost structure."
>
> ***"We have built a powerful operating platform to support our long-term growth***, with comprehensive technology and outsourcing solutions that are highly valued by our customers. Our roadmap for the future focuses on leveraging our deep customer relationships and broad product portfolio to serve a greater share of our customers' needs. We are also focused on continuing to deliver innovative technology solutions such as our InsurePay automated payroll solution and our Insurance Expert software platform."

430. On August 15, 2016, Patriot National filed with the SEC its quarterly report for the period ended June 30, 2016 (the "Q2 2016 10-Q"). The Q2 2016 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

431. The Q2 2016 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended June 30, 2016 was $56.5 million compared to $47.4 million for the three months ended June 30, 2015, an increase of $9.1 million or approximately 19%. The increase in fee income and fee income from related party was primarily related to increases in the

volume of business we managed and from acquisitions completed since January 2015.

Total fee income and fee income from related party for the six months ended June 30, 2016 was $121.3 million compared to $90.4 million for the three months ended June 30, 2015, an increase of $30.9 million or approximately 34%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.

For the three and six months ended June 30, 2016, approximately 55% and 59% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and six months ended June 30, 2016.

For the three and six months ended June 30, 2015 approximately 70% and 76% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 9% of our total fee income and fee income from related party were attributable to our contracts with our second **largest** client for both the three and six months ended June 30, 2015.

***

*Fee Income from Related Party*. Fee income from related party for the three months ended June 30, 2016 was $16.0 million compared to $20.5 million for the three months ended June 30, 2015, a decrease of $4.5 million. For the six months ended June 30, 2016 and June 30, 2015 fee income from related party was $40.4 million versus $45.1 million, a decrease of $4.6 million.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three and six-month period ended June 30, 2016 relative to the three and six-month period ended June 30, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

"Fee income from related party" represents a portion of fee income earned from [GIC], a related party as described in Note 12, *Related Party Transactions*. Fee income from [GIC] for claims administration services is based on the net portion of claims expense retained by [GIC] pursuant to quota share reinsurance

agreements between [GIC], PUI's third party insurance company customers and the segregated portfolio cell reinsurers that assume business written by [GIC]. Certain fee income from third-party segregated portfolio cell reinsurers is remitted to [Patriot National] by [GIC] on behalf of the segregated portfolio cell reinsurers. Fee income from [GIC] for brokerage, underwriting and policyholder services represents fees for soliciting applications for workers' compensation insurance for [GIC], based on a percentage of premiums written or other amounts negotiated by the parties.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], as described in Note 13, *Concentration*, [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

***

**Concentration**

For the six months ended June 30, 2016, approximately 59% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer. For the six months ended June 30, 2015, approximately 76% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 9% were attributable to contracts with [Patriot National]'s second largest customer.

As of June 30, 2016, approximately 76% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 2% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer. As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

432. Patriot National also reported in the Q2 2016 10-Q that as of June 30, 2016, it had $27.24 million in fee income receivable from GIC and stated that "[a]s of March 31, 2016, [sic] we were not subject to any material interest rate risk or credit risk[.]" Further, the Q2 2016 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

433. Additionally, the Q2 2016 10-Q reported a total of approximately $121.7 million in goodwill as of June 30, 2016. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $36 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, the Company will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made."

434. Patriot National also stated that it "review[s] all of our intangible assets for impairment periodically (at least annually) and whenever events or changes in business circumstances indicate that the carrying value of the assets may not be recoverable…. [And] [b]ased on the results of impairment reviews during the six-month periods ended June 30, 2016 and 2015, no impairments were required."

435. The Q2 2016 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2015. There have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2015."

436. The Q2 2016 10-Q stated further stated the following "risks": (1)"Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

437. The Q2 2016 10-Q also stated:

> On August 1, 2016, the Issuer stated that a special committee of independent directors (the "Special Committee") of the Board received and is considering an offer from Ebix, Inc. ("Ebix") to acquire 100% of the outstanding stock of the Issuer. The Special Committee is continuing to explore other strategic alternatives for the Issuer to maximize value for shareholders, including a possible sale of the Issuer. ***Neither the Board nor the Special Committee has made a decision to enter into any transaction or other alternative.***

438. The Q2 2016 10-Q contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC. . . .
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith***

> ***that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.
>
> ***

439. Patriot National stated the following in the Q2 2016 10-Q in connection with the PIPE Transaction and the Back-to-Back Agreement:

> **Loan Arrangements and Receivable from Affiliates**
>
> In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

440. Further, Patriot National stated the following in the Q2 2016 10-Q in connection with Mariano's indemnification of Patriot National, pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $51.9 million as of June 30, 2016. In particular, the Q2 2016 10-Q states:

> *Decrease (Increase) in Fair Value of Warrant Redemption Liability*.
>
> There was a $3.1 million increase in the fair value of warrant redemption liability for the three months ending June 30, 2016, which was fully offset by a corresponding $3.1 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. There was a $23.8 million increase in the fair value of warrant redemption liability for the six months ending June 30, 2016, which was fully offset by a corresponding $23.8 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. These instruments are fully described in *Note 12 Related Party* and *Note 15 Warrant Redemption Liability*. For the six months ended June 30, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated

> valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015. There was no remaining warrant redemption liability as of June 30, 2015 and no subsequent fair value adjustments were required.

441. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for doubtful accounts and intangible assets; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) the credit risk that GIC posed to Patriot National as of August 15, 2016; (6) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (7) that Patriot National's acquisitions posed a significant threat to Patriot National's financial health at the time of filing; (8) Mariano's willingness and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; (9) the value of the Forward Purchase Asset; (10) the independence of the Special Committee and how it functioned; (11) Mariano's personal dominance over the Strategic Review; and/or (12) Mariano's complete disfavor for the Ebix offer and his attempts to tank any potential deal with Ebix.

442. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, and an additional net income loss of $16.9 million in the following two years. Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE Transaction) into GIC so that it could meet its year-end FOIR capital requirements in 2015. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no

assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

443. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of August 15, 2016—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

444. The Q2 2016 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

445. The Q2 2016 10-Q was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or

allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Q2 2016 10-Q materially false and misleading.

446. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue for the three months ended June 30, 2016 was overstated by at least $6.5 million, the quarterly increase in the amount of the receivable recorded as owing from GIC. Consequently, Patriot National's financial statements as set forth in the Q2 2016 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

447. The financial statements contained in the Q2 2016 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

448. Approximately 42.3% of Patriot National's $121.7 million "goodwill" asset listed in the Q2 2016 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 15% of total Company assets. As described above, both of those entities derived a substantial portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. As of August 15, 2016, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of

circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

449. For the same reasons, Patriot National's accounting of approximately $36.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

450. Additionally, the above detailed risk factors were false and misleading because the Q2 2016 10-Q failed to disclose that, as of August 15, 2016: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National and the Individual Defendants.

451. As detailed above, Mariano was unwilling to allow Patriot National and/or the Board to approve a transaction with Ebix because it would require him to cede control of Patriot National and threatened to expose the fraud and other improprieties he was engaged in at Patriot

National and its subsidiaries. Mariano had no intention of allowing the Ebix transaction and engaged in a secret process with Houlihan to obtain funds for GIC without dealing with Ebix.

### O. On October 21, 2016, Patriot National Filed A Misleading Form 8-K

452. On October 21, 2016, Patriot National filed a Form 8-K, which stated that:

> On October 17, 2016, Austin J. Shanfelter, a director of Patriot National, Inc. (the "Company"), notified [Patriot National] that he would resign from [Patriot National]'s Board of Directors effective immediately. Mr. Shanfelter's decision to resign is solely for personal reasons and did not involve any disagreement with [Patriot National], [Patriot National]'s management or the Board of Directors.

453. The Form 8-K also attached as an exhibit Shanfelter's resignation letter sent via email to Mariano, dated October 17, 2016, which stated:

> I have come to the decision to submit my resignation from the Patriot National Board of Directors. As you are aware, I experienced some health related setbacks this year. During conversations with my doctors and family I have made the decision to fully focus on them and my health. I hope my time on the board has been both helpful and productive. Thank you for the opportunity to serve.

454. The stated reason for resigning from the Board was materially false and misleading because his "health" and "personal reasons" were not the true reason for his resignation. Rather, Shanfelter resigned because he was concerned over the legality and prudence of Mariano's actions at Patriot National. As stated above, Shanfelter suffered a heart attack May 2016, and he continued his duties at Patriot National and other companies of which he was part. What changed was that by October 2016, Shanfelter saw the writing on the wall that Mariano was attempting to seize control of Patriot National to push through an improper transaction that would harm minority shareholders. In an attempt to get out before things got too bad, Shanfelter used his heart attack from months prior as pretext to resign. Notably, Shanfelter's LinkedIn pages reflects that he continues to serves on the boards of Sabre Industries, Inc., and Orion

Group Holdings, Inc. He also continues to work his "regular job" as a special consultant to MasTec, Inc. Thus, the above statement that "Shanfelter's decision to resign is solely for personal reasons and did not involve any disagreement with [Patriot National], [Patriot National]'s management or the Board of Directors" is false and/or misleading.

**P. Patriot National Issued A Misleading Press Release On November 8, 2016**

455. On November 8, 2016, Patriot National issued a press release over Globe Newswire, entitled "Patriot National Rejects $475 Million Offer from Ebix, Inc.[:] Special Committee Continues to Explore and Evaluate More Attractive Offers and all Opportunities for Value Creation." The press release stated:

> Patriot National, Inc. . . . today announced that ***the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal. The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation***.
>
> Patriot National, Inc. is a leading provider of technology and outsourced services to the insurance industry. The company was founded by Fort Lauderdale based entrepreneur Steven Michael Mariano.
>
> ***Neither the Special Committee nor the Board of Directors has made a decision to enter into any transaction or other opportunity at this time***, and there are no assurances that the consideration of strategic opportunities will result in [Patriot National] entering into a transaction or other opportunity. The exploration of strategic opportunities may be terminated at any time and without notice.
>
> Patriot National will provide a more complete update on its strategic value creation initiatives on the third quarter earnings conference call on Monday, November 14, 2016.

456. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) that the Special Committee recommended against the Ebix

offer because it was not in the best interest of Patriot National; (2) the Special Committee was still an independent committee evaluating "all opportunities for value creation"; and/or (3) Mariano and the Board had already determined to enter into the Leveraged Recap at the time of the press release.

457. As detailed above, the Special Committee never voted or recommended against the Ebix transaction. Moreover, it was Ebix that "rejected" the offer, and not Patriot National. In fact, as detailed above, when Ebix's CEO learned of Patriot National's press release asserting this much, he emailed a colleague, "[Mariano] is a complete liar - we disengaged not him and our offer was not $475 million - we reduced along the way. It defies any ethics. He did the release to create a negative event into a fake positive event." In fact, the only reason why Ebix's CEO never publically responded to Patriot National's press release because it was "limited by a tight NDA (that [Mariano] forced [Ebix] to sign as a precondition to talking to [it] many months back)." Indeed, Corey, a member of the Special Committee was also shocked to learn of the false and/or misleading statement that the Special Committee rejected Ebix's offer, texting Smith on that same day: "[the press release] shows we (SC) voted on rejecting the Ebix offer, which is not true…Is that a problem[?]."

458. To Ebix's CEO's point, the above statements where materially false and misleading because they were made with the intention of persuading stockholders that Patriot National was worth in *excess* of $475 million.

459. On this news, shares of Patriot National declined from $6.90 per share at close on November 8, 2016, to $6.35 per share at close the following day, an 8% drop, on unusually heavy volume.

### Q. On November 14, 2016, Patriot National Issued The Q3 2016 10-Q And Press Release, Both Of Which Were Misleading

460. On November 14, 2016, Patriot National released a press release, attached to the Form 8-K filed with the SEC on November 14, 2016, as Exhibit 99.1, that states:

> **Management Commentary**
>
> "In February, our Board of Directors formed a Special Committee to explore all avenues for shareholder value creation including a potential sale of [Patriot National], divesting non-core assets, and other ways to return capital to shareholders," said Steven M. Mariano, President and Chief Executive Officer of Patriot National. "***Throughout this process, our shareholders have been very patient, and we are pleased to provide an immediate return of capital through a significant special dividend and to expand our stock repurchase program.***
>
> "The Board of Directors will continue to evaluate all options for value creation and, at the same time, we are taking decisive action to enhance the value of [Patriot National] by driving organic growth in our core insurance services and technology businesses. ***Our new credit facility with Cerberus significantly enhances our financial flexibility to execute on our plans for enhanced growth and returns in 2017."***
>
> **Update on Organic Growth Plan**
>
> Patriot National has built a powerful operating platform capable of delivering substantial value to its customers to support long-term growth. [Patriot National] currently has relationships with 139 carriers and more than 4,100 agencies and offers a broad menu of products and services that is unparalleled in the marketplace and spans from workers' compensation and specialty property and casualty insurance services to technology solutions.
>
> ***Over the past month, Patriot National has secured three significant new client engagements that include the expansion of a turnkey partnership with a leading national insurance carrier and the launch of a BPO relationship with two carriers that have a growing presence in the U.S. workers' compensation insurance market.*** Looking ahead, Patriot National intends to leverage its core insurance platform and suite of technology solutions to strengthen existing and new client relationships and to expand its sales channels and commercialize its technology. [Patriot National]

> also plans to drive profitable growth by achieving cost savings of approximately $8 million in 2017.
>
> **Return of Capital to Shareholders**
>
> Today, Patriot National's Board of Directors declared a special cash dividend (the "Dividend") of $2.50 per share on all issued and outstanding shares of Common Stock of [Patriot National]. The Dividend is considered an ordinary dividend for tax purposes, and will be paid on December 9, 2016 to stockholders of record as of the close of business on November 28, 2016.
>
> The Board has also approved an expansion of the existing share repurchase program to $40 million from $15 million, effective immediately. The program continues to give management discretion in determining the market and business conditions under which shares may be repurchased from time to time, in open market transactions or in negotiated off-market transactions.
>
> **Recapitalization**
>
> On November 10, 2016, Patriot National entered into an agreement with Cerberus Business Finance for a new $280 million five-year senior secured credit facility. The credit facility consists of a $30 million revolving line of credit and $250 million term loan.
>
> [Patriot National] fully repaid all outstanding obligations on the former senior secured credit facility upon closing. As of November 14, 2016, [Patriot National] has $106 million in cash, restricted cash and investments and approximately $250 million of debt outstanding including capital lease obligations and deferred financing charges.

461. Defendant Pesch signed or authorized the signing of the Form 8-K filed with the SEC.

462. On November 14, 2016, Patriot National filed with the SEC its 10-Q for the period ended September 30, 2016 (the "Q3 2016 10-Q"). The Q3 2016 10-Q stated that "[t]he accompanying unaudited consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America (GAAP) and pursuant to the rules and regulations of the Securities and Exchange Commission."

463. The Q3 2016 10-Q provided, "Our total fee income and fee income from related party are currently substantially dependent on our relationships with [GIC] and a small number of other insurance carrier clients." It further stated the following:

> *Total Fee Income and Fee Income from Related Party*. Total fee income and fee income from related party for the three months ended September 30, 2016 was $60.2 million compared to $58.5 million for the three months ended September 30, 2015, an increase of $1.7 million or approximately 3%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.
>
> Total fee income and fee income from related party for the nine months ended September 30, 2016 was $181.6 million compared to $148.9 million for the nine months ended September 30, 2015, an increase of $32.7 million or approximately 22%. The increase in fee income and fee income from related party was primarily related to increases in the volume of business we managed and from acquisitions completed since January 2015.
>
> For the three and nine months ended September 30, 2016, approximately 61% and 59% of our total fee income and fee income from related party was attributable to our contracts with [GIC], a related party, and approximately 6% and 6% of our total fee income and fee income from related party was attributable to contracts with our second largest client for both the three and nine months ended September 30, 2016.
>
> For the three and nine months ended September 30, 2015 approximately 66% and 72% of our total fee income and fee income from related party was attributable to our contracts with [GIC], and approximately 6% and 8% of our total fee income and fee income from related party were attributable to our contracts with our second largest client for both the three and nine months ended September 30, 2015.
>
> ***
>
> *Fee Income from Related Party*. Fee income from related party for the three months ended September 30, 2016 was $22.3 million compared to $23.8 million for the three months ended September 30, 2015, a decrease of $1.5 million or 6%. For the nine months ended September 30, 2016 and September 30, 2015 fee income

from related party was $62.7 million versus $68.9 million, a decrease of $6.2 million or 9%.

Our prices by customer for our brokerage and policyholder services and claims administration services were unchanged for the three and nine-month period ended September 30, 2016 relative to the three and nine-month period ended September 30, 2015, and accordingly, the net increase in fee income was solely related to changes in the volume of business we managed.

***

**Concentration**

For the nine months ended September 30, 2016, approximately 59% of total combined fee income and fee income from related party was attributable to contracts with [GIC], [Patriot National]'s largest customer and a related party, and approximately 6% was attributable to contracts with [Patriot National]'s second largest customer. For the nine months ended September 30, 2015, approximately 72% of total combined fee income and fee income from related revenues was attributable to contracts with [GIC], and approximately 8% were attributable to contracts with [Patriot National]'s second largest customer.

As of September 30, 2016, approximately 79% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 1% of combined fee income receivable and fee income receivable from related party were attributable to contracts with [Patriot National]'s second largest customer. As of December 31, 2015, approximately 77% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [GIC] and approximately 3% of combined fee income receivable and fee income receivable from related party was attributable to contracts with [Patriot National]'s second largest customer.

Because fee income from related party for claims administration services is based on the net portion of claims expense retained by [GIC], [Patriot National]'s revenues attributable to contracts with [GIC] do not necessarily represent fee income from related party.

464. Patriot National also reported in the Q3 2016 10-Q that as of September 30, 2016, it had $35.3 million in fee income receivable from related party, an increase of $8.3 million since the previous quarter. The Q3 2016 10-Q further stated that Patriot National had $30 million in

accounts receivable owed by GIC and "[a]s of September 30, 2016, we were not subject to any material interest rate risk or credit risk[.]" Further, the Q3 2016 10-Q stated that "We believe that our cash flow from operations and available cash and cash equivalents will be sufficient to meet our liquidity needs for the foreseeable future."

465. Additionally, the Q3 2016 10-Q reported a total of approximately $121.7 million in goodwill as of September 30, 2016. As of that date, Patriot National also reported in the filing that its intangible asset of "Customer and carrier relationships" was over $35.3 million. Concerning the valuation of its intangible assets, Patriot National stated:

> . . . Intangible assets are tested for impairment at least annually (more frequently if certain indicators are present). In the event that management determines that the value of the intangible asset has become impaired, [Patriot National] will incur an accounting charge for the amount of impairment during the fiscal quarter in which the determination is made.

466. Patriot National also stated that it had "determined that there was no impairment as of September 30, 2016."

467. The Q3 2016 10-Q also contained false and misleading statements and/or omissions in "ITEM 1A. RISK FACTORS," which proved: "For a discussion of our potential risks and uncertainties, see the information under the heading 'Risk Factors' in our Annual Report on 10-K for the year ended December 31, 2015. There have been no material changes to the risk factors disclosed in our Annual Report on 10-K for the year ended December 31, 2015."

468. The Q3 2016 10-Q stated further stated the following "risks": (1) "Our relationship with [GIC] may create conflicts of interest, and we cannot be certain that all our transactions with [GIC] will be conducted on the same terms as those available from unaffiliated third parties[;]" and (2) "We are subject to extensive regulation and supervision, and our failure

to comply with such regulation or adapt to new regulatory and legislative initiatives may adversely impact our business."

469. The Q3 2016 10-Q contained the following "Statement of Policy Regarding Transactions with Related Persons":

> Our board of directors has adopted a written Related Person Transaction Policy to assist it in reviewing, approving and ratifying transactions with related persons and to assist us in the preparation of related disclosures required by the SEC. . . . .
>
> ***The Related Person Transaction Policy provides that all transactions with related persons covered by the policy must be reviewed and approved and ratified by the Audit Committee or disinterested members of the board of directors and that any employment relationship or transaction involving an executive officer and any related compensation must be approved or recommended for the approval of the board of directors by the Compensation Committee***.
>
> ***
>
> ***The Audit Committee or disinterested members of the board of directors, as applicable, will not approve or ratify any related person transaction unless it shall have determined in good faith that, upon consideration of all relevant information, the related person transaction is in, or is not inconsistent with, the best interests of [Patriot National].*** The Audit Committee or the disinterested members of the board of directors, as applicable, may also conclude, upon review of all relevant information, that the transaction does not constitute a related person transaction and thus that no further review is required under this policy.

470. Patriot National stated the following in the Q3 2016 10-Q in connection with the PIPE Transaction and the Back-to-Back Agreement:

> **Loan Arrangements and Receivable from Affiliates**
>
> In addition, on December 23, 2015, we and Steven M. Mariano amended the Stock Back-to-Back Agreement, pursuant to which, upon the exercise of the New Warrants, we would purchase a number of shares of our common stock owned by Steven M. Mariano equal to 100% of the shares to be issued in connection with the exercise by the PIPE investors of the New Warrants.

471. Further, Patriot National stated the following in the Q3 2016 10-Q in connection with Mariano's indemnification of Patriot National, pursuant to the Back-to-Back Agreement, Patriot National reported a Forward Purchase Asset of $57.1 million as of September 30, 2016. In particular, the Q3 2016 10-Q states:

> *Decrease in Fair Value of Warrant Redemption Liability*. There was a $5.6 million increase in the fair value of warrant redemption liability for the three months ending September 30, 2016, which was fully offset by a corresponding $5.6 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. There was a $29.4 million increase in the fair value of warrant redemption liability for the nine months ending September 30, 2016, which was fully offset by a corresponding $29.4 million increase in the fair value of the forward purchase asset, which represents the Back-to-Back agreement. These instruments are fully described in *Note 12 Related Party* and *Note 15 Warrant Redemption Liability*. For the nine months ended September 30, 2015 the decrease in fair value of warrant redemption liability was $1.4 million which reflects the change in fair value from estimated valuation on December 31, 2014 to the exercise of the detachable common stock warrants associated with Pennant Park on January 22, 2015. There was no remaining warrant redemption liability as of September 30, 2015 and no subsequent fair value adjustments were required.

472. The Q3 2016 10-Q also stated the following "Subsequent Events":

> On November 8, 2016 we announced that the Special Committee of its Board of Directors (the "Special Committee") has concluded that Ebix, Inc.'s most recent proposal of $475 million is not the best alternative to maximize value for Patriot National's shareholders and, at the recommendation of the Special Committee, the Board of Directors has rejected the proposal. The Special Committee continues to evaluate other more attractive offers and all opportunities for value creation.
>
> On November 9, 2016, Patriot National, Inc. (the "Company") entered into the Financing Agreement (the "Credit Agreement"), by and among [Patriot National], Cerberus Business Finance, LLC, as collateral agent and as administrative agent ("Agent"), and the other lenders party thereto, which provides for a $30.0 million revolving credit facility and a $250.0 million term loan facility (the "senior secured credit facility"). The senior secured credit facility has a maturity of five years, and borrowings thereunder bear

interest, at [Patriot National]'s option, at LIBOR plus a margin ranging from 700 basis points to 725 basis points or at a base rate plus a margin ranging from 525 basis points to 550 basis points. The minimum LIBOR rate before applicable margin is 1.00%, while the minimum base rate before applicable margin is 3.00%. Effective with the closing of the Financing Agreement on November 9, 2016, the existing BMO credit facility was repaid in full and any remaining commitments terminated thereunder.

In addition to paying interest on outstanding principal under the senior secured credit facility, [Patriot National] is required to pay a commitment fee to the administrative agent for the ratable benefit of the lenders under the revolving credit facility in respect of the unutilized commitments thereunder of 50 basis points. In addition, [Patriot National] is required to pay Agent a loan servicing fee of $5,000 per month. [Patriot National] paid Agent, for the account of the lenders, a closing fee equal to $5,600,000.

The term loan facility amortizes quarterly beginning on December 31, 2016 with quarterly payments of $1,250,000 in the first year, quarterly payments of $2,000,000 in the second year and quarterly payments of $2,500,000 thereafter, with the remainder due at maturity. . . .

***

Special Dividend

On November 9, 2016, the Board of Directors (the "Board") approved a special dividend of $2.50 per share of Company common stock, payable December 9, 2016, to shareholders of record at the close of business on November 28, 2016.

Stock Repurchase Program

On November 9, 2016, the Board also authorized up to $40 million of stock repurchases through November 9, 2018 under [Patriot National]'s previously announced $15 million stock repurchase program (the "Repurchase Program"). This authorization represents an increase of $34 million for stock repurchases in addition to the approximately $6 million remaining under the previously authorized program. Pursuant to the terms of the Repurchase Program, [Patriot National] may purchase no more than 1,000,000 shares in any calendar month. [Patriot National] may otherwise repurchase its common stock from time to time, in amounts and at prices [Patriot National] deems appropriate, subject to market conditions and other considerations. [Patriot National's]

> repurchases may be executed using open market purchases or negotiated off-market transactions.

473. Defendant Shields signed or authorized the signing of Patriot National's Q3 2016 10-Q filed with the SEC on November 11, 2016. Mariano and Shields certified the filing pursuant to Sarbanes-Oxley Act of 2002, affirming that it "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and "information contained in the [filing] fairly presents, in all material respects, the financial condition and results of operations of the Company."

474. Additionally, Mariano and Shields signed certifications as Chief Executive Officer and Chief Financial Officer, respectively, certifying that they had reviewed the filing and, based on their knowledge, the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," among other things.

475. That same day, during the conference call held for the Q3 2016 results, the company's executives stated in relevant part:

> **Steve Mariano:**
>
> Since our IPO, we've built up a powerful operating platform that has considerable leverage to deliver growth and profitability. In combination with our new credit facility which Tom will discuss shortly, ***we now have the financial flexibility to execute on this mission***.
>
> ***

In a moment, Tom will review third quarter results, which reflect a slower than expected ramp in client activity and awards. As a result, we have recalibrated our expectations for this year and ***we're committing resources to accelerate growth and improve our operating efficiencies***.

***

**Tom Shields:**

As Steve mentioned earlier, we announced that we entered into an agreement with Cerberus Business Finance to provide a new $280 million five-year senior-secured credit facility. The credit facility consists of a $30 million revolving line of credit and $250 million term loan. We have not drawn on the revolver.

The net proceeds from the new credit facility was $101.8 million after the full repayment of all outstanding obligations on a former senior-secured credit facility and the payment of closing fees related to the new loan transaction.

***

**Steven Mariano**

Thanks, Tom. In closing, I believe we have made the right investments to strategically position Patriot National for organic growth and enhanced profitability. We're committed to our strategic plan and to deliver best-in-class solutions to the insurance industry. We have considerable runway ahead for sustainable long-term growth. And are well positioned to deliver attractive returns to our shareholders as an independent Company. That said, our Board will continue to review all alternatives to enhance shareholder value. Nothing is off the table.

**Q&A Sessions**

**Matt Carletti**

Okay. And then I guess just playing a little devil's advocate here, can you talk about the special dividend? I mean, I understand the wanting to reward shareholders. But I could take the other flip side of it and say that, if I'm doing the math right, it's about $80 million. ***And you're taking on net increased borrowings of a little over $100 million at 8.25% to pay out a special dividend***. ***Can you talk a little about why you may think that makes sense now, alongside needing to recapitalize the Business?***

**Steven Mariano**

Well, the dividend's about $67 million, if I've got the shares right. So we feel that the special dividend is good to give all shareholders something. ***I mean, it's been a long time since the IPO. We think that [Patriot National] is tremendously undervalued based on where its share price is today, primarily because of the concentration issue that's being worked on as we speak***. And we believe that the shareholders, all shareholders, should be rewarded at the same time. I think where we are and what we're saying, Matt, is we have a great organic growth engine that generates huge cash flows during the year. As Tom mentioned, you had an 8%, 8.25% interest rate, but our tax load is almost 40%. So on a net tax basis, the number's closer to 6%.

So when you look at the cash coming into the Business from organic growth, and the BPO clients we have and the free cash that we have, ***we think the money's better off in the shareholders' hands.*** There's no reason to give a dividend to the shareholders. ***They've been waiting two years and haven't seen it. Investors have been asking for something***. And we believe that this shows, number one, the cash flow initiatives that we have, the ability for us to believe in organic growth for the Business, while we continue to look at potential offers that are obviously a lot higher than the current stock price. We think those are all positive things.

***

**Brian Meredith**

Okay. And then I just want to follow up just a little bit on Matt's question about the special dividend, Steve. I'm still trying to understand this. If you think your stock is undervalued, why would you be doing a special dividend, and instead just doing an accelerated share repurchase or something like that in your stock? I think from a shareholder's perspective, that would deliver a lot more value, rather than levering up for a special dividend, or investing it in acquisitions or organic growth or something like that. I'm just still a little confused.

**Steven Mariano**

Well, first of all, we are very much motivated by our organic growth in our pipeline. It is, even though the numbers look light for Q3 and were light, the number of submissions, the core Company, the business growth is moving very, very fast in the right direction from an organic growth perspective. From our

> standpoint, we see that. Number two, as you saw, it wasn't just a stock dividend, it is a big company repurchase. We've gone from a $50 million Company repurchased back six months ago to an enhanced repurchase up to $40 million. So when you see [Patriot National], where its stock price is – we're doing both things. We're giving our shareholders a dividend, but we're also buying back shares in [Patriot National].
>
> And so we feel that's two big major enhancements to shareholder value that are happening simultaneously, along with us just focusing on our core business and our organic growth in our core businesses, which should be substantial in 2017.

476. Also, during the November 14, 2016 conference call, while asked by an analyst, Mariano discussed the reasons for killing the Ebix offer. He stated that the offer was rejected because there was a better offer on the table:

> **Matt Carletti**
>
> Hey, thanks. Good morning, just had a few questions. I guess first just on the update on the strategic alternatives. Obviously, you had the press release out, I think it was last week, just saying that Ebix wasn't going forward. But it seems, maybe this is just me reading it, but it seems like there was a slight difference in tone then versus now, that then it was still kind of a focus on other strategic alternatives. And it seems like today more of the focus is back to organic growth. Am I interpreting that right? I know that you will always look at what's out there. But it seems like the plan A today as we go forward is organic growth of [Patriot National]. Am I reading that right?
>
> **Steven Mariano**
>
> Matt, this is Steve. ***Well, the Ebix transaction was rejected because it wasn't the best offer on the table.*** And so, with that, I really can't say anything further, other than there is still a process going. And the special committee is continuing to look at offers. ***The rejection of the Ebix deal was plain and simple because we had a better offer from someone else***. But while we continue to look at that, and look at those potential offers, we need to understand a couple of things that are going on that are very positive for [Patriot National].

**Matt Carletti**

Absolutely. I want to make sure I heard you right. You said that there was a better offer on the table than the Ebix one, and that it's still currently being evaluated? And obviously I know you can't say any more than that. Is that correct?

**Steven Mariano**

***That is correct.***

477. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern and meet its year-end FOIR capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National without obtaining at least $30 million from Mariano; (3) Patriot National's adherence to GAAP in its financial statements, including improperly accounting for doubtful accounts, goodwill, and "Customer & Carrier Relationships"; (4) the risks, including credit risk, to Patriot National posed by GIC's precarious financial position; (5) the purpose of the Leveraged Recap; (6) that the Company did not reject the Ebix offer; (7) Patriot National's ability to grow organically; (8) Mariano is a controlling stockholder of the "significant new client engagements"; (9) Mariano's intention and ability to provide shares to Patriot National pursuant to the Back-to-Back Agreement; (11) the value of the Forward Purchase Asset; and (12) Patriot National's adherence to its Policy Regarding Transactions with Related Persons.

478. As detailed above, GIC sustained over $43 million in total losses between 2007 and 2013, and an additional net income loss of $16.9 million in the following two years. Due to the annual operating losses, Mariano was forced to pump at least $17 million (with proceeds from the PIPE Transaction) into GIC so that it could meet its year-end FOIR capital requirements in 2015. And most importantly, the Individual Defendants secretly approved the Leveraged Recap because they needed to do so in order for Mariano to provide GIC with the

capital it needed by year-end. Thus, Patriot National and Mariano knew or were reckless in not knowing as of November 14, 2016 that GIC would be unable to repay the $30 million recorded as an account receivable as of September 30, 2016. With GIC's debt to the Company growing each quarter, GIC's ability to pay the balance it owed to Patriot National depended on Mariano injecting GIC with additional capital—capital that Mariano would have to extract from Patriot National. There were no assurances (or even a reasonable basis to believe) that Mariano would be able to legally leverage his control over Patriot National to obtain additional funds to support GIC in the future. (This was repeatedly proven true, as seen in the failed Secondary Offering, the PIPE Investors' lawsuits following the PIPE Transaction, the sham Strategic Review, the enjoined Leveraged Recap, and ultimately, GIC's Receivership.)

479. As revealed by the GIC Bailout, GIC's Receivership, and Patriot National's bankruptcy, GIC's precarious financial condition—which was manifest and known by Patriot National and the Individual Defendants as of November 14, 2016—posed a serious credit risk to the Company. This was later addressed in Patriot National's November 22, 2017, Form 8-K, which explained that GIC's Receivership will result in the non-payment of its accounts payable to Patriot National and "a major portion of [Patriot National]'s revenue and cash flow going forward will cease."

480. The Q3 2016 10-Q failed to disclose that GIC presented yet another undisclosed risk to the Company. Mariano's use of Patriot National common stock to meet GIC's FOIR capital requirements tied GIC's fate to Patriot National's stock price. If Patriot National's stock price fell enough GIC would no longer meet its capital requirement, which would cause GIC to enter into receivership and, in turn, terminate the source of the majority of Patriot National's revenue.

481. The Q3 2016 10-Q was also false and misleading because Patriot National's financial statements did not conform to GAAP. Because GIC needed Patriot National's cash to remain in business, the collectability of the account receivable from GIC was not reasonably probable or assured and should have been reserved against. Failure to record a reserve or allowance for doubtful accounts in respect of the GIC accounts receivable made the financial statements contained in the Q3 2016 10-Q materially false and misleading.

482. Similarly, it was improper for Patriot National to recognize revenue from GIC until payment was actually received because collectability of payments from GIC was not reasonably probable or assured. Patriot National should have recognized revenue on a cash basis rather than accrue it as it is purportedly "earned." Patriot National's revenue for the three months ended September 30, 2016 was overstated by at least $2.9 million, the quarterly increase in the amount of the receivable recorded as owing from GIC. Consequently, Patriot National's financial statements as set forth in the Q3 2016 10-Q were materially false and misleading and not properly stated in accordance with GAAP.

483. The financial statements contained in the Q3 2016 10-Q also misrepresented the value of Patriot National's goodwill assets. In connection with an acquisition, GAAP requires that any excess of the purchase price over the fair value of the assets acquired and the liabilities assumed be reported as goodwill or "excess purchase." GAAP also requires that goodwill be tested for impairment annually, or more frequently if any changes in circumstances or events indicate that the asset in question might be impaired.

484. Approximately 42.3% of Patriot National's $121.7 million "goodwill" asset listed in the Q1 2015 10-Q was tied to its acquisitions of GUI and PCM, and that figure represented 14% of total Company assets. As described above, both of those entities derived a substantial

portion of their revenue from doing business with GIC. Thus, the majority of the goodwill attributed to the acquisition of these businesses was based on GIC's revenue stream. As of November 14, 2016, Patriot National and the Individual Defendants knew or should have known of GIC's deteriorating business. Accordingly, they were aware, or were recklessly uninformed, of circumstances requiring Patriot National to test for impairment of goodwill to reflect the true worth of GUI and PCM in light of their dependence on GIC. Had they actually performed an impairment test, Patriot National would found that the businesses' combined goodwill was worth far less than $50 million. However, they did not test for impairment, which rendered false and/or misleading the statement that Patriot National adhered to GAAP's goodwill impairment requirements.

485. For the same reasons, Patriot National's accounting of approximately $35.3 million in intangible assets related to customer and carrier relationships (namely, GIC), was unfounded, and thus, false and omitted information necessary to make such misstatements not misleading.

486. Additionally, the above detailed "Risk Factors" were false and misleading because the Q3 2016 10-Q and the 2015 10-K failed to disclose that, as of November 14, 2016: (1) GIC's business had already been in decline for at least 7 years; (2) the primary factor for GIC's decline was Mariano's looting; (3) Mariano had already exerted his control as an executive and director of Patriot National to obtain undue benefits for himself and GIC; (4) Patriot National's "related party transaction policy" was ineffective, feckless, and/or Patriot National and the Board had no intention of ever following it; (5) GIC had been under regulatory scrutiny for years due to failure to fulfill its legal obligations, including maintaining sufficient

capital ratios impermissible related party transactions; and/or (6) the aforementioned regulatory issues at GIC were known to Patriot National and the Individual Defendants.

487. As detailed above, Mariano desperately needed $30 million for GIC by year end to meet FOIR capital requirements, so he did what he has always done, use his control to unlawfully leech funds from Patriot National. Mariano caused Patriot National to enter into a massive Leveraged Recap for the undisclosed purpose of creating liquidity for Mariano to bail out GIC and support his personal expenses. There was no other legitimate purpose for the transaction. Mariano's statement that the Cerberus Credit Agreement "significantly enhances our financial flexibility to execute on our plans for enhanced growth and returns in 2017" has been proven to be false and/misleading by the fact that Patriot National entered into bankruptcy due to not being able to pay its interests payments for a single year out of the five year duration of the loan.

488. Additionally, Mariano's statement to stockholders that there was a "better offer" than the Ebix offer was clearly false.

### R. On March 3, 2017, The Company Filed A Misleading Form 8-K Regarding The GIC Bailout

489. On March 3, 2017, Patriot National filed a Form 8-K with the SEC revealing the GIC Bailout:

> **Item 1.01 Entry into a Material Definitive Agreement.**
>
> On February 27, 2017, Patriot National . . . entered into an agreement with [GIG] and Steve Mariano, the Chairman, Chief Executive Officer and majority owner of [Patriot National] and the majority owner of GIG, regarding the service agreements between [Patriot National] and GIG's wholly-owned subsidiary [GIC]. GIC is [Patriot National]'s principal customer, with contracts and relationships from GIC generating $107.8 million, or 59% of [Patriot National]'s Total Fee Income and Fee Income from Related Party (the line item that reflects aggregate fee income) for

the nine-months ended September 30, 2016 and $144.1 million, or 69%, for the year ended December 31, 2015.

Pursuant to the agreement, GIG agreed to, among other things, cause GIC to, subject to regulatory approval, amend each of the existing service agreements such that (1) the expiration date of each service agreement, as amended, shall be extended by not less than 10 years, (2) each such amended agreement shall provide that all of the services that GIC requires to be performed within the scope of such agreement shall be performed solely and exclusively by [Patriot National], (3) GIC will have the right to terminate each such amended agreement only in the event that [Patriot National] substantially fails to meet its obligations under the agreement or [Patriot National] commits gross negligence in the performance of its obligations under the agreement, (4) none of the rights and obligations of GIC and [Patriot National] under the amended agreements shall be assigned to any other party without the prior approval of a majority of the independent directors of [Patriot National], and (5) [Patriot National] and GIC will act in good faith to ensure that for the duration of the extended service agreements the amount of revenue to [Patriot National] from business with GIC does not decrease. ***In consideration of, among other things, the expansion of exclusivity and the extension of the term of such agreements and agreement as to certain corporate governance and financial covenants with respect to GIG, GIC (subject to regulatory approval) and [Patriot National], [Patriot National] paid GIG $30 million which was required to be immediately contributed into GIC as surplus and thereby included in GIC's calculation of total adjusted capital and its risk-based capital levels as of the end of the calendar year just ended in compliance with Florida Statute Section 624.4085.***

***As further material inducements for [Patriot National]'s payment, GIG and Mr. Mariano agreed to a series of corporate governance and financial covenants. These corporate*** governance ***covenants include the following: (1) at least one independent member of the Board of Directors of [Patriot National] shall have the right to attend and observe all meetings of the Board of Directors of GIC, (2) [Patriot National] will appoint an independent Lead Director, (3) [Patriot National]'s Audit Committee will have authority to approve payments of expenses for Board-related matters, (4) [Patriot National]'s Board of Directors will at all times be comprised of a majority of independent directors and nominations of new directors and nominations of directors seeking reelection must be approved by a majority of the independent directors, (5) [Patriot National] will not enter into any transaction with an affiliate of Mr. Mariano***

> ***without the prior approval of a majority of independent directors and (6) prior approval of a majority of [Patriot National]'s independent directors will be required before [Patriot National] carries out certain extraordinary transactions.***
>
> Pursuant to the financial covenants, GIG agreed to cause GIC to (1) not issue any dividends or distributions to (other than dividends or distributions permitted by the Florida Office of Insurance Regulation), or make any further advances to, any of its or GIG's shareholder(s), (2) adopt certain policies relating to operations including GIC expenses and (3) comply with certain other customary negative covenants including restrictions on indebtedness, investments, liens, affiliated party transactions and purchases and sales of assets, other than in the ordinary course of business. GIG further agreed that if it transfers or sells any of its shares in GIC, then GIG will pay to [Patriot National] the first $13.0 million in proceeds from such sale.
>
> The transaction was approved by an independent special committee of [Patriot National]'s Board of Directors and by the independent directors of the Board. The special committee engaged separate independent legal counsel and financial advisors in connection with the agreement.

490. The above statements were partially revealing of the extent of GIC's precarious financial condition and the threat of regulator action. The above statements, however, were also false and purposefully misleading because they omitted and/or misrepresented: (1) the reason why GIC needed $30 million, specifically, because Mariano had systematically and continuously looted the company to fund his lavish lifestyle (as revealed in the Receivership Letter, discussed above)[4]; and (2) Mariano's intention to adhere to the covenants in the agreement.

---

[4] In the Receivership Letter, the FOIR stated that "GIC has systematically transferred funds, totaling $15,743,000 to Mr. Steve Mariano, the ultimate owner of GIC during the calendar year 2016 and through June 2017. These transfers were made with no documented business purpose and no discernable benefit to GIC[.]" The FOIR further concluded that "[w]hile Mr. Mariano benefitted individually from these transaction by receiving cash from GIC, this indebtedness diverted funds that otherwise could be used to increase the surplus of GIC and otherwise be available for the payment of policyholders."

**S. On March 14, 2017, The Company Filed A Misleading Form 8-K Regarding Its 2016 Financial Performance**

491. On March 14, 2017, Patriot National issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, disclosing its financial results for the quarter and year ended December 31, 2016, and providing guidance for 2017. The press release stated in pertinent part:

> **Recent Developments:**
>
> - ***On December 1, 2016, Patriot National expanded its relationship with one of its major, non-related party carrier clients and now provides them with a wide variety of services***. . . .
>
> - On February 27, 2017, Patriot National announced that an independent special committee of its Board of Directors entered into an agreement with [GIC] Group ("GIG") and Steven Mariano, Chairman, Chief Executive Officer and majority owner of GIG, and its wholly-owned subsidiary [GIC] Company ("GIC"). This agreement expands the exclusivity and extends the term by not less than ten years of our existing service agreements with GIC and includes an agreement as to certain corporate governance and financial covenants with respect to GIG, GIC (subject to regulatory approval) and [Patriot National] in exchange for $30 million. The transaction was approved by the independent special committee of [Patriot National]'s Board of Directors and by the independent directors of the Board. The special committee engaged separate independent legal counsel and financial advisors in connection with the agreement.
>
> ***
>
> **Management Commentary:**
>
> "Our results for the fourth quarter and the year were disappointing and, frankly, we did not execute as well as we hoped." said Steven M. Mariano, Chief Executive Officer of Patriot National. "***In 2017, we have dedicated all of our resources to delivering profitable organic growth from our core businesses – workers' compensation insurance services and technology. We believe a focused approach combined with improved execution and***

> ***expense management across [Patriot National] is the most realistic way to improve our financial performance. We are optimistic about 2017. We have a solid plan and a very strong platform to build upon.***"

492. Additionally, since Patriot National did not issue its annual report, it included the following operating results for 2016 in the press release:

> **Operating Results**
>
> **Three Months Ended December 31, 2016**
>
> Total fee income was $51.5 million for the fourth quarter of 2016, a decrease of 15.4% compared with $60.9 million in the fourth quarter of 2015. The decrease in fee income during the fourth quarter of 2016 reflects weaker than expected results across [Patriot National]'s businesses. Organic fee income was $50.3 million for the fourth quarter of 2016, a decrease of 17.3% compared with $60.9 million in the fourth quarter of 2015. "Organic fee income" is defined as fee income earned after the first four quarters of fee income generated by each acquisition.
>
> Total expenses for the fourth quarter of 2016 were $84.6 million, compared with $59.6 million in the fourth quarter of 2015. ***The increase was largely attributable to a $17.7 million goodwill impairment charge relating to the 2015 acquisition of Global HR Research*** and a write down of $3.7 million of other assets, primarily related to amounts owed to [Patriot National] under a third-party settlement agreement. In addition, fourth quarter 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, and $2.0 million in costs related to extinguishment of debt.
>
> Fourth quarter 2016 GAAP net loss was $20.3 million, or $0.65 per diluted share, compared to a net loss of $5.4 million, or $0.19 per diluted share in the fourth quarter of 2015. Weighted average diluted shares were 31.3 million on a GAAP basis, which includes 4.9 million shares relating to the warrants associated with the PIPE financing as discussed in [Patriot National]'s previous 10-Q (the "Warrants"); and 26.4 million shares excluding the Warrants on a non-GAAP basis respectively. It is important to note that pursuant to the Back-to-Back Agreement between [Patriot National] and Mr. Mariano, Mr. Mariano has agreed to tender any shares back to

[Patriot National] for any shares delivered by [Patriot National] pursuant to the Warrant Agreement.

Adjusted Loss for the fourth quarter of 2016 was $1.4 million, or $0.05 per diluted share, compared with Adjusted Earnings of $5.5 million, or $0.19 per diluted share, in the fourth quarter of 2015. In calculating the weighted average diluted shares, the Warrants previously mentioned have been excluded. Patriot National defines Adjusted Earnings and Adjusted Earnings Per Share as net income (loss) adjusted for cost for debt payoff, non-cash stock compensation costs, net realized gains (losses) on investments, increase (decrease) in fair value of warrant redemption liability, acquisition costs, claims settlements cost, litigation fees, severance expense, public offering costs, costs for strategic alternatives, goodwill impairment, write-down of other assets, and the income tax effect related to reconciling items.

Adjusted EBITDA for the fourth quarter of 2016 was $6.3 million, compared to Adjusted EBITDA of $14.6 million for the fourth quarter of 2015. Patriot National defines Adjusted EBITDA as net income (loss) adjusted for income tax, interest, depreciation and amortization, net realized gains (losses) on investments, increase (decrease) in fair value of warrant redemption liability, costs for debt payoff, non-cash stock compensation costs, acquisition costs, claims settlement cost, litigation fees, severance expense and public offering costs, and costs for strategic alternatives, goodwill impairment, and write-down of other assets.

Operating Cash Flow for the fourth quarter of 2016 was $1.3 million, compared to $5.6 million for the fourth quarter of 2015. Patriot National defines Operating Cash Flow as Adjusted EBITDA less income tax expense, interest expense and capital expenditures.

As of December 31, 2016, [Patriot National] had $91.9 million in cash and approximately $238.5 million of debt outstanding, net of deferred loan fees.

**Full Year Ended December 31, 2016**

Total revenues were $232.8 million for the twelve months ended December 31, 2016, compared with $209.7 million in the same period a year ago. Total fee income was $233.0 million for the twelve months ended December 31, 2016, an increase of 11.1% compared to $209.8 million for the corresponding prior-year period. The increase in fee income during the twelve months ended 2016 was primarily due to acquisitions closed during the twelve

> months ended December 31, 2016 and 2015. Organic fee income of $204.1 million declined 2.7% year-over-year. "Organic fee income" is defined as fee income earned after the first four quarters of fee income generated by each acquisition.
>
> Total expenses for the twelve months ended December 31, 2016 were $252.3 million, compared with $210.1 million in the corresponding prior-year period. The increase was largely attributable to a $17.7 million goodwill impairment charge relating to our 2015 acquisition of Global HR Research and write down of $3.7 million of other assets, primarily related to amounts owed to us under a third-party settlement agreement. In addition, 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, $2.0 million in costs related to extinguishment of debt and expenses attributable to acquisitions closed during the twelve months ended December 31, 2016 and 2015.
>
> For the twelve months ended December 31, 2016, GAAP net loss was $0.8 million or $0.03 per share, compared with GAAP net loss of $5.4 million, or $0.20 per share, for the twelve months ended December 31, 2015. Adjusted Earnings for the twelve months ended December 31, 2016 were $10.3 million, or $0.38 per diluted share, compared with Adjusted Earnings of $20.1 million, or $0.75 per diluted share, in the prior-year period.
>
> For the twelve months ended December 31, 2016, Adjusted EBITDA decreased to $44.1 million, down from $51.5 million for the twelve months ended December 31, 2015. Operating Cash Flow for the twelve months ended December 31, 2016 was $31.7 million, compared to Operating Cash Flow of $37.1 million for the same period a year ago.

493. In Patriot National's consolidated balance sheet attached to the filing, it reported approximately $105.3 million in goodwill, as of December 31, 2016.

494. Likewise, since Patriot National did not issue its annual report, it included the 2017 guidance in the press release:

> **Outlook**
>
> Patriot National is providing its full year 2017 Outlook for anticipated results. The Outlook provided is based on a number of

> assumptions that it believes are reasonable at the time of this press release. Information regarding potential risks that could cause the actual results to differ from these forward-looking statements is set forth below and in Patriot National's filings with the Securities and Exchange Commission.
>
> For the full year ending December 31, 2017, Patriot National currently expects the following financial results.
>
> Patriot National is providing its full year 2017 Outlook for anticipated results. The Outlook provided is based on a number of assumptions that it believes are reasonable at the time of this press release. Information regarding potential risks that could cause the actual results to differ from these forward-looking statements is set forth below and in Patriot National's filings with the Securities and Exchange Commission.
>
> For the full year ending December 31, 2017, Patriot National currently expects the following financial results:

| In millions: | 2017 Guidance |
|---|---|
| Total Fee Income | $224 - $236 |
| GAAP Net Income | $1 - $5 |
| Adjusted Earnings | $3 - $7 |
| Adjusted EBITDA | $45 - $52 |
| Operating Cash Flows | $21 - $25 |

495. Each of these statements was false and purposefully misleading because they omitted and/or misrepresented: (1) GIC's ability to operate as a going concern, including meeting its regulatory capital requirements; (2) GIC's ability to repay the sizable accounts payable to Patriot National; (3) Patriot National's adherence to GAAP, including improperly accounting for goodwill; (4) the risks to Patriot National caused by GIC's precarious financial position; (5) Patriot National's adherence to its Policy Regarding Transactions with Related Persons and otherwise ensuring proper corporate governance; (6) Mariano's intention and ability to indemnify Patriot National pursuant to the Back-to-Back Agreement; (7) the GIC Bailout and

Mariano's intentions to adhere to its covenants; and (8) Patriot National's 2017 outlook and ability to continue as a viable going concern.

496. Further, Patriot National's failure to account for the risk of GIC's ability to continue as a going concern in its doubtful accounts and 2017 guidance is particularly egregious in the months following the Leveraged Recap and the GIC Bailout. Moreover, based on information and belief, at that time GIC and Patriot National were in discussions with the FOIR concerning GIC falling into receivership, which they knew would eventually foreclose any payment on GIC's debts and cessation of future revenue.

497. On this news, shares of Patriot National declined from $3.41 per share at close on March 13, 2017, to $2.83 per share at close on March 14, 2017, a 17% drop, on unusually heavy volume.

### T. The Company Filed A Misleading Form NT 10-K On March 17, 2017

498. On March 17, 2017, Patriot National filed a Form NT 10-K with the SEC, stating:

> ***Patriot National . . . has determined that it is unable to file its annual report on 10-K for the fiscal year ended December 31, 2016 within the prescribed time because [Patriot National] is still finalizing the 10-K and continues to prepare analyses and provide documentation requested by its auditors.*** In accordance with Rule 12b-25 under the Securities Exchange Act of 1934, as amended, ***[Patriot National] expects to file the 10-K within the permitted 15- day extension of the prescribed due date of March 16, 2017.***

499. Exhibit A to the filing provided:

> As reported in [Patriot National]'s earnings release for the quarter and year ended December 31, 2016, ***[Patriot National] had total revenues of $232.8 million for the twelve months ended December 31, 2016, compared with $209.7 million in the same period a year ago. Total fee income was $233.0 million for the twelve months ended December 31, 2016, an increase of 11.1% compared to $209.8 million for the corresponding prior-year period. The increase in fee income during the twelve months***

> ***ended 2016 was primarily due to acquisitions closed during the twelve months ended December 31, 2016 and 2015.***
>
> Total expenses for the twelve months ended December 31, 2016 were $252.3 million, compared with $210.1 million in the corresponding prior-year period. ***The increase was largely attributable to a $17.7 million goodwill impairment charge relating to our 2015 acquisition of Global HR Research and write down of $3.7 million of other assets, primarily related to amounts owed to us under a third-party settlement agreement.*** In addition, 2016 expenses included $2.7 million in transaction bonuses paid to certain executives upon closing the new credit facility, and incurred in connection with our efforts to seek and evaluate strategic alternatives, $2.0 million in costs related to extinguishment of debt and expenses attributable to acquisitions closed during the twelve months ended December 31, 2016 and 2015.
>
> For the twelve months ended December 31, 2016, GAAP net loss was $0.8 million or $0.03 per share, compared with GAAP net loss of $5.4 million, or $0.20 per share, for the twelve months ended December 31, 2015.

500. The above statements were materially false and/or misleading because they misrepresented and/or omitted, among other things: (1) the reason why Patriot National was unable to timely file its annual report; (2) that Patriot National's would be able to file its annual report within 15 days of March 16, 2017; (3) that the increase in total revenue and fee income was based on GIC accounts payable to Patriot National which they knew or should have known would not get paid due to GIC's inevitable receivership; and (4) Patriot National's intangible assets related to GIC, which was no impaired (even after GIC Bailout).

501. On this news, shares of Patriot National declined from $2.55 per share at close on March 15, 2017, to $2.25 per share at close on March 17, 2017, an 11.8% drop, on unusually heavy volume.

**U. On April 4, 2017, The Company Misled The Market Regarding Cerberus' Extension Of The Company's Filing Deadline**

502. On April 4, 2017, Patriot National filed a Form 8-K with the SEC. Attached as exhibits were Patriot National's April 3, 2017, and April 4, 2017, press releases, detailed above. The 8-K stated, in relevant part:

> On March 31, 2017, the lenders under the Financing Agreement, dated November 9, 2016, by and among Patriot National, Inc. (the "Company"), Cerberus Business Finance, LLC, as collateral agent and as administrative agent, and the other lenders party thereto (the "Credit Agreement"), consented to extending the time by which [Patriot National] must deliver its audited financial statements to the lenders from March 31, 2017 to May 1, 2017.
>
> ***
>
> During the first quarter of 2017, [Patriot National] paid down approximately $36.0 million principal of the Term Loan under its Credit Agreement, $20.0 million of which was attributable to the sale of Global HR.

503. Additionally, the filing informed stockholders that Mariano had removed Smith and Walsh from the Board:

> On March 30, 2017, [Patriot National] received a written consent signed by Steven M. Mariano, Steven Mariano Trust, [GIC] Company, Blue Ridge Insurance Company, LLC and [GIG], which collectively hold of record at least a majority in voting power of all outstanding shares of [Patriot National], removing Quentin P. Smith and Charles H. Walsh from the Board of Directors of [Patriot National], effective immediately.

504. The above statements were false and misleading because they did not disclose that the Company was required to pay Cerberus to avoid a default of the Cerberus Credit Agreement, and that Mariano removed Smith and Walsh from the Board in order to obtain an excessive employment agreement.

## VIII. LOSS CAUSATION AND DEFENDANTS' CORRECTIVE DISCLOSURES

505. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

506. During the Class Period, Plaintiffs and the Class purchased Patriot National's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

507. The truth regarding Patriot National was revealed—and/or the risks that Defendants concealed through misrepresentations materialized—between the third quarter of 2015 and the fourth quarter of 2017. As a direct result of these disclosures and materializations of concealed risk, the price of Patriot National's shares declined precipitously, on unusually heavy trading volume.

508. The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' false and/or misleading statements, and the significant decline in the value of Patriot National's shares when the truth was revealed.

### A. October 5, 2015

509. On October 5, 2015, Patriot National filed a Form S-1 registration statement for the Secondary Offering through which Mariano intended to sell an undisclosed number of his shares.

510. The market reacted poorly to news of the Secondary Offering. Patriot National's stock opened at $16.15 per share on October 5, 2015, and closed at $14.72—a drop of 8.6%, on unusually heavy volume.

511. The Secondary Offering was the partial revelation of a concealed truth that Mariano was desperate for cash to fund his and GIC's obligations. Defendants disseminated false and/or misleading statements, and omitted material information regarding the nature and impact of GIC's failing business and Mariano's looting of Patriot National. In particular, Defendants concealed the fact that GIC was unable to continue as a going concern without outside cash as well as the extent to which Mariano was looting the Company to infuse GIC with cash and satisfy his own cash needs. This obscured from shareholders the possibility that the Company would engage in behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano and GIC. Here, the Company engaged in a Secondary Offering to increase liquidity so that Mariano would be able to acquire cash to keep GIC alive and fund his own lavish lifestyle. The Secondary Offering was (at least in part) a materialization of the risk concealed by Defendants.

**B. December 14-15, 2015**

512. On December 14, 2015, Patriot National filed a Form 8-K announcing the PIPE Transaction.

513. This news caused Patriot National's stock to plunge from $13.08 on Friday, December 11, 2015 to $7.79 per share on Monday, December 14, 2015, an overall drop of 40.4%, on unusually heavy volume.

514. On December 15, 2015, Patriot National filed an amendment to the Form 8-K filed the previous day announcing that the terms of the PIPE Transaction had been altered.

515. Shares in the Company continued to fall, from $7.79 per share on December 14, 2015, to $6.59 per share on December 15, 2015, an overall drop of 15.4%, on unusually heavy volume.

516. The PIPE Transaction was the partial revelation of a concealed truth that Mariano was desperate for cash to fund his and GIC's obligations. Defendants disseminated false and/or misleading statements and omitted material information regarding the nature and impact of GIC's failing business and Mariano's looting of Patriot National. In particular, Defendants concealed the fact that GIC was unable to continue as a going concern without outside cash as well as the extent to which Mariano was looting the Company to infuse GIC with cash and satisfy his own cash needs. This obscured from shareholders the possibility that the Company would engage in behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano and GIC. Here, the Company engaged in a PIPE Transaction to increase liquidity solely so that Mariano would be able to acquire cash to keep GIC alive and fund his own lavish lifestyle. The PIPE Transaction was (at least in part) a materialization of the risk concealed by Defendants.

**C. October 24, 2016**

517. After the close of trading on Friday, October 21, 2016, Patriot National filed a Form 8-K announcing that Shanfelter was resigning from the Board immediately, allegedly due to health reasons.

518. On this news, shares of Patriot National declined from $7.96 per share at close on October 21, 2016, to $6.78 per share at close on October 24, 2016, a 14.8% drop, on unusually heavy volume.

519. Shanfelter's resignation was the partial revelation of a concealed truth: that at least some members of the Board were aware that the Company was engaged in malfeasance and/or in financial trouble. Shanfelter knew this because the Board was complicit in Mariano looting the Company. Defendants concealed the fact that GIC was unable to continue as a going

concern without outside cash and the extent to which Mariano was looting the Company to infuse GIC with cash and satisfy his own cash needs. This obscured from shareholders the possibility that the Company would engage in behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano and GIC. Here, Shanfelter's resignation signaled that he was aware that Mariano's actions had jeopardized the Company. His resignation was (at least in part) the revelation of a truth concealed by Defendants.

**D. November 9, 2016**

520. On November 8, 2016, after market close, Patriot National issued a press release over Globe Newswire announcing that it had rejected the Ebix offer.

521. On this news, shares of Patriot National declined from $6.90 per share at close on November 8, 2016, to $6.35 per share at close the following day, an 8% drop, on unusually heavy volume.

522. The rejection of the Ebix offer was the materialization of a concealed risk. As discussed, *supra*, Defendants concealed the fact that Patriot National was being run for the benefit of Mariano, rather than for the benefit of shareholders. As such, Defendants concealed the risk that they would cause Patriot National to act against shareholder interests in order to benefit Mariano. The rejection of the Ebix transaction benefited Mariano, and placed his interests above those of shareholders—which was precisely the risk that was concealed.

**E. December 12, 2016**

523. After the close of trading on December 7, 2016, Patriot National filed a Form 8-K announcing that in connection with the Wasik Derivative Action the Court of Chancery of the State of Delaware had granted a temporary restraining order enjoining the Company from issuing the Dividend on December 9, 2016, and from continuing the Repurchase Program.

524. Pursuant to the Court order, the Company did not pay the Dividend to shareholders on December 9, 2016, as it had previously planned.

525. On Friday, December 9, 2016, the Company's shares closed at $6.30. The following Monday, December 12, 2016, Company shares closed at $5.03, a 20.2% drop, on unusually heavy volume.

526. The Court's injunction was the partial revelation of a concealed truth: that the Individual Defendants had caused the Company to engage in behavior that harmed shareholders and itself. The Board was complicit in and concealed the extent to which Mariano was looting the Company to infuse GIC with cash and satisfy his own cash needs (as well as to benefit other insiders). This obscured from shareholders the possibility that the Company would engage in behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano, GIC, and Company insiders. Here, the Court's injunction signaled that the Dividend and Repurchase Program primarily benefitted Mariano at the expense of other shareholders and the Company. The injunction was (at least in part) the revelation of a truth concealed by Defendants.

**F. March 6, 2017**

527. After the close of trading on March 3, 2017, Patriot National filed a Form 8-K disclosing that on February 27, 2017, Patriot National, GIG, and Mariano had executed a binding term sheet implementing the GIC Bailout, the terms of which called for a $30 million cash payment from Patriot National to GIC.

528. This was the $30 million that Mariano first sought to secure for GIC through the Dividend.

529. Company shares closed at $4.39 on Friday, March 3, 2017, and closed at $3.67, on March 6, 2017—a 16.4% drop, on unusually heavy volume.

530. The GIC Bailout was the materialization of a concealed risk and the revelation of a concealed truth: that GIC would not be able to continue operating without cash pulled from the Company. Defendants disseminated false and/or misleading statements, and omitted material information regarding the nature and impact of Patriot National's dependence upon GIC's failing business and Mariano's looting of the resources of Patriot National. In particular, Defendants concealed the extent to which GIC was failing and Mariano was looting the Company to infuse GIC with cash. This obscured from shareholders the magnitude of GIC's dependence upon cash pulled by Mariano from Patriot National. Here, the GIC Bailout made clear that GIC was failing and that Patriot National was its lifeline. The GIC Bailout was a materialization of risks and a revelation of truths concealed by Defendants.

**G. March 14-15, 2017**

531. On March 14, 2017, Patriot National issued a press release over Globe Newswire, attached as Exhibit 99.1 to a Form 8-K filed with the SEC, disclosing its financial results for the quarter and year ended December 31, 2016. In the release, Mariano stated: "Our results for the fourth quarter and the year were disappointing and, frankly, we did not execute as well as we hoped." The Company further explained that "[t]otal fee income was $51.5 million for the fourth quarter of 2016, a decrease of 15.4% compared with $60.9 million in the fourth quarter of 2015," and "[t]otal expenses for the fourth quarter of 2016 were $84.6 million, compared with $59.6 million in the fourth quarter of 2015. The increase was largely attributable to a $17.7 million goodwill impairment charge relating to the 2015 acquisition of Global HR Research."

532. On this news, shares of Patriot National declined from $3.41 per share at close on March 13, 2017, to $2.83 per share at close on March 14, 2017, a 17% drop, on unusually heavy volume. The stock price continued to decline the following day in response to the news, falling another $0.28 per share, or 9.9%, to close at $2.55 per share on March 15, 2017.

533. The poor financial results disclosed above were the materialization of the concealed risk posed by running the Company for the benefit of insiders rather than investors. Defendants concealed the fact that they were operating Patriot National for the benefit of Mariano (and certain other insiders). This obscured from shareholders the possibility that the Company would engage in behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano, GIC, and Company insiders. As discussed above, Global HR was owned by Shanfelter, and Patriot National had no need to purchase Global HR. When the concealed risk materialized, shareholders were injured.

**H. March 17, 2017**

534. On March 16, 2017, Patriot National filed a Form 8-K announcing that Pesch had left the Company, allegedly to pursue other career opportunities.

535. The following day, Patriot National filed a Form NT 10-K announcing that it would be unable to file its annual Form 10-K for the fiscal year ended December 31, 2016, within the prescribed time.

536. On this news, shares of Patriot National declined from $2.55 per share at close on March 15, 2017, to $2.25 per share at close on March 17, 2017, an 11.8% drop, on unusually heavy volume.

537. Pesch's resignation and the announcement of the delayed Form 10-K filing partially revealed a concealed truth: that the Company was engaged in malfeasance and/or in financial trouble and at least some members of the Board were aware of it. Pesch knew this because the Board was complicit in Mariano looting the Company. Defendants concealed the fact that GIC was unable to continue as a going concern without outside cash and the extent to which Mariano was looting the Company to infuse GIC with cash and satisfy his own cash needs. This obscured from shareholders the possibility that the Company would engage in

behavior that damaged itself and shareholders to acquire liquidity to benefit Mariano and GIC. Here, Pesch's resignation signaled that he was aware that Mariano's actions had jeopardized the Company, and the delayed Form 10-K revealed that the Company's finances were in materially worse shape than Defendants and the Company's filings let on. His resignation was (at least in part) the revelation of a truth concealed by Defendants.

**I. November 22, 2017**

538. In a Form 8-K filed on November 22, 2017, Patriot National finally disclosed the severity of the regulatory issues at GIC and the extent to which Patriot National relied upon GIC's business. It stated:

> [Patriot National's] largest customer, [GIC] Company ("GIC"), which has historically accounted for approximately 60-70 percent of [Patriot National]'s business, consented to be placed into receivership on November 13, 2017. [Patriot National] has met with the Florida Office of Insurance Regulation (the "OIR") on various occasions, including most recently on November 20, 2017, seeking to obtain both payment for past services rendered to GIC and an agreement that would allow [Patriot National] to provide and receive payment for future services while GIC is in receivership. However, based on the most recent meeting with the OIR and other authorities now engaged in respect of GIC, [Patriot National] does not believe these efforts will be successful. Accordingly, a major portion of [Patriot National]'s revenue and cash flow going forward will cease.

539. This Form 8-K also disclosed that Patriot National entered into a Forbearance Agreement with Cerberus, delaying bankruptcy until December 3, 2017:

> On November 17, 2017, [Patriot National] obtained and entered into a Forbearance Agreement (the "Forbearance Agreement") with the lenders party to that certain Financing Agreement, dated as of November 9, 2016, with Cerberus Business Finance, LLC ("Cerberus"), as collateral agent and administrative agent, and the lenders party thereto (the "Credit Agreement"). [Patriot National] is currently in default of the Credit Agreement due to its failure to deliver timely financial statements, its non-payment of interest due November 1, 2017 and its failure to comply with financial covenants.

540. The Forbearance Agreement was necessary because Patriot National was and continues to be in default of the Cerberus Credit Agreement due to its failure to deliver timely financial statements, its non-payment of interest due November 1, 2017, and its failure to comply with financial covenants.

541. Following these disclosures, between market close on November 22 and market close on November 24, Patriot National's shares declined from $1.00 per share to $0.36 per share, a 64% drop, on unusually heavy volume.

542. The entry into the Forbearance Agreement was the materialization of a concealed risk. Defendants disseminated false and/or misleading statements, and omitted material information regarding the nature and impact of Patriot National's dependence upon GIC's failing business and looting by Mariano and other insiders of Patriot National's resources. In particular, Defendants concealed the extent to which it was unable to develop revenue sources independent of GIC as well as the extent to which Mariano was looting the Company to infuse GIC with cash. This obscured from shareholders the possibility and magnitude of the impact on the Company of GIC's failure. Here, GIC's receivership quickly resulted in the Company's entry into the Forbearance Agreement. This devastating announcement was a materialization of the risk concealed by Defendants.

**J. November 29, 2017**

543. On November 28, 2017, Patriot National filed a Form 8-K with the SEC disclosing that it had "reached an agreement in principle with its secured lenders to recapitalize the Company" under which Patriot National agreed to file for Chapter 11 bankruptcy. In greater part, Patriot National stated:

> Patriot National, Inc. (the "Company") announced today that it has reached an agreement in principle with its secured lenders to recapitalize the Company. Under the terms of the agreement, the

> Company anticipates that it will reduce its debt, significantly improve its liquidity and financial condition, and improve its ability to service its customers.
>
> On November 28, 2017, the Company entered into a restructuring support agreement (the "RSA") with the lenders under its Financing Agreement, dated as of November 9, 2016, with and among Cerberus Business Finance, LLC, as the collateral agent and administrative agent, and certain funds and accounts managed by each of Cerberus Business Finance, LLC and its affiliates and TCW Asset Management Company LLC, as the lenders party thereto (the "Lenders") (the "Credit Agreement," and the claims and other obligations arising thereunder, the "Lender Claims."). The RSA contemplates that the Company and its direct and indirect U.S.-based subsidiaries will file voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") to implement the recapitalization in accordance with the RSA and the term sheet for a plan of reorganization attached thereto as Exhibit A (the "Term Sheet").

544. On this news, Patriot National's share price fell $0.29 per share, or 80.6%, to close at $0.07 per share on November 29, 2017.

545. The disclosure that Patriot National would file for bankruptcy was the revelation of concealed truth and/or the materialization of a concealed risk. In particular, Defendants concealed the fact that they were operating Patriot National for the benefit of Mariano (and certain other insiders). This obscured from shareholders the possibility that the Company would engage in behavior that was damaging to shareholders and behavior likely to end in bankruptcy. The announcement of bankruptcy was the materialization of that concealed risk.

## IX. UNDISCLOSED ADVERSE FACTS

546. The market for Patriot National's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Patriot National's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired

Patriot National's securities relying upon the integrity of the market price of the Company's securities and market information relating to Patriot National, and have been damaged thereby.

547. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Patriot National's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Patriot National's business, operations, and prospects as alleged herein.

548. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot National's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## X. SCIENTER ALLEGATIONS

549. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Patriot National, their control over, and/or receipt and/or modification of Patriot National's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Patriot National, participated in the fraudulent scheme alleged herein.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

550. The market for Patriot National's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Patriot National's securities traded at artificially inflated prices during the Class Period. On July 31, 2015, the Company's stock price closed at a Class Period high of $18.60 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Patriot National's securities and market information relating to Patriot National, and have been damaged thereby.

551. During the Class Period, the artificial inflation of Patriot National's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Patriot National's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Patriot National and its business, operations, and prospects, thus causing the price of the Company's

securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

552. At all relevant times, the market for Patriot National's securities was an efficient market for the following reasons, among others:

a. Patriot National stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Patriot National filed periodic public reports with the SEC and/or the NYSE;

c. Patriot National regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d. Patriot National was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

553. As a result of the foregoing, the market for Patriot National's securities promptly digested current information regarding Patriot National from all publicly available sources and reflected such information in Patriot National's stock price. Under these circumstances, all purchasers of Patriot National's securities during the Class Period suffered similar injury through their purchase of Patriot National's securities at artificially inflated prices and a presumption of reliance applies.

554. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. COUNTS

### COUNT I

### Violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Patriot National, Mariano, and Shields

555. Plaintiffs repeat and reallege the allegations above.

556. During the Class Period, Patriot National, Mariano, and Shields carried out a plan, scheme, and course of conduct which was intended to and did, throughout the Class Period: (a) deceive the investing public regarding Patriot National's business, operations, management and the intrinsic value of its common stock; (b) enable defendants to enrich themselves at the expense of Patriot National and its public shareholders by causing the Company to enter into self-interested transactions for their personal benefit, while in possession of material adverse nonpublic information about Patriot National; and (c) cause Plaintiffs and all other members of the Class to purchase the Patriot National's common stock at artificially-inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Patriot National, Mariano, and Shields jointly and individually took the actions set forth herein. Accordingly, Mariano and Shields are liable to Plaintiffs and all other members of the Class pursuant to Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. 240.10b-5.

557. Patriot National, Mariano, and Shields: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make those statements not misleading; and, (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National's common stock in an effort to maintain artificially high market prices for Patriot National's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

558. Patriot National, Mariano, and Shields, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations, and future prospects of Patriot National as specified herein.

559. Patriot National, Mariano, and Shields employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Patriot National's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Patriot National and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Patriot National common stock during the Class Period.

560. Mariano and Shields' liability arises from the following facts: (a) Mariano and Shields were high-level executives and/or directors at Patriot National during the Class Period and members of its management team or had control thereof; (b) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of Patriot National was privy to and participated in the creation, development and reporting of Patriot National's internal budgets, plans, projections and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of Patriot National's management team, internal reports and other data and information about its finances, operations, and sales at all relevant times; and (d) each of these defendants was aware of Patriot National's dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading, or omitted to state material facts necessary to make the statements not misleading.

561. Mariano and Shields had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severe recklessness in disregarding the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or deliberately for the purpose and effect of concealing Patriot National's operating condition and future business prospects from the investing public and supporting the artificially-inflated price of its common stock. As demonstrated by Mariano and Shields' gross exaggerations, omissions, and misstatements about Patriot National's business, operations, and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were deliberate in failing to obtain such knowledge by refraining from taking those steps necessary to

discover whether those statements were false or misleading, or omitted to state material facts necessary to make the statements not misleading.

562. As a result of the dissemination of the materially false and misleading information and material omissions, as set forth above, the market price of Patriot National common stock was artificially inflated during the Class Period. In ignorance of this inflation, and relying directly or indirectly on the false and misleading statements made by Mariano and Shields, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or deliberately disregarded by Mariano and Shields but not disclosed in public statements by defendants during the Class Period, Plaintiffs and all other members of the Class acquired Patriot National common stock during the Class Period at artificially high prices and were damaged thereby.

563. At the time of said misrepresentations and omissions, Plaintiffs and all other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and all other members of the Class and the marketplace known the truth about Patriot National that were not disclosed by Mariano and Shields, Plaintiffs and all other members of the Class would not have purchased or otherwise acquired their shares of Patriot National's common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

564. By virtue of the foregoing, when the truth about Mariano and Shields' false and misleading statements began to be revealed, the price of Patriot National shares precipitously dropped causing a loss to Plaintiffs and all other members of the Class. Thus, as a direct and proximate result of Mariano and Shields' wrongful conduct, Plaintiffs and all other members of

the Class suffered damages in connection with their respective purchases and sales of the Patriot National's common stock during the Class Period.

565. It is appropriate to treat Mariano and Shields as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in Patriot National's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly-defined group of defendants identified above. Each of the above officers or directors, by virtue of their high-level positions with Patriot National, directly participated in its management, was directly involved in the day-to-day operations of Patriot National at the highest levels, and was privy to confidential proprietary information concerning Patriot National and its officers' backgrounds, its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Mariano and Shields were involved in drafting, producing, reviewing and/or disseminating false and misleading statements and information, and were aware or knew and/or were severely reckless in not becoming aware or knowing that false and misleading statements were being issued regarding Patriot National and its officers' backgrounds, business, operations, products, growth, financial statements, and financial condition, and approved or ratified these statements, in violation of the federal securities laws.

566. Each of Mariano and Shields had a duty to ensure that they complied with all legal obligations and requirements, and a duty to ensure that Patriot National was run in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

567. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act and, during the Class Period, was traded on New York Stock Exchange, and governed by the provisions of the federal

securities laws, Mariano and Shields each had a duty to disclose and disseminate promptly, accurate and truthful information with respect to Patriot National's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Patriot National's publicly-traded common stock would be based upon truthful and accurate information. Mariano and Shields' misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

568. Mariano and Shields participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports, and other communications complained of herein and knew or were aware of, or were severely reckless in not knowing or becoming aware of, the materially false and misleading nature of misstatements contained therein and omissions therefrom. Because of their membership on the Board of Directors and/or executive and managerial positions with Patriot National, each of the defendants had access to the adverse undisclosed information about Patriot National's financial condition and performance, illegal activities (whether contemplated, undertaken, or completed), growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects and knew, or were severely reckless in not knowing, that adverse facts rendered the positive representations made by or about Patriot National and its financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects issued or adopted by Patriot National were materially false and misleading.

569. Mariano and Shields, because of their positions of control and authority as officers and/or directors of Patriot National, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Patriot National and issued during the Class Period. Each of Mariano and Shields was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of them is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein or omissions therefrom.

570. Mariano and Shields are each liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Patriot National common stock by engaging in misleading transactions between Patriot National and other companies controlled by Mariano, particularly GIC, and disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme was accomplished through both misleading transactions, self-dealing, and through false and misleading statements and the omission of material information. The scheme: (a) deceived the investing public regarding Patriot National's business, operations, management, and the intrinsic value of Patriot National's common stock; (b) enabled Mariano and Shields to enrich themselves and their associates and friends at the expense of Patriot National's public shareholders, while in possession of material, adverse nonpublic information about Patriot National; and, (c) caused Plaintiffs and other members of the Class to purchase Patriot National's common stock at artificially-inflated prices and to be damaged thereby.

571. As alleged herein, Mariano and Shields each acted with scienter in that each knew (or should have known) that the public documents and statements issued or disseminated in the

name of Patriot National were materially false and misleading or omitted to state material facts; knew (or should have known) that such statements or documents would be issued or disseminated to the investing public; and knowingly (or recklessly) participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the truth regarding Patriot National, their control over, and/or receipt and/or modification of Patriot National's allegedly materially misleading misstatements and/or their associations with Patriot National, GIC, and other companies as alleged herein, made them privy to confidential proprietary information concerning Patriot National, participated in the fraudulent scheme alleged herein.

572. Mariano and Shields were motivated to materially misrepresent to or omit material facts from investors because deceiving the investing public regarding Patriot National's business, operations, management, and the intrinsic value of Patriot National's common stock, permitted Mariano to arrange transactions that allowed him to transfer millions of dollars to himself. Mariano used those illicit proceeds to support an extravagant lifestyle and keep GIC alive (which was critical because GIC was the largest customer for a number of Mariano-controlled companies). Essential to this scheme was keeping the truth about Patriot National hidden from the public and the SEC to inflate market demand for Patriot National shares in the IPO, the Secondary Offering, PIPE Transaction, and the failed Strategic Review.

573. Mariano's and Shields' scienter is also established due to the importance of GIC's revenue to Patriot National. While Patriot National sought to expand its customer base beyond GIC, it was never able to do so. As such, from the time of the IPO to the Patriot National Bankruptcy, GIC represented at least 60% of Patriot National's revenue.

574. The common thread uniting each of the above false and misleading statements is that they are attempts by Mariano and Shields to conceal GIC's operational losses, capital shortfalls, and regulatory issues. Mariano and Shields knew (or were recklessly unaware) of GIC's precarious financial and regulatory issues. Indeed, once GIC fell under state receivership, Patriot National was immediately forced to fire over 250 of its employees and pushed into bankruptcy.

575. Mariano's scienter is demonstrated by his conflicts of interests. At all times during the Class Period, Mariano was in dire need of additional capital for GIC and his lavish lifestyle. This is why Mariano caused Patriot National to, *inter alia*, (1) acquire his personal companies, (2) over pay for contracts with GIC, (3) announce the Secondary Offering, (4) enter into the PIPE Transaction, (5) approve the Repurchase Program, (6) engage in a self-interested and unfair Strategic Review, (7) fail to accept Ebix's offer for $475 million, (8) approve the Leveraged Recap, and (9) enter into the GIC Bailout. Nevertheless, Mariano signed the above-detailed public filings and statements while knowingly hiding the true purpose of those transactions.

576. Furthermore, due to Mariano's ownership of GIC and GIC's reliance upon Patriot National stock to serve as its capital cushion, Mariano knowingly issued false and misleading statements designed to artificially inflate Patriot National's stock. In doing so, Mariano sought to minimize the amount of capital he would be required to pump into GIC to cover its losses at year-end. Additionally, Mariano artificially inflated Patriot National's stock price because it allowed him to sell his shares at inflated prices in the attempted Secondary Offering, the PIPE transaction, and failed Strategic Review. Inflating Patriot National's stock price also assisted Mariano in his fight with the PIPE Investors.

577. Shields's scienter is also demonstrated here by his excessive compensation. Shields knowingly issued false and misleading statements designed to artificially inflate Patriot National's stock so that he could continue to earn excessive compensation as Patriot National's CFO far above the compensation earned by CFOs at insurance companies with market capitalizations far exceeding Patriot National's market capitalization. The table below shows Shields's 2015 compensation at Patriot National (the only reported year) as compared to the 2015 compensation of CFO's at other insurance companies:

| | **Company Name** | **Market Cap (billions)** | **2015 CFO Compensation** |
|---|---|---|---|
| **1** | The Progressive Corporation | $32.34 | $ 5,122,462 |
| **2** | Marsh & McLennan Companies, Inc. | $41.45 | $ 4,334,683 |
| **3** | Patriot National, Inc. | $0.4 | $ 3,613,768 |
| **4** | Arthur J. Gallagher & Co. | $11.47 | $ 3,209,490 |
| **5** | Employers Holdings, Inc. | $1.40 | $ 1,671,116 |
| **6** | Amerisafe, Inc. | $1.17 | $ 1,131,833 |
| **7** | Brown & Brown, Inc. | $7.28 | $ 1,121,097 |
| **8** | Crawford & Company | $0.49 | $ 625,505 |
| **9** | Kinsale Capital Group, Inc. | $0.92 | $ 461,821 |

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, Smith, and Corey**

578. Plaintiffs repeat and reallege the allegations above.

579. As alleged herein, Defendants Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, Smith, and Corey acted as controlling persons of Patriot National within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company and disseminated to the investing public, Defendants Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, Smith, and Corey had the power to influence and control, and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.

580. Defendants Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, Smith, and Corey were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

581. Defendants Mariano, Shields, and Pesch had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

582. As set forth above, Patriot National violated Section 10(b), and Rule 10b-5 promulgated thereunder, by acts and omissions as alleged in this Complaint.

583. By virtue of their positions as controlling persons, Defendants Mariano, Shields, Del Pizzo, Shanfelter, Pesch, Walsh, Smith, and Corey are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities.

584. This action was filed within two years of discovery of the fraud and within five years of each Plaintiffs' purchases of securities giving rise to the cause of action.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d. Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 18, 2018

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Brian P. Murray*

Brian P. Murray
Bryan Faubus
230 Park Ave, Suite 530
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
Email: bmurray@glancylaw.com
bfaubus@glancylaw.com

-and-

Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**BERGER MONTAGUE PC**
Lawrence Deutsch
Jacob M. Polakoff
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: ldeutsch@bm.net
jpolakoff@bm.net

*Co-Lead Counsel for Plaintiffs*

**THE GRANT LAW FIRM, PLLC**
Lynda J. Grant
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: (212) 292-4441
Facsimile: (212) 292-4442
Email: lgrant@grantfirm.com

**SAFIRSTEIN METCALF LLP**
Peter Safirstein
Elizabeth Metcalf
The Empire State Building
350 Fifth Avenue, Suite 5960
New York, NY 10118
Telephone: (212) 201-2845
Email: psafirstein@safirsteinmetcalf.com
emetcalf@safirsteinmetcalf.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (917) 697-8209
Email: peretz@bgandg.com

*Additional Counsel*

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On October 18, 2018, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 18, 2018.

*s/ Brian P. Murray*
Brian P. Murray

# Mailing Information for a Case 1:17-cv-01866-ER Gingello v. Patriot National, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **McIntire Aric**
  ek@zlk.com
- **Bradley Joseph Bondi**
  bbondi@cahill.com,managingattorney@cahill.com,MA@cahill.com
- **Kathryn Anne Coleman**
  kcoleman@hugheshubbard.com,katie-coleman-0482@ecf.pacerpro.com,managingattorney@hugheshubbard.com,managing-attorney-4212@ecf.pacerpro.com
- **Lawrence Deutsch**
  ldeutsch@bm.net,ecf@bm.net,ahickman@bm.net,gmacmillan@bm.net
- **Christopher Charles Gartman**
  gartman@hugheshubbard.com,christopher-gartman-1408@ecf.pacerpro.com,managing-attorney-4212@ecf.pacerpro.com
- **Jason Michael Hall**
  jhall@cahill.com,mmcloughlin@cahill.com,sramesh@cahill.com,managingattorney@cahill.com,MA@cahill.com
- **Todd Harris Henderson**
  henderson@bespc.com
- **Robert Allen Horowitz**
  horowitzr@gtlaw.com,schaefferc@gtlaw.com,gtcourtalert@gtlaw.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Eduard Korsinsky**
  ek@zlk.com
- **Peter James Linken**
  plinken@cahill.com,MA@cahill.com
- **Alexander Victor Masotti**
  amasotti@conradscherer.com,ekreiling@conradscherer.com,emorejon-daher@conradscherer.com,bwilliamson@conradscherer.com
- **Brian Philip Murray**
  bmurray@glancylaw.com,brian-murray-4237@ecf.pacerpro.com
- **Jacob M. Polakoff**
  jpolakoff@bm.net
- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com,info@glancylaw.com,lesley-portnoy-3007@ecf.pacerpro.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)